ORIGINAL

FILED
MAY 3 1 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CONTINENTAL AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 06-432 C |

## COMPLAINT

This action is brought under the Tucker Act, 28 U.S.C. § 1491(a)(1), by Plaintiff Continental Airlines, Inc. ("Continental") against Defendant the United States of America (the "Government"), for the recovery of sums illegally exacted by the Government under the purported auspices of statutory and regulatory authority requiring airlines to collect Immigration User Fees and Animal and Plant Health Inspection Service User Fees from international passengers. These amounts were illegally exacted under the Government's mistaken assertion that the statutes and regulations in question also grant the Government the authority to force carriers themselves to pay any user fees that are not collected from passengers. This case presents the same issues that have previously been decided in favor of American Airlines by this Court in *American Airlines, Inc. v. United States*, 68 Fed. Cl. 723 (2005).

## Jurisdiction

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

**Parties**

2. Plaintiff Continental is a corporation formed under the laws of Delaware and having its principal place of business in Houston, Texas.

3. Defendant is the United States of America, acting through the Department of Justice, Immigration and Naturalization Service ("INS") during the years 2001-2002 and through the Department of Homeland Security, Immigration Office of Financial Management and Customs and Border Protection since the inclusion of the INS within the Department of Homeland Security in 2002 until the present with respect to the Immigration User Fee; and through the United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS") with respect to the APHIS User Fee.

**Immigration User Fee Scheme**

4. The Government is responsible for immigration services within the United States. Such immigration services include inspection of arriving commercial airline passengers and detention, transportation, hospitalization and all other expenses of detained aliens.

5. To fund the expenses relating to such immigration services, Congress passed the 1986 Immigration User Fee Statute, codified at 8 U.S.C. § 1356 ("the Immigration User Fee Statute"). By enacting the Immigration User Fee Statute, Congress transferred the responsibility for all immigration service costs to the Government through the creation of the Immigration User Fee Account under the Government's exclusive control.

6. The Immigration User Fee Statute established the Immigration User Fee as a means to fund the Government's Immigration User Fee Account by assessing a fee on each passenger that is seeking transportation by a commercial aircraft into the United States.

7. The Immigration User Fee Statute places sole monetary responsibility on the passenger and requires entities issuing tickets to individuals for such transportation to collect the Immigration User Fee from that individual at the point-of-sale of such ticket.

8. If a ticket for transportation is issued in a foreign country and/or the Immigration User Fee has not been collected by a travel agent or the ticketing carrier at the point-of-sale, the Immigration User Fee Statute provides for collection of the Immigration User Fee by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States.

9. The Immigration User Fee Statute, and its implementing regulations, require Immigration User Fee collectors (either ticket issuers or carriers) to remit to the Government the balances of collected Immigration User Fees on a quarterly basis. Remitted Immigration User Fees are then deposited by the Government into the Immigration User Fee Account.

10. The amount of the Immigration User Fee is set by the Government. It is currently $7 per passenger, and has been since 2002. For all other times relevant to this case, the fee was $6 per passenger.

**APHIS User Fee Scheme**

11. The Government is also responsible for agricultural quarantine and inspection ("AQI") services provided in connection with the arrival of international air passengers into the customs territory of the United States or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States.

12. To fund the expenses relating to such AQI services, Congress passed Section 2509 of the Food Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus

Budget Reconciliation Act of 1990, codified at 21 U.S.C. § 136a (the "APHIS User Fee Statute"). By enacting the APHIS User Fee Statute, Congress placed the responsibility for all AQI service costs on the Government through the creation of the Agriculture Quarantine Inspection User Fee Account, which until September 30, 2002, contained all APHIS User Fees collected, including late payment penalties and interest charges. The Government has remained in exclusive control of the Agriculture Quarantine Inspection User Fee Account throughout its existence. After September 30, 2002, the APHIS User Fee Statute provides that all APHIS User Fees collected shall be credited to the Department of Agriculture accounts that incur the costs associated with the provision of AQI services, over which the Government also maintains exclusive control.

13. The APHIS User Fee Statute permits but does not require the Secretary of Agriculture to prescribe and collect fees sufficient to cover the cost of providing AQI services in connection with the arrival of international air passengers into the customs territory of the United States from a foreign location by a commercial aircraft or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States. The APHIS User Fee Statute specifically places limits on the assessment of APHIS User Fees by providing that the amount of APHIS User Fees assessed shall be commensurate with the costs of AQI services with respect to the class of persons or entities paying the fees.

14. On or about April 12, 1991, the Secretary of Agriculture promulgated regulations, currently codified at 7 C.F.R. § 354.3(f) (the "APHIS User Fee Regulations"), requiring that any person who issues tickets on or after May 13, 1991, is responsible for collecting an APHIS User

Fee from all persons (subject to certain exceptions enumerated in the regulations) transported into the customs territory of the United States at the point-of-sale of such ticket.

15. If a ticket for transportation is issued in a foreign country and/or the APHIS User Fee has not been collected by a travel agent or the ticketing carrier at the point-of-sale, the regulations provide for collection of the APHIS User Fee by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States. 7 C.F.R. § 354.3(f)(4)(B).

16. The APHIS User Fee Regulations require APHIS User Fees collectors (either ticket issuers or carriers) to remit to the Government the balances of collected APHIS User Fees on a quarterly basis.

17. The amount of the APHIS User Fee is set by the Government. Currently, and since October 1, 2005, the fee is $5 per passenger. From January 1, 2005, until September 30, 2005, it was $4.95. From October 1, 2001, until December 31, 2004, it was $3.10 per passenger. From January 1, 1993, until September 30, 2001, the fee ranged from $1.45 to $3.10 per passenger.

**Fee Collection Difficulties**

18. Despite the collection requirements imposed on Continental, collections of the Immigration User Fees and the APHIS User Fees at the point-of-sale in certain foreign countries is or was problematic under local laws of certain countries, particularly in Latin America, or is otherwise difficult to enforce, *e.g.*, with travel agencies who issue tickets and may unilaterally waive collection.

19. The enplaning carrier's ability to collect the Immigration User Fee and the APHIS User Fee in these instances is further restricted by United States law. For instance, neither of the statutes at issue, nor their respective regulations, require or authorize a carrier to deny boarding to a passenger who does not pay his or her user fees. Nor is there any other authority for a carrier, or even a federal official, to deny boarding to a passenger for that reason.

**Continental's User Fee Collection**

20. Continental is the sixth largest commercial air carrier in the world and, with its regional partners operating as Continental Express and Continental Connection, offers more than 3,200 daily flights serving 151 U.S. and 137 international locations, including to and from Canada, Latin America, Europe, and Asia. In addition, Continental provides ticketing services to individuals for travel on Continental flights by various distribution channels. As such, Continental is responsible for collecting Immigration User Fees and APHIS User Fees from international passengers pursuant to the two statutory schemes, as well as a myriad of additional fees and assessments imposed by the United States, other governments, and airports.

21. Continental has taken its commitment toward collection of such user fees seriously. Within the domestic and foreign legal framework discussed above, Continental has instituted policies and procedures to achieve the highest possible user fee collection rate.

22. Notwithstanding the statutory and practical difficulties carriers experience at home and abroad, the Government's own auditors have found that Continental has achieved a high degree of success with collection rates of user fees for the periods at issue ranging from more than 97 percent to more than 99 percent.

23. Despite Continental's near-perfect collection rate, the Government asserts that it can hold Continental liable for any uncollected Immigration User Fees and APHIS User Fees. However, the Government has no statutory or regulatory authority to require remittance by Continental of any such uncollected fees.

**The Government's Audits**

24. The Government has audited Continental's compliance in connection with the Immigration User Fee and the APHIS User Fee for audit periods beginning before 1999 on approximately an annual or biannual basis ("User Fee Audits").

25. In connection with the User Fee Audits, the Government tested for collection, recording, reporting, and remittance compliance.

26. For each of the User Fee Audits, the Government tested Continental's user fee collection compliance by reviewing Continental-issued tickets (*i.e.*, tickets sold on Continental ticket stock, which means it carries Continental's 005 code) from a sampling of Continental flights during the relevant period. The Government then checked each ticket for evidence that the user fees had been collected. Any ticket lacking such evidence (and for which Continental could not produce any other evidence that the fees had been collected or that the passenger was exempt from the fees) was deemed an "error" by the Government auditors.

27. For each User Fee Audit, the Government auditors then calculated an "error rate" by dividing the number of "errors" by the total number of qualifying tickets in the sample.

28. For each User Fee Audit, the Government auditors then used the "error rate" to assess a liability against Continental.

29. The auditors applied the "error rate" to the total dollar amount of applicable

Immigration User Fees or APHIS User Fees that Continental had remitted during the period covered by the audit.

30. According to the Government auditors, these assessments represent uncollected user fees.

31. Continental has paid each of the assessments from each of these User Fee Audits.

**<u>The Immigration User Fee Audit For April 1, 1999 through December 31, 2000</u>**

32. On or about March 27-30, 2001, the Government audited Continental in connection with Immigration User Fee remittances for the period April 1, 1999 through December 31, 2000.

33. The Government auditors found that Continental remitted $55,542,318 in Immigration User Fees during the audit period.

34. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 8 "errors" out of 1,056 qualifying sampled tickets, which translated to an "error rate" of 0.76 percent.

35. The auditors applied this "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $420,784.

36. In response to this assessment, on or about October 18, 2001, Continental paid $420,784 to the Government.

**<u>The Immigration User Fee Audit For January 1, 2001 through December 31, 2001</u>**

37. On or about August 5-8, 2002, the Government audited Continental in connection

with Immigration User Fee remittances for the period January 1, 2001 through December 31, 2001.

38. The Government auditors found that Continental remitted $32,756,501 in Immigration User Fees during the audit period.

39. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 11 "errors" out of 879 qualifying sampled tickets, which translated to an "error rate" of 1.25 percent.

40. The auditors applied this "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $414,639.

41. In response to this assessment, on or about December 2, 2002, Continental paid $414,639 to the Government.

**<u>The Immigration User Fee Audit For January 1, 2002 through December 31, 2003</u>**

42. On or about May 10-14, 2004, the Government audited Continental in connection with Immigration User Fee remittances for the period January 1, 2002 through December 31, 2003.

43. The Government auditors found that Continental remitted $74,086,268 in Immigration User Fees during the audit period.

44. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 4 "errors" out of 1,270 qualifying sampled tickets, which translated to an "error rate" of 0.31

percent.

45. The auditors applied this "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $230,547.

46. In response to this assessment, on or about July 21, 2004, Continental paid $230,547 to the Government.

**The APHIS User Fee Audit For July 1999 through December 2001**

47. On or about January 28-February 1, 2002, the Government audited Continental in connection with APHIS User Fee remittances for the period July 1, 1999 through December 31, 2001.

48. The Government auditors found that Continental remitted $30,704,044.94 in APHIS User Fees during the audit period.

49. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 24.21 "errors" out of 862 qualifying sampled tickets, which translated to an "error rate" of 2.81 percent.

50. The auditors applied this "error rate" to the amount of APHIS User Fees remitted by Continental during the audit period and assessed an additional APHIS User Fee liability of $863,979.89.

51. In response to this assessment, on or about July 30, 2002, Continental paid $863,979.89 to the Government.

52. In addition, the Government assessed interest charges of $48,687.60 on the

amount described in Paragraph 51. Continental paid that $48,687.60 to the Government on or about November 15, 2002.

**The APHIS User Fee Audit For January 2002 through December 2003**

53. On or about May 10-14, 2004, the Government audited Continental in connection with APHIS User Fee remittances for the period January 1, 2002 through December 31, 2003.

54. The Government auditors found that Continental remitted $27,952,069 in APHIS User Fees during the audit period.

55. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 5 "errors" out of 1,270 qualifying sampled tickets, which translated to an "error rate" of 0.39 percent.

56. The auditors applied this "error rate" to the amount of APHIS User Fees remitted by Continental during the audit period and assessed an additional APHIS User Fee liability of $109,535.

57. In response to this assessment, on or about July 21, 2004, Continental paid $109,535 to the Government.

58. In addition, the Government assessed interest and penalty charges of $15,476.68 on the amount described in Paragraph 57. Continental paid that $15,476.68 to the Government on or about January 5, 2005.

**COUNT I**
**(Illegal Exaction of Immigration User Fees)**

59. Plaintiff incorporates paragraphs 1 through 46 above.

60. The Government has misinterpreted and misapplied its statutory and regulatory authority relating to the collection and remittance of Immigration User Fees by compelling Continental to pay user fees that should have been paid by Continental's passengers. The Government has imposed such financial liability on Continental without either statutory or regulatory authority to do so.

61. There is neither statutory nor regulatory authority that imposes secondary liability on Continental for uncollected Immigration User Fees nor that requires Continental to guarantee the collection of such fees. Furthermore, there is neither statutory nor regulatory authority for the Government to require the remittance of uncollected Immigration User Fees by Continental.

62. The aforementioned amounts that the Government assessed against Continental in 2001, 2002, and 2004 for uncollected Immigration User Fees were illegally exacted.

**COUNT II**
**(Illegal Exaction of APHIS User Fees)**

63. Plaintiff incorporates paragraphs 1 through 31 and 47 through 58 above.

64. The Government has misinterpreted and misapplied its statutory and regulatory authority relating to the collection and remittance of APHIS User Fees by compelling Continental to pay user fees that should have been paid by Continental's passengers. The Government has imposed such financial liability on Continental without either statutory or regulatory authority to do so.

65. There is neither statutory nor regulatory authority that imposes secondary liability on Continental for uncollected APHIS User Fees nor that requires Continental to guarantee the collection of such fees. Furthermore, there is neither statutory nor regulatory authority for the Government to require the remittance of uncollected APHIS User Fees by Continental.

66. The aforementioned amounts that the Government assessed against Continental in 2002 and 2004 for uncollected APHIS User Fees were illegally exacted.

**PRAYER FOR RELIEF**

WHEREFORE, Continental prays for judgment in its favor against the United States as follows:

(a) for judgment awarding Plaintiff damages caused by the Government's illegal exactions of uncollected Immigration User Fees, including, but not limited to, reimbursement of all the funds illegally exacted by the Government;

(b) for judgment awarding Plaintiff damages caused by the Government's illegal exactions of uncollected APHIS User Fees, including, but not limited to, reimbursement of all the funds illegally exacted by the Government;

(c) for judgment awarding Plaintiff any and all other damages to which it is entitled by law;

(d) for judgment awarding Plaintiff costs and interest as allowed by law; and

(e) for judgment awarding such other and further relief as this Court deems just.

Respectfully submitted,

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W.
Washington, D.C. 20005
(202) 626-6087
(202) 626-5801 (Facsimile)

Counsel for Plaintiff

*Of Counsel*:
Robert K. Huffman
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W.
Washington, D.C. 20005
(202) 626-5824
(202) 626-5801 (Facsimile)

Dated: May 31, 2006