# Rules and Regulations

Federal Register
Vol. 57, No. 6
Thursday, January 9, 1992

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.
The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

### 7 CFR Part 354

### 9 CFR Part 130

[Docket No. 91-135]

RIN 0579-AA43

### User Fees—Agricultural Quarantine and Inspection Services, Phytosanitary Certificates, Animal Quarantine Services, Veterinary Diagnostics, Export Health Certificates

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** We are amending 7 CFR part 354 and 9 CFR chapter I to establish user fees for certification, inspection and testing services we provide. These user fees are authorized by sections 2509 (b) and (c) of the Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 (21 U.S.C. 136a) and by the Food, Agriculture, Conservation, and Trade Act Amendments of 1991 (Pub. L. 102-237).

The effect of these regulations will be to require certain persons to pay fees for services they receive.

**EFFECTIVE DATE:** February 9, 1992.

**FOR FURTHER INFORMATION CONTACT:** For information concerning agricultural quarantine and inspection (AQI), plant inspections, and additional inspections, contact Charles A. Havens, Chief Operations Officer, Port Operations, PPQ, APHIS, USDA, room 635, Federal Building, 6505 Belcrest Road, Hyattsville, MD 20782, 301-436-8295.

For information concerning animal imports and exports, contact Louise R. Lothery, Director, Resource Management Support Staff, VS, APHIS, USDA, room 740, Federal Building, 6505 Belcrest Road, Hyattsville, MD 20782, 301-436-7517.

For information concerning veterinary diagnostics, contact Dr. Robert M. Nervig, Director, National Veterinary Services Laboratory, S&T, APHIS, USDA, 1800 Dayton Road, P.O. Box 844, Ames, Iowa 50010, 515-239-8266.

**SUPPLEMENTARY INFORMATION:**

## Background

*User Fees Authorized Under the Farm Bill*

The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990 (Budget Reconciliation Act) and the Food, Agriculture, Conservation, and Trade Act Amendments of 1991 (technical amendments), referred to below as the Farm Bill, authorizes the Secretary of Agriculture, within certain limits, to prescribe and collect fees to cover the cost of providing certain agricultural quarantine and inspection services. The services are "agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States,[1] or the preclearance or preinspection at a site outside the customs territory of the United States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car" (section 2509 of the Farm Bill). We refer to these services as AQI services.

The Farm Bill, as amended by the technical amendments, limits the amount of money which APHIS can collect for services provided in certain categories. One category is user fees collected for "airport inspection services," which are limited to $69 million in fiscal year 1992 and $75 million in fiscal 1993 "from international airline passengers and commercial aircraft operators." (See section 1015 of the technical amendments, amending section 2509(a)(1)(B) of the Farm Bill). In addition, the Farm Bill, as amended, states that "Fees, including fees from international airline passengers and commercial aircraft operators, may only be collected to the extent that the Secretary reasonably estimates that the amount of the fees are commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees. Costs of such services with respect to passengers as a class include the cost of related inspections of the aircraft." (See section 2509(a)(1)(D) of the Farm Bill, as amended.)

The Farm Bill establishes a fund in the Treasury of the United States, known as the "Agricultural Quarantine Inspection User Fee Account" (the Account), for the Secretary of Agriculture to use for quarantine or inspection services. All fees collected for agricultural quarantine and inspection services are to be deposited in the Account. Fees collected within a calendar quarter are to be deposited no later than 31 days after the close of that quarter. The Farm Bill further requires the Secretary of the Treasury to reimburse, from the Account, any appropriation accounts that incur costs associated with agricultural quarantine services for which the Secretary of Agriculture is authorized to collect user fees and "all other activities carried out by the Secretary at ports in the customs territory of the United States and at preclearance or preinspection sites outside the customs territory of the United States in connection with the enforcement of the animal quarantine laws." (See section 2509(a)(3)(B)(ii) of the Farm Bill, as amended).

The Farm Bill also authorizes the Secretary of Agriculture "to prescribe and collect fees to recover the costs of providing for the inspection of plants and plant products offered for export of transiting the United States and certifying to shippers and interested parties as to the freedom of such plants and plant products from plant pests according to the phytosanitary requirements of the foreign countries to which such plants and plant products may be exported, or to the freedom from exposure to plant pests while in transit through the United States * * *." (Section 2509(b) of the Farm Bill). This section further provides that "[t]he Secretary of Agriculture shall, pursuant to regulations as prescribed by the Secretary of Agriculture, suspend performance of services to persons who have failed to pay such fees, late payment penalty and accrued interest."

In addition to the above authority, the Farm Bill authorizes the Secretary of

[1] The Farm Bill defines "customs territory of the United States" as "[t]he 50 States, the District of Columbia, and Puerto Rico." (section 2509(f)(2))



HeinOnline -- 57 Fed. Reg. 755 1992

Agriculture to "prescribe and collect fees to reimburse the Secretary for the cost of carrying out the provisions of the Federal Animal Quarantine Laws that relate to the importation, entry, and exportation of animals, articles, or means of conveyance" (section 2509(c)(1) of the Farm Bill).

Further, the Farm Bill authorizes the Secretary "to prescribe and collect fees to recover the costs of carrying out the provisions of [21 U.S.C. 114a, as amended], which relate to veterinary diagnostics" (section 2509(c)(2) of the Farm Bill). 21 U.S.C. 114a concerns control and eradication of livestock and poultry diseases. Section 2509(c) also provides procedures for the Secretary to follow in the case of nonpayment, late payment penalties, or accrued interest. The section states that "[t]he Secretary shall suspend performance of services to persons who have failed to pay fees, late payment penalty, or accrued interest * * *".

Section 2509(d) of the Farm Bill provides in addition that "[t]he Secretary may prescribe such regulations as the Secretary determines necessary to carry out the provisions of [section 2509]."

Finally, the Farm Bill authorizes the Secretary "in carrying out regulations prohibiting or restricting the entry of materials that may harbor pests, or diseases, * * * to enter into agreements with operators or owners of vessels or aircraft for the purpose of providing inspection services at points of entry in the United States in addition to the regular or on-call basis currently available in connection with such vessels or aircraft." The section states that such agreements shall "provide for the payment by the operator or owner of an amount determined by the Secretary to be necessary to defray the costs of providing additional service pursuant to such agreement" (section 2508 of the Farm Bill).

*Previously Published Regulations*

On February 27, we proposed to amend 7 CFR parts 318, 320, 330, 352 and 354 (56 FR 8148-8156, Docket No. 90-247), to establish user fees for services we provide in connection with airline passengers departing Hawaii and Puerto Rico for other parts of the United States, and in connection with the arrival at ports in the customs territory of the United States of commercial vessels, commercial trucks, commercial railroad cars, and passengers on commercial aircraft.[2]

We made a portion of these regulations final in a document published April 12, 1991 (56 FR 14837-14846, Docket No. 91-028). It covered user fees for commercial vessels, commercial trucks, commercial railroad cars, and passengers on commercial aircraft arriving in the United States from outside the country. We began charging user fees for these services May 13, 1991.

The second final rule was published April 23, 1991 (56 FR 18496-18502, Docket No. 91-054). It covered user fees for passengers on commercial airlines departing Hawaii and Puerto Rico for other parts of the United States. We originally scheduled these regulations to be effective August 1, 1991. However, in a subsequent document published August 1, 1991 (56 FR 36724, Docket No. 91-113), we postponed the effective date until October 1, 1991. Then, on September 30, 1991, we published a document, Docket No. 91-138 (56 FR 49389), postponing indefinitely the effective date of these rules.

*Proposed Rule*

On August 7, 1991, we published a document in the **Federal Register** (56 FR 37481-37499, Docket 91-021) in which we proposed to amend 7 CFR part 354 and 9 CFR chapter I to establish user fees for certification, inspection and testing services we provide. On August 21, 1991, and September 24, 1991, documents were published in the **Federal Register** (56 FR 41805 and 56 FR 48270) making various corrections.

The services for which we proposed to charge an APHIS user fee fall into five categories.

The first category of services is the inspection services we provide to commercial aircraft, both aircraft arriving at a port within the customs territory of the United States and aircraft departing Hawaii or Puerto Rico for other locations within the United States, and commercial vessels departing Hawaii or Puerto Rico for other locations within the United States.

The second category of services relates to the issuance of phytosanitary certificates for plants and plant products being exported from the United States. These certificates are issued in accordance with the regulations at 7 CFR 353.1. They certify agricultural products moving from one country to another as being "free from quarantine pests, and practically free from other injurious pests."

The third category includes services which relate to the export or import of animals or birds. In this category are: (1) Services provided in connection with animals or birds in quarantine facilities, including Animal Import Centers operated by APHIS and privately-operated facilities; (2) endorsing health certificates needed to export animals or birds; (3) inspecting export isolation facilities for animals or birds; (4) inspecting animals and birds in isolation facilities; (5) supervising rest periods for animals and birds prior to export; and (6) supervising loading and unloading of animals or birds from a means of conveyance.

The fourth category of services relates to veterinary diagnostics. Veterinary diagnostics is the work performed in a laboratory to determine if a disease-causing organism is present in body tissues or cells. The services in this category are: (1) Performing laboratory tests required to import or export animals or birds; (2) conducting diagnostic testing on tissue samples referred to APHIS by State animal health officials who want assistance in establishing or confirming a diagnosis (referred to in this document as reference assistance testing); (3) providing certain diagnostic reagents. Diagnostic reagents are substances used in diagnostic tests to detect disease antibodies by causing an identifiable reaction.

The fifth category of services includes inspection services provided, at the request of operators or owners of vessels or aircraft, in addition to regular or on-call services currently available at points of entry in the United States.

We solicited comments concerning our proposal for a 30-day period ending September 6, 1991. We received 176 comments by that date. They were from shipping interests, both international and domestic, Members of Congress, airlines, State governments, representatives of agricultural industries, importers, exporters, veterinarians, and producers.

This document, Docket No. 91-135, covers all of the APHIS user fees we proposed in our proposed rulemaking, except (1) the user fees proposed for inspecting commercial aircraft and commercial vessels departing Hawaii and Puerto Rico for other parts of the United States, (2) the user fees for veterinary diagnostic services and diagnostic reagents, and (3) the user fees for export health certificates for animal products and byproducts.

As mentioned above, we indefinitely postponed the effective date of user fees under the User Fee Statute (31 U.S.C. 9701) for agricultural quarantine and inspection (AQI) services provided in

[2] The authority for the proposed regulations concerning passengers on certain domestic airline flights from Hawaii and Puerto Rico was 31 U.S.C. 9701, not the Farm Bill.



HeinOnline -- 57 Fed. Reg. 756 1992

connection with the departure of passengers from Puerto Rico and Hawaii on certain domestic airline flights. Since then, Congress has passed the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies appropriations act for fiscal year 1992. This Act, among other things, prohibits APHIS from developing, establishing, or operating any user fee program for agricultural quarantine and inspection to prevent the movement of exotic pests and diseases from Hawaii and Puerto Rico as authorized by 31 U.S.C. 9701. Consequently, we plan to publish documents in the **Federal Register** to withdraw both the previous published regulations that would have established user fees for AQI services provided in connection with the departure of passengers from Puerto Rico and Hawaii on certain domestic airline flights, and that part of our recent proposed rulemaking concerning user fees for inspecting commercial aircraft and commercial vessels departing Hawaii and Puerto Rico for other parts of the United States. Our reasons for not adopting user fees for veterinary diagnostic services and diagnostic reagents or for export health certificates for animal products and byproducts, are explained elsewhere in this document.

In addition, technical amendments to the Farm Bill limit, among other things, the total amount of money we can collect in user fees from international airline passengers and commercial aircraft operators. The technical amendments provide that the cost of services with respect to passengers include the cost of related inspections of the aircraft. As explained below, based on these amendments, we have changed the fee we proposed for aircraft inspection services. We have also recalculated the costs to be funded by the passengers fee.

We have carefully considered all of the comments we received. All the comments that apply to the user fees made final in this document are discussed below by topic.

*General Comments*

Increased Costs to APHIS

Some commenters pointed out that collecting user fees will raise APHIS's own administrative costs. One commenter charged that no real savings would be realized.

We agree that APHIS's administrative costs will rise when we start collecting user fees. However, we have attempted to minimize the increase, which is already factored into the proposed fees.

With regard to savings realized by charging user fees, the intent of the Farm Bill was not to save money, but to shift the burden of paying for services from the general public to the recipient of the services. We believe our APHIS user fees accomplish this goal.

Public v. Private Benefit

Numerous commenters stated that we do not have the authority to charge user fees for any service which is not clearly a "private benefit." Other comments stated that we should not charge a user fee for any service which benefits the public. Many of these comments referred to the User Fee Statute (31 U.S.C. 9701), which provides that agencies "may prescribe regulations establishing the charge for a service or thing of value provided by the agency."

We are making no changes in the proposed regulations based on these comments. The user fees we are adopting in this document are authorized by the Farm Bill, not by the User Fee Statute.

Our authority under the Farm Bill, which is explained more extensively above, does not require us to consider the issue of private or public benefits at all. The Farm Bill states simply that we may charge a user fee for certain listed services. Whether those services provide public or private benefits, or a combination of the two, is irrelevant under the Farm Bill.

Length of Comment Period

Numerous comments expressed dissatisfaction with the length of the comment period. Many of these comments requested that the comment period, which was 30 days, be extended. As we explained in the proposal, the Animal and Plant Health Inspection Service (APHIS) must institute user fees as soon as possible. Time considerations do not allow for a longer comment period. We believe the comment period provided was reasonable under the circumstances. Moreover, the fact that we received 176 comments on the proposal, many of which were extensive, leads us to believe that the comment period was adequate.

Use of Fees—Deficit Reduction versus Improved APHIS Service

Many comments stated that APHIS user fees should be used to augment the APHIS budget and improve services. Many comments also stated that APHIS user fees should not be used for general Federal budget deficit reduction.

All user fees collected under the regulations adopted in this final rule will be collected under authority of the Farm Bill. This money will be available to APHIS to apply directly to APHIS programs, as explained above.

The Farm Bill does not require Congress to reduce our appropriation. Whether to increase or decrease our funding is a decision made by Congress as part of the budget process. For fiscal year 1992, the APHIS appropriation has been reduced. We anticipate that the loss of direct funding will be made up by APHIS user fees we collect.

Cost Cutting versus User Fees

Several commenters suggested that APHIS, and other agencies within the Federal government, reduce costs and thereby avoid charging user fees. We have not made any changes based on these comments. Implementing user fees is not a substitute for cost-cutting. We are constantly trying to reduce costs and minimize necessary cost increases. Also, because APHIS user fees reflect the actual cost of providing a service, up to any limit which may have been imposed by Congress, if we can reduce the cost of a service, we can reduce the user fee for that service.

Future Review and Revision of User Fees

Many commenters stated that our proposed fees were either too high or too low, and should be adjusted. Others stated that we will collect money in excess of our costs. We are making no changes based on these comments.

We have determined, using the best data available, the cost of each of the services for which we will charge an APHIS user fee. In addition, the services we provide and the cost of providing those services will change over time. Therefore, as stated in our proposal, we intend to monitor our fees throughout the year and review them at least annually. We will propose to adjust the fees up or down as the review warrants, and we will publish, for public comment, any proposed fee changes in the **Federal Register**.

In addition, as explained elsewhere in this document, through technical amendments to the Farm Bill, the amount of money we can collect in user fees for certain services has been limited. Regardless of the cost of providing these services, we cannot collect more in user fees than allowed by the Farm Bill.

Increased Cost of Doing Business

Some comments stated that the fees would increase their cost of doing business. We realize that payment of the user fees will increase the up-front cost of doing business. However, as stated in our proposal, having the user, or immediate recipient, of the service pay



HeinOnline -- 57 Fed. Reg. 757 1992

for it directly will allow a reduction in general tax receipts.

General Economic Situation and Other Factors To Be Considered

Many comments objected in general terms to the proposed APHIS user fees. Many maintained the proposed APHIS user fees would be detrimental to specific industries, such as international trade in horses, lumber exports, tobacco, wool exports, semen and embryo transfer, and tourism. Some comments proposed that we exempt certain industries or classes of users from the proposed user fees. Among those mentioned were the tobacco industry, germplasm industry, "companion animal (pet)" owners, and food animal producers. Commenters maintained that our user fees will discourage "young" industries, inhibit exports, and harm small businesses. Commenters also argued that we should consider the current economic situation, both in the United States and abroad, and the financial health of affected industries, before adopting APHIS user fees. One commenter suggested that instead of user fees, we should implement export credits to encourage exports.

We are not exempting any industries or businesses from APHIS user fees based on these comments. Because of budget constraints, we do not have the option to charge user fees which recover less than the full cost of providing a service. If we did so, we would not collect enough money to support the service. However, we have attempted to minimize the cost of our services, thereby keeping APHIS user fees at the lowest possible level. In addition, we are adjusting our proposed user fees for phytosanitary certificates, which will minimize the impact on shippers of "low value" commercial shipments.

Rounding of Fees

Several comments objected to our proposal to round up our fees. We are not making any changes in the regulations based on these comments. As explained in our proposal, we "proposed to round these fees up, rather than down, in order to ensure that we collect enough revenue to cover the costs of providing these services. If we were to round down, many fees would be lower than the cost of the service. As we would not have a reserve fund (for non-AQI services), there would be no funds for us to draw on to make up the deficiency (see 56 FR 37491)." We cannot recover any shortfall by charging a higher fee for another service category.

Also, as we stated in the proposal, we intend to review, at least annually, the user fees we are adopting in this document. We will publish any necessary adjustments in the **Federal Register.**

Request for Delay of Effective Date

Many other comments stated that the effective date of the regulations should be delayed. Most of these comments suggested no particular length of time, but one requested we delay implementation a full year. One other letter suggested that the proposed APHIS user fees should be phased in gradually over time.

We are making no changes based on these comments. We believe publication of our proposed regulations has given affected persons adequate time to prepare. Also, as explained in this docket, our appropriation for fiscal year 1992 has been reduced. We must begin collecting APHIS user fees to continue providing services at or near the same level as provided previously.

Proliferating User Fees

Several comments complained that federal user fees are proliferating. Unfortunately, APHIS has not control over other user fees which may be authorized or mandated by Congress.

Calculation of Fees

According to many comments, certain user fees as proposed are too high, too low, or inconsistent with other proposed user fees. Comments asserted that we did not include sufficient data in our proposed rules to justify our proposed user fees. Comments compared our proposed user fees with fees charged by other facilities for similar services. Comments also questioned whether we should include certain cost factors, for example, agency-level overhead charges, in calculating fees. Comments also stated that we would recover more money from our proposed fees than it costs to provide APHIS services.

We did not make any changes in the regulations based on these comments. The proposed APHIS user fees were based, in part, on estimates of the traffic volume in various service categories: Aircraft arrival, air cargo inspection, vessel inspection, maritime cargo clearance, and others. Costs were assigned directly to a category when the cost directly related to providing the service. Where a cost benefits all categories of service, it was pro-rated among the categories based on historic direct labor staff hours.

The total cost in each service category was divided by activity volume to arrive at a final fee. We estimated activity volume for 1992 by obtaining data for prior years from the Department of Transportation, Customs, and our own records. We adjusted these figures for anticipated changes in volume, based on past changes and on current world conditions which could affect volume, such as wars and economic conditions. This calculation provided the "raw fee."

We rounded the "raw fees" up to the nearest quarter. We rounded them off to simplify collection and accounting. We rounded our fees up, rather than down, because if we were to round down, even if only by pennies, the fees would not fully recover our costs. If there is a shortfall for a service category, we cannot recover it by charging a higher fee for another service category.

The technical amendments to the Farm Bill provide that the cost of services with respect to passengers include the cost of related inspections of the aircraft. As explained below, no changes in the amount of the passenger user fee are necessary to effectuate this change.

The technical amendments to the Farm Bill also limit the amount of money APHIS can collect in user fees for certain categories of services. For these services, we have adjusted our user fees, if necessary, to a level that would generate no more money than allowed. We will monitor receipts monthly, and if it appears the fees will exceed the applicable revenue limitations, we will revise our fees.

Each service category was considered separately. Each category must, through user fee receipts, return enough money to APHIS, up to the maximum allowed for certain categories under the Farm Bill, to cover the cost of providing AQI services to that particular category. Therefore, when computing fees for one category, we cannot take into account the amount of the fees calculated for other service categories.

We would like to point out that as a government agency, our cost categories for providing any given service may be similar, but not the same as, the costs for non-government entities to provide the same service. For example, both APHIS and any non-governmental entity have personnel costs. But APHIS, unlike some non-governmental entities, has no advertising cost. However, even where cost factors are the same, the actual dollar amounts may be very different.

We put as much of our supporting data in the proposed rulemaking as possible. However, it was not possible to publish all the material. Therefore, as stated in the proposed rulemaking, we made it available for inspection at our headquarters in Hyattsville, Maryland. Only one individual came to our office to inspect the supporting data.



HeinOnline -- 57 Fed. Reg. 758 1992

Relationship of User Fee to Service Provided, Risk Posed, or Value of Item Receiving Service

There were several comments suggesting different approaches to fee setting. Comments suggested that the higher the disease or pest risk, the higher the applicable user fee. Comments suggested user fees be tied to the duration of inspection or the amount of service provided. Comments also suggested that user fees be tied to the value of the item receiving service. For example, one commenter stated that someone exporting a $40 box of plants should not have to pay the same fee for a phytosanitary certificate as the shipper of a $20,000 load of lumber.

We have carefully considered these comments.

We realize that the degree of pest or disease risk posed by individual means of conveyance or cargo varies. However, the number of variables which determine the actual risk, and, therefore, determine the amount of service or length of time required to provide service, is virtually infinite. A system which attempted to account for the variables would be unwieldy and expensive to administer and would require that the additional expenses would have to be included in the fee calculated. We are making no changes in our user fees on this basis.

The service we provide is also not directly related to the value of the items being inspected, or receiving some service. For example, using the commenter's example, the box of plants and the lumber require similar APHIS inspection. The dollar value of the items being inspected is not directly related to the time or effort required of APHIS personnel to issue a phytosanitary certificate. However, there is an indirect relationship. As we stated in our proposed regulations (55 FR 37484), it takes APHIS personnel less time and effort to issue a certificate for a noncommercial shipment because shippers usually bring the items to the APHIS office to be inspected. This is also true of low value commercial shipments. Therefore, in order to reflect this difference in cost to APHIS, we are amending the regulations to charge the same user fee for phytosanitary certificates for low value commercial shipments as for phytosanitary certificates for noncommercial shipments. We are specifying in the regulations that "low value" means less than $1,250.

We have chosen this figure to distinguish low value shipments from others, because it is a standard recognized by the exporting and importing industry. Most shippers, brokers, and others in the export business are also importers, or are familiar with this standard. This includes exporters who obtain phytosanitary certificates from APHIS. All importers must comply with the United States Customs Service (Customs) regulations. Under those regulations, all imported goods must "enter" the United States. This is true regardless of the type, quantity, or value of the goods. However, customs regulations distinguish between minor, low value importations, and others. Low value importations are allowed to make "informal entry" into the United States. This requires less paperwork and documentation, and processing is faster. Customs regulations state that to qualify for "informal entry" importations must, among other things, be valued at less than $1,250. (See 19 CFR 143.21)

In connection with the amendment, we are specifying in the regulation that commercial shippers can take advantage of this lower user fee only if: (1) The shipper requests the lower fee; (2) the items to be inspected are the same ones identified on the phytosanitary certificate; and (3) the shipment is accompanied by an invoice stating that the shipment is worth less than $1,250.

Discounts and Fee Caps

Several comments mentioned discounts. Several requested discounts for small businesses. One asked that we give discounts to large businesses.

Capping APHIS user fees was also suggested by several comments. As pointed out by a commenter, we have fee caps already in place for loaded commercial railroad cars (if prepaid for an entire year), commercial trucks (if prepaid for an entire year), and commercial vessels arriving in the United States.

In addition, as explained above, since our proposed regulations were published on August 7, 1991, Congress enacted technical amendments to the Farm Bill. These amendments, among other things, limit the amount of revenue APHIS may collect in user fees for airport inspection services.

We have carefully considered both the comments we received and the amendments to the Farm Bill. We have determined that only an adjustment to the aircraft inspection user fee is necessary to stay within the revenue limitations imposed by the amended Farm Bill.

Generally speaking, inspections or other services for a small entity cost the same as an inspection or other services for a large entity. The service provided is not related to the size of the business receiving it. Therefore we cannot justify a discount based on size of the business.

The commenters are correct that we already have fee caps in place for certain means of conveyance arriving in this country. In these situations the United States Customs Service or some other entity is collecting APHIS's user fees for us. As explained in the user fee document we published February 27, 1991 (Docket number 90-247, 56 FR 8140-8156), we adopted these fee caps to make our user fee collection regulations the same as United States Customs Service's regulations which applied to the same users and which were already in place. To do differently would have created needless confusion and would have raised the cost of our services.

However, this reasoning does not apply to any of the user fees we proposed adopting in our user fee document of August 7, 1991, as the United States Customs Service or other entity will not be collecting for us the APHIS user fees proposed in that document. Also, our proposed user fees were calculated based on the actual number of times we anticipate a service will be provided during one year. Our calculations did not take into account fee caps. As explained above, we must recover enough money from APHIS user fees to recover the full cost of providing our services. Therefore, we are making no changes based on these comments.

However, we are amending our proposed user fees to shift passenger-related inspection costs from the aircraft user fee to the airline passenger user fee. We have also recalculated the user fees for airport inspection services pursuant to the technical amendments to the Farm Bill. Therefore, we are lowering our proposed user fees for inspection of commercial aircraft arriving at a port in the customs territory of the United States. The user fee proposed for this service was $117.50. The final amended user fee for this service is $76.75.

We still must collect enough in user fees to cover the full cost of providing services. In this situation, though the total amount of money we can collect is limited, we estimate that user fees collected for these inspections will cover our costs. As explained in our proposal of August 7, 1991 (56 FR 37481-37499), our proposed user fee included the cost of inspections related to the presence of passengers on aircraft, such as inspection of the passenger cabin. The cost of these inspections will now be covered in the APHIS user fee for aircraft passengers. That fee was adopted April 12, 1991, and was effective May 13, 1991. The passenger fee was not originally intended to cover



HeinOnline -- 57 Fed. Reg. 759 1992

the cost of these services. However, the fee was rounded up, as explained in the proposal, and therefore will generate some extra money. We believe this extra income is sufficient to cover the cost of passenger-related aircraft inspections. Therefore, the airline passenger user fee and the aircraft inspection user fee together should recover enough money to cover the full cost of airport inspection services and stay within the revenue limitations of the Farm Bill.

Originally, the airline passenger user fee covered inspection of the passenger, his or her baggage, and all related administrative and overhead expenses. The cost of these services was $1.73 per passenger. In addition to these costs, the airline passenger user fee will now also cover inspection of the aircraft galley, including garbage, the passenger compartment, the baggage hold, and all related administrative and overhead expenses. The cost of these additional services is $0.25 per passenger, raising the total cost of passenger-related inspection services to $1.98 per passenger. In both instances, the fee is rounded up to $2.00 per passenger.

User Fees for Services During Normal Business Hours

Many comments suggested that we should not charge a user fee for any service we provide during normal business hours. We are sympathetic to the feelings of these commenters. However, charges for services we provide during normal business hours are exactly the services for which the Farm Bill now authorizes us to charge a user fee. However, one advantage to our charging an APHIS user fee for these services is that we will be able to directly apply the fees to fund our programs and services. The Farm Bill requires that APHIS user fees be applied to APHIS programs.

User Fee or Tax?

Other comments stated that the APHIS user fee is a tax, not a fee. We do not agree with this comment. A tax is money paid to support general government operations. A fee is money paid for a specific service. The APHIS user fees herein are designed to recover and fund the cost of providing specific services. As such, the APHIS user fee is a user fee, not a tax.

Advisory Committee

One comment suggested that as part of the regulations APHIS should establish an Advisory Committee to monitor operations and use of the APHIS user fee/review performance of APHIS. We are taking no action based on this comment at this time. The establishment of an Advisory Committee is outside the scope of this rulemaking proceeding.

Economic Analysis

Of the many comments received, one requested that "the USDA do a study of how much the proposed user fees would produce for income to the USDA in relation to how much it would cost the producers in lost sales or reduced-priced sales due to the fees * * *." Another comment asked if we had "engaged in any formal, systematic effort to determine the economic impact of (phytosanitary certificate) fees * * *." A third commenter stated that the preliminary economic analysis did not state what method was used to determine discounted values or discuss the monetary ramifications of detecting a foreign animal disease before it spread.

In our proposed rulemaking we included a summary of our preliminary economic analysis. That analysis, which was made available for public inspection, includes the analyses and information the commenters request. As part of this final rule, we have included a summary of our final economic analysis. That analysis, along with numerous other documents pertaining to this final rule, is available for public inspection. Documents, including economic analyses performed in connection with other APHIS user fees may also contain relevant information and are, and were, available for public inspection.[3]

Administrative Procedure Act

One comment maintained that the proposed regulations violate the Administrative Procedure Act (5 U.S.C. 553, *et seq.*) because, according to the commenter, we have not conducted an adequate cost analysis. We believe, as discussed above, that we have conducted an adequate cost analysis. The analysis, which was summarized in the proposed rulemaking (56 FR 37492–37493) has been available for inspection since the rulemaking was published.

[3] General background documents such as prior proposed regulations, comments received in response to proposed regulations, and preliminary and final economic analyses, can be inspected at USDA, room 1141, South Building, 14th Street and Independence Avenue, SW., Washington, DC. Economic data supporting individual APHIS user fees may be inspected at APHIS, Budget and Accounting Division, User Fee Branch, room 263, Federal Building, 6505 Belcrest Road, Hyattsville, MD. Both offices are open 8 a.m. to 4:30 p.m., Monday through Friday, except holidays.

Miscellaneous General Comments

One commenter pointed out that a statement in our proposed rulemaking, that the regulations would have no effect on the family (see 56 FR 37493), did not take into account "the many economic problems that delays in detection of an important disease outbreak will cause." We stand by our earlier statement. We agree with the commenter that delay in detecting an important disease outbreak does have economic consequences. However, those consequences are spread over society and the economy at large. Under our proposed regulations, the impact on the family would be difficult to quantify, would vary depending on the disease, the amount of delay, the location where the disease was introduced, and a number of other factors.

Several comments noted that some foreign governments subsidize exports indirectly by not charging for tests, inspections, or export certificates. Some of these commenters suggested that APHIS also do this; and that our charges will put American businesses at a competitive disadvantage.

We are making no changes in the regulations based on these comments. We have no basis for exempting shipments destined to any specified country from our export-related user fees. Other countries require various export certificates, which in turn require inspections and tests, to accompany plants and plant products and animals, animal products, and germplasm imported into their countries. We issue certificates, including performing tests and inspections, as a service to exporters in this country. We cannot provide these services without incurring various costs. Under authority of the Farm Bill, we can recover these costs by collecting user fees from those who request the services.

Whether other countries should charge their exporters a user fee for issuing various health certificates is a matter for the governments of those countries to decide. Their decisions have no bearing on whether we should charge a user fee for the same services provided by us in the United States.

One comment stated that we should institute a user fee for performing the "pink juice" test on meat transiting the United States. This is a test designed to help ensure that meat is not infected with foot-and-mouth disease or rinderpest. APHIS requires the test under 9 CFR 94.4. However, as the commenter correctly observed, "it is anticipated that transshipment (of meat subject to the test) would occur only



HeinOnline -- 57 Fed. Reg. 760 1992

occasionally." At this time we have not calculated a user fee for the "pink juice" test. Any user fee we propose to adopt will be published for public comment in the **Federal Register**.

One comment suggested we guarantee that APHIS always maintain staffing at authorized levels. There is always turnover among staff, and time unavoidably passes before replacements can be hired and start to work. Also, hiring freezes and local shortages of qualified personnel can keep staffing below authorized levels. Therefore, it is not possible to guarantee constant staffing at authorized levels.

Proposed Amendments to Title 7, Code of Federal Regulations

Movement of Plants Without Phytosanitary Certificates

If APHIS adopts user fees for endorsing phytosanitary certificates, according to one comment, some people will be tempted to move plants out of the United States without the certification required by the receiving country. We are aware of this possible problem. However, we believe the potential loss of plant shipments and penalty actions taken by foreign governments against individuals who attempt this will deter such activities. For these reasons we are making no changes in the regulations based on this comment.

Exemption for Exports to Canada

Plant exports to Canada should be exempt from APHIS user fees for phytosanitary certificates, according to one commenter. The commenter cited the Free Trade Agreement with Canada as their reason.

We are making no changes in the regulations based on this comment. Canada requires phytosanitary certificates to accompany imported plants and plant products. We issue certificates as a service to exporters in this country. We cannot provide this service without incurring various costs. Under authority of the Farm Bill, we can recover these costs by collecting user fees from those who request phytosanitary certificates. The Free Trade Agreement with Canada has no bearing on APHIS charges for services we provide to American citizens in the United States.

Issuance of Phytosanitary Certificates/State-Federal Relationship

Two comments questioned whether we will charge an APHIS user fee if State personnel perform a phytosanitary certificate inspection, but APHIS personnel issue the certificate. One commenter wanted to know further that if APHIS did charge a fee in this situation, how we would split it, if we would, with the State. The answer is that we would charge an APHIS user fee in the situation described, but we would not split the fee with the State. As explained in the proposal of August 7, 1991, (56 FR 37484–37485), we will charge the applicable APHIS user fee when a certificate is signed by APHIS personnel. However, the State has the option of charging its own fee for any services it provides. This is true even if the State does not issue a certificate. For example, if State personnel conduct an inspection for a certificate signed by APHIS personnel, the State may charge a fee for the inspection. State fees are allowed under 7 CFR 354.3(g)(4).

One of the commenters also asked several hypothetical questions about a shipper who pays for a block of Federal phytosanitary certificates at an APHIS office, receives the required inspection from a State inspector, and the State inspector signs a certificate from the block. The commenter's questions all concerned fees associated with the certificate.

However, the situation described by the commenter should never arise. Administrative controls over issuance of Federal phytosanitary certificates do not allow block certificates to be signed in any office other than the one where the certificates are obtained. For example, if a shipper pays for a block of certificates in APHIS's Portland, OR, office, then the shipper must get each certificate in the block signed by an APHIS inspector from our Portland, OR, office. An APHIS inspector from our Seattle, WA, office may not sign the certificate. Neither may any State inspector. Likewise, if a shipper obtains a block of phytosanitary certificates from a State office, the shipper must return to that State office to get the certificates signed.

Calculation of State Fees for Phytosanitary Certificates

Two comments questioned our statutory authority to prescribe guidelines for setting State fees for phytosanitary certificates.

Our authority for prescribing fee-setting guidelines is the Talmadge-Aiken Act (7 U.S.C. 450). That Act provides that:

> In order to avoid duplication of functions, facilities, and personnel, and to attain closer coordination and greater effectiveness and economy in administration of Federal and State laws and regulations relating to the marketing of agricultural products and to the control or eradication of plant and animal diseases and pests, the Secretary of Agriculture is authorized, in the administration and enforcement of such Federal laws within his area of responsibility, whenever he deems it feasible and in the public interest, to enter into cooperative arrangements with State departments of agriculture and other State agencies charged with the administration and enforcement of such State laws and regulations and to provide that any such State agency which has adequate facilities, personnel, and procedures, as determined by the Secretary, may assist the Secretary in the administration and enforcement of such Federal laws and regulations to the extent and in the manner he deems appropriate in the public interest.
>
> Further, the Secretary is authorized to coordinate the administration of such Federal laws and regulations with such State laws and regulations wherever feasible. However, nothing herein shall affect the jurisdiction of the Secretary of Agriculture under any Federal law, or any authority to cooperate with State agencies or other agencies or persons under existing provisions of law, or affect any restriction of law upon such cooperation.

As explained in our August 7, 1991, proposed rulemaking, issuance of phytosanitary certificates is a Federal function under Federal law (7 U.S.C. 147a) and regulations (7 CFR 353.1 *et seq.*). APHIS inspectors issue many certificates directly to exporters. However, in some States which cooperate with APHIS, certain State employees are designated to issue Federal certificates. Designated State employees issue approximately 47 percent of all certificates. These State inspectors are vital to the success of our program. There are more State inspectors than APHIS inspectors, and in many instances they are able to provide services more efficiently, including at remote portions of the country.

To ensure that United States plants and plant products move in international commerce, it is in the public's interest that APHIS cooperate with States to ensure that phytosanitary certificates are issued.

The Secretary of Agriculture, through APHIS, believes that one aspect of cooperation with the States is to allow them to recover the cost of services they perform in issuing phytosanitary certificates. However, we also believe that administration of Federal regulations concerning issuance of phytosanitary certificates should be coordinated with the States. We have the authority to do this under the Talmadge-Aiken Act. One aspect of coordination is to ensure that Federal and State fees for this Federal function have a similar cost basis. Therefore, we are adopting fee-setting guidelines for States to follow. We are not prescribing



HeinOnline -- 57 Fed. Reg. 761 1992

each individual item for which they may charge or prescribe the exact amount they may charge.

Missing Phytosanitary Certificate Fees

We received one comment pointing out that we did not include a user fee for re-export certificates for noncommercial shipments. As explained above, we are amending our proposed regulations to change "noncommercial shipments" to "noncommercial and low-value shipments." Where it is clear and appropriate, we will use the new terminology in discussing this comment.

As the commenter pointed out, we were incorrect when we stated we had never issued a phytosanitary certificate for re-export certificate for noncommercial shipments (see proposed rulemaking published on August 7, 1991, 56 FR 37484), and therefore did not need to propose a user fee for the service.

We do in fact issue phytosanitary certificates for re-export of noncommercial shipments, though they are rare. An example is a phytosanitary certificate for a shipment of imported fruit being re-exported by the United States Department of Defense to a United States military installation overseas.

Based on this comment, we have decided to publish a proposed APHIS user fee covering phytosanitary certificates for re-export of noncommercial and low-value shipments in another document. The proposed user fee, which we will publish as soon as practicable, will appear in the **Federal Register** and the public will be invited to comment on it.

While considering this comment, we also realized we had neglected to include an APHIS user fees in our proposed regulations for processed product certificates for commercial shipments. This proposed APHIS user fee was explained in the background portion of our proposed rulemaking (see 56 FR 37484) and a proposed fee of $30.00 was listed. In the proposed regulations, we included a definition of "processed product certificate," but we did not include the $30.00 user fee (see 56 FR 37494.)

Therefore, we are amending 7 CFR 354.3(g)(5) to add a $30.00 user fee for processed product certificates for commercial shipments.

Efficiency of Issuing and Collecting User Fees for Phytosanitary Certificates

One comment stated that "[t]he necessity for issuing phytosanitary certificates expediently has not been considered. The proposal does not offer any viable method for collecting these fees * * *"

We are making no changes based on this comment. However, we agree with the comment that phytosanitary certificates need to be issued efficiently and user fees collected efficiently. Over the years we have developed our current system for issuing phytosanitary certificates. We welcome any suggestions for improving it. With regard to collecting user fees, we believe the collection system we proposed is practical and efficient. However, it is a new system. We will be working to improve it. Again, we welcome any suggestions.

Conflict with California Fee

Under authority of the Torres Bill, the State of California has recently instituted an $85 fee which must be paid by commercial aircraft arriving in California. Several commenters stated that it would constitute "double-billing" if they had to pay both the California user fee and the proposed Federal user fee. We do not agree, and have made no changes in the regulations based on these comments.

The California fee covers the cost of providing enhanced AQI inspections in that State. An APHIS user fee is not being assessed for these additional personnel. In calculating the APHIS user fee, the inspection cost was based on the level of funding requested in the fiscal year 1992 budget. Therefore, carriers are not being double-billed for inspection services provided in California because the cost of the enhanced inspection was excluded from our user fee calculations.

Difference in User Fees for Inspection of International and Domestic Aircraft

Two comments asked us to explain the apparent "discrepancy" between the proposed user fees for inspecting commercial aircraft arriving in the United States from other countries and the proposed user fee for inspecting commercial aircraft departing Hawaii and Puerto Rico for other parts of the United States.

As explained above, we are not adopting any user fee at this time for inspecting aircraft departing Hawaii and Puerto Rico for other parts of the United States. When we do publish a document adopting such rules, we will repeat our explanation.

The proposed user fee for inspecting certain domestic aircraft is lower because: (1) The scope of the inspection is narrower, being concerned only with certain plant materials, as opposed to all plants and plant materials, noxious weeds, endangered species, certain animal products and byproducts, and other items under APHIS regulation; (2) airlines are prohibited from accepting uncertified regulated cargos without bringing them to APHIS for certification; (3) no prohibited materials are allowed on the aircraft; therefore no garbage needs to be monitored; and (4) we can control materials loaded on the aircraft at domestic ports, which we cannot do at foreign ports, because we have inspectors stationed at domestic ports. As a result, we can charge a lower fee for inspecting these domestic aircraft.

Violation of International Agreements

Several commenters stated that our proposed user fees for inspection of aircraft arriving in the United States from foreign countries would be in violation of various international agreements. The agreements mentioned by commenters were: The Convention on International Civil Aviation (Chicago Convention) (Dec. 7, 1944, 61 Stat. 1180, 3 Bevans 944); the International Civil Aviation Convention (ICAO); the General Agreements on Trade and Tariffs (GATT); Bermuda 2 bilateral aviation agreement; Air Transport Services Agreements between the United States and Paraguay, Switzerland (11 Bevans 946), the United Kingdom, and Japan (Agreement of August 11, 1952 (4 U.S.T. 1948); and the United States-Japan Treaty of Friendship, Commerce and Navigation. We have carefully reviewed all of these agreements and have determined that no changes in the regulations are necessary. Each agreement is discussed individually below.

*Chicago Convention.* Several comments listed the Convention on International Civil Aviation as being violated by the proposed APHIS user fees.

According to the comments, Article 15 of the Convention provides that:

> Any charges that may be imposed or permitted to be imposed by a Contracting State for the use of such airports and air navigation facilities by the aircraft of any other Contracting State shall not be higher * * *
>
> (a) * * *
>
> (b) As to aircraft engaged in scheduled international air services, than those that would be paid by its national aircraft engaged in similar international air services.
>
> All such charges shall be published and communicated to the International Civil Aviation Organization (ICAO): * * * 61 Stat. at 1184–85)

According to the commenters, user fees "other than those related to airport and airway facilities (are) not contemplated by the scheme of international regulations of civil aviation." This commenter also states that the "network of international



HeinOnline -- 57 Fed. Reg. 762 1992

aviation agreements obligates APHIS to consult with the Departments of State and Transportation, and through those agencies with appropriate foreign air transportation officials, regarding the proposed imposition of this fee."

We do not believe the Chicago Convention applies to APHIS. The Convention applies to "airport operator[s] or other competent authorit[ies]." APHIS is not an airport operator. Neither do we believe APHIS is an "other competent authority" within the intended meaning of the Convention.

We also do not believe that the "network of international aviation agreements" obligates APHIS to consult with other Departments of the Federal government, as suggested by the commenter. However, by publishing our proposed rule for public comment in the **Federal Register**, we have solicited comments from all interested parties, including other Departments of the Federal government. We received no comments on our proposed rules from any other Federal government agency.

*ICAO.* One commenter states that ICAO Document 9082/3 "specifically required airport operators or *other competent authorities* (emphasis added by commenter) to provide adequate notification (4 to 6 months) when contemplating the imposition of new charges."

As explained above with regard to the Chicago Convention, we do not believe APHIS is either an "airport operator (* * *) or (an) other competent authority" within the intended meaning of the document. Therefore we do not believe this document applies to APHIS.

*GATT.* The GATT does not apply to persons or means of conveyance; the GATT does apply to cargo. However, the GATT permits user fees imposed on or in connection with importations, for inspection and quarantine services, if such fees are limited in amount to the approximate cost of the services rendered.

*Various Bilateral Air Transport Services Agreements.* Based on the comments we received, it appears that the many bilateral Air Transport Services Agreements to which the United States is a party are similar, if not identical, in wording and contain virtually the same provisions. In this discussion we quote from several different agreements. They are representative of the wording and contents of the other agreements.

The Air Transport Agreement between the United States and Switzerland requires that user fees be "established at reasonable and non-discriminatory levels, consistent with the costs of providing the relevant services and facilities, and be equitably apportioned among categories of users." According to the comments, the proposed APHIS user fees for aircraft inspection do not meet these criteria.

The APHIS user fees do not violate this agreement. It is not clear that the APHIS user fees proposed are encompassed by this provision of the agreement. However, even if they are, they are in compliance. As explained elsewhere in this document, the user fees have been established to reflect the cost of providing certain APHIS services to individual users of those services. Within each category of service, the user fee is the same. Under these circumstances, we conclude that the APHIS user fees meet the criteria of this agreement.

Accordingly, to another commenter, APHIS is in violation of the Air Transport Agreement between the United States and the United Kingdom because, among other things, APHIS "failed to consult the airlines using (APHIS) services or their representative organizations" before proposing the APHIS user fee. The provision which the commenter asserts has been violated is paragraph (5) of Article 10 (T.I.A.S. No. 8461 at 10-11). It states: "each Contracting Party shall use its best efforts to encourage the competent charging authorities and the airlines to exchange * * * information."

We do not believe APHIS is in violation of any requirement to report proposed fees. The provision in question only requires that "best efforts (be used) to encourage * * * exchange" of information. This does not appear to be a requirement. Therefore we do not believe APHIS can be in violation of it.

*United States-Japan Treaty of Friendship, Commerce and Navigation.* According to a commenter, the United States-Japan Treaty of Friendship, Commerce and Navigation provides, at paragraph 1, Article V, that:

> Neither party shall take unreasonable or discriminatory measures that would impair the legally acquired rights or interests within its territories of nationals and companies of the other Party in the enterprises which they have established.

The commenter believes that the proposed APHIS user fees violate this clause because they exceed APHIS's authority and are therefore unreasonable. As we have explained elsewhere, we do not believe the proposed user fees exceed our authority under the Farm Bill. Therefore, we do not believe that we are in violation of this Treaty.

Nationality of Airlines

It appears that several commenters believe our user fees will apply to non-United States airlines, but not to United States airlines.

This is incorrect. The nationality of the airline is irrelevant—we will impose APHIS user fees on all aircraft arriving in the United States from other countries. We will except some aircraft from paying user fees, as listed in the regulations (see 7 CFR 354.3(e)(2)). However, the exceptions apply to any aircraft which meet the requirements, regardless of what country's flag the aircraft flies.

User Fees Exemption for Commercial Aircraft Arriving in the United States from Canada

One commenter objected to the "arbitrary exemption of Canada" from user fees proposed for commercial aircraft arriving in the United States. According to the commenter, our explanation that aircraft from Canada "pose little animal or plant disease or pest risk to the United States" (see 56 FR 37483) was unconvincing because the statement "likely also applies to aircraft from Great Britain, Norway and numerous other countries" which are not exempted from the proposed user fees.

We do not agree that the exemption is arbitrary. APHIS applies many quarantine restrictions on plants and animals and plant and animal products from countries other than Canada (including those mentioned by the commenter). By contrast, very few restrictions apply to plants and animals and plant and animal products from Canada. In addition, because of close cooperation between APHIS and Agriculture Canada, only materials which can be imported into the United States without restrictions are allowed by Canadian authorities to be placed on aircraft leaving Canada for the United States. Under these circumstances it is not necessary for APHIS to provide inspection services for commercial aircraft from Canada, and APHIS, therefore, incurs no expenses for such services.

Double-Billing: User Fees for Aircraft Passenger Inspection and Aircraft Inspection

Several comments expressed the opinion that for us to charge a user fee for foreign aircraft passenger inspection (see 56 FR 14837-14848, user fees effective May 13, 1991) and a user fee for inspection of the aircraft itself, including cargo, is "double-billing." We do not agree. Passengers pose a different risk of



HeinOnline -- 57 Fed. Reg. 763 1992

bringing foreign diseases and pests into the United States than do the aircraft and cargo it carries. For example, passengers may have walked through dirt infested with parasites, or they may be carrying infested fruits or vegetables or infected meat on their person or in their baggage. Aircraft may be infested with a pest which has escaped from infested cargo. Aircraft or cargo may need to be fumigated or disinfected. Also, passengers are responsible for themselves and their baggage; the airline is responsible for the aircraft and the cargo. For all these reasons, passengers and their baggage must be inspected separately and in a different manner than the aircraft and its cargo.

It is also relevant that passengers themselves pay the APHIS user fees for passengers. Airlines are not responsible for paying passenger fees, though they collect the fee along with the price of the ticket, taxes, and any other charges that apply, and then remit the APHIS user fee to APHIS.

In addition, APHIS is authorized under the Farm Bill to charge separate user fees for inspecting foreign arriving commercial aircraft and foreign arriving commercial aircraft passengers.

In view of these facts, we have decided to make no changes in the regulations based on this comment. However, we want to point out that the APHIS user fee for aircraft inspection has been recalculated, and lowered. Passenger-related services, such as inspection of the aircraft's passenger compartment, will be covered by the APHIS passenger user fee. This change is explained more fully elsewhere in this document.

Calculation of User Fee for Aircraft Inspection

Several comments questioned the method and data we used to calculate the proposed APHIS user fee for aircraft inspection. Commenters raised several issues. One observed that our administrative cost figure for air cargo inspection was incorrect in the preliminary economic impact analysis. The commenter is correct that the figure should have been $1,250,000, not $209,000, as we reported in our preliminary economic analysis. However, we have recalculated our administrative cost figure at $179,000, based on the fact that aircraft inspection user fees will not be billed, but instead will be remitted.

Among other things, commenters stated that APHIS will receive "excessive" revenue from aircraft-related user fees. Some provided figures purporting to show this.

First, it is apparent that at least some of the commenters incorrectly included the APHIS user fee for passenger inspection as an aircraft fee, thereby inflating the apparent impact of APHIS user fees on airlines. However, the APHIS user fee for airline passengers is paid by passengers, not by airlines.

Second, a commenter asked what we considered user fee administrative costs. As we noted in our proposed rulemaking (56 FR 37485), user fee administrative costs include the cost to develop, implement, and properly account for AQI user fees. These are costs we would not incur if APHIS did not have user fees. Activities and costs included in this category are rate-development, cost and aircraft tracking systems, fee collection and processing systems, regulatory processes, and audit functions.

Third, one commenter charged that we did not reveal management support costs we included in the cost of program delivery. We believe APHIS clearly explained that the cost of providing service includes program delivery, program support, and agency level (or management support) costs. Management support, or overhead costs, are appropriate costs to include in user fees. No government program or business entity can operate without overhead, and including such costs in pricing goods or services is a standard cost accounting principle.

APHIS conducts a variety of activities, including the AQI program. All our activities are funded through "line item" appropriations. APHIS receives no direct Congressional appropriation for program support costs. Each APHIS "line item" must contribute to administrative support in order to fund costs. In the past, a portion of all administrative support has been funded through the AQI "line item." The funding process is the same under our proposed user fee regulations. All AQI user fees include amounts to support the AQI share of APHIS administrative costs.

Fourth, one commenter stated that APHIS has included various "non-administrative" program delivery costs. This is correct. We have included costs such as risk analysis and methods development which directly benefit users of AQI services. We have documented these costs, and they have been made available for public inspection.

Fifth, according to one comment, "APHIS has overstated the costs of its AQI services." The commenter has calculated a cost per inspector of approximately $183,000 to provide AQI services. We do not agree with the figures provided by the commenter. The commenter has estimated $30 million for APHIS aircraft clearance costs. At the time we published our proposed user fees, we estimated our costs at $23 million. However, based on the recent technical amendments to the Farm Bill, explained above, and the fact that aircraft inspection user fees will not be billed, but instead remitted, we have recalculated APHIS aircraft clearance costs at $18.8 million. This figure includes amounts for recomputed administrative costs and reserves. The reserve fund will remain in our user fee account to cover expenses when user fee collections are low.

Finally, one commenter stated that our data is from 1984 and our economic analysis is therefore invalid. As we have stated elsewhere in this document, our user fee program is new. In the past, we collected only data that was necessary for AQI program operations. Therefore, this data was the only data available when we developed our user fees. The data came from many sources, including detailed work load studies from 1984. However, contrary to the comment, we also have Workload Based Budgeting information from fiscal year 1990 and APHIS Work Accomplishment Data from 1985 to 1990, and the most recent Department of Transportation Air Travel Statistics available, from 1989.

Reimbursable Overtime for Arriving Commercial Aircraft

Several comments suggested that aircraft subject to the commercial aircraft user fee should be exempt from overtime charges.

We intended to exempt aircraft from overtime charges for aircraft inspection if they are subject to the commercial aircraft user fee. This will be true no matter what time of day the aircraft arrives. This exception is similar to the exception we adopted in our document of April 12, 1991 (56 FR 14840), concerning APHIS user fees for various AQI services, including inspection of passengers arriving in the United States aboard commercial aircraft. That exception provides that airlines will not be charged reimbursable overtime for required passenger inspection if the passenger has paid the APHIS passenger user fee for that flight.

With one exception, charging overtime for cargo inspection would also be excessive, as the cost of cargo inspection performed concurrently with inspection of the aircraft is already covered in the APHIS aircraft user fees. Only when cargo is off-loaded and inspected, by request of the shipper or aircraft owner or operator outside of normal business hours, is reimbursable



HeinOnline -- 57 Fed. Reg. 764 1992

overtime justified. We are adding a new 7 CFR 354.3(e)(5) to clearly exempt aircraft from reimbursable overtime charges for aircraft or cargo inspection, if the aircraft is subject to the APHIS user fee for international arrivals.

The regulation will be applied as follows: If an aircraft arrives at any hour, even outside of normal business hours, and is inspected at that time, the standard APHIS user fee for aircraft will apply. If the cargo is inspected at that time, or is off-loaded and inspected later, but during normal business hours, we will not charge reimbursable overtime. The cargo inspection is included in the aircraft inspection fee. However, if an aircraft arrives and is inspected, but the cargo is off-loaded and inspected, by request, outside of normal business hours, then reimbursable overtime charges will apply to the cargo inspection. Normal business hours are 8:00 am to 4:30 pm, Monday through Friday.

User Fees for Intransit Aircraft

Some comments questioned how the regulations would apply to intransit aircraft. Implicit in these comments is the issue of multiple user fees, that is, more than one user fee for the same trip. Intransit aircraft are aircraft which arrive at a port of entry, without going through any portion of the Federal clearance process, which includes APHIS, United States Customs Service, and Immigration and Naturalization Service inspections and clearance, and then continues to another destination. In the airline industry, this type of stop is known as a "technical stop." An example would be an aircraft which lands for refueling only—no cargo is placed on the aircraft or removed from it, no passengers get on or off the aircraft, no crew members get on or off the aircraft, no food is placed on the aircraft, no garbage is removed from the aircraft. In these situations, we will not charge an APHIS user fee. We have therefore amended the regulations to add this exception in a new 7 CFR 354.3(e)(2)(vi).

Multiple User Fees

Aircraft arriving in the United States, and the cargo they carry, may be subject to multiple inspections as they are processed through Federal clearance procedures. Federal clearance procedures include inspections and clearances by APHIS, the United States Customs Service, and the Immigration and Naturalization Service. Under our proposed regulations, at each port where they are subject to APHIS inspection, they would pay the appropriate APHIS user fee.

Reserve Fund

A few comments stated that we should not establish a reserve fund.

We have made no changes based on this comment. The Farm Bill allows for a "reasonable balance" in the AQI user fee account. Our reserve fund is consistent with the size of reserve funds established by other agencies within the Department. The reserve fund will ensure that APHIS has sufficient operating funds in cases of bad debt, user insolvency, and fluctuation in activity volumes.

Miscellaneous Comments Concerning Title 7

Several commenters suggested changes in regulations which are not connected with the proposed APHIS user fees. One suggested that we establish a standard clearance time for aircraft. The commenter continued to suggest that if an aircraft was not cleared within the standard time, it would not have to pay the APHIS user fee.

We have considered this comment. We conclude that such a regulation would be inappropriate, as conditions outside our control affect the clearance time of individual aircraft.

Missing Provisions in Proposed Regulations

One comment stated that our proposed rulemaking did not address either APHIS's plans to document and substantiate its fee assessments to carriers (airline) or procedures for administrative appeals.

We are making no changes in the regulations based on this comment. Proposed 7 CFR 354.3(e)(3) contains requirements for carriers to remit user fees to APHIS. We did not propose to bill carriers for the APHIS user fees they owe. They will be responsible for remitting the correct amount to us. We will be responsible for ensuring the remittances are accurate. We currently maintain records of aircraft flights arriving in the United States which are subject to our inspection. Also, the Debt Collection Act of 1982 (31 U.S.C. 3717), referred to in 7 CFR 354.3(e)(3), applies to user fees remitted by carriers to APHIS. United States Department of Agriculture regulations implementing the Debt Collection Act of 1982 contain provisions for administrative appeals. Those regulations appear in 7 CFR 3.21 *et seq.*

Proposed Amendments to Title 9, Code of Federal Regulations Definitions

One commenter pointed out an error in our proposed definition of "export health certificate". The commenter correctly explained that export health certificates are issued, or filled in, by USDA accredited veterinarians, whom we had left out of our definition. However, it is the endorsement of the certificate, not its issuance, for which we are going to charge an APHIS user fee. The endorsement indicates that APHIS officially has reviewed the certificate and believes it to be accurate and reliable. Export health certificates are endorsed only by APHIS veterinarians. Therefore, we are adjusting the definition of "export health certificate" to clarify this. The new definition, in 9 CFR 130.1, will read as follows:

*Export health certificate.* An official document endorsed by an APHIS veterinarian which, as required by the importing country, states that animals or birds to be exported from the United States are free of certain diseases and pests.

Import versus Export Animal Quarantine Fees

A large number of commenters asked whether the daily animal quarantine charges we proposed applied both to animals being imported into the United States and to animals being exported from the United States, or only to animals being imported.

We proposed to charge a daily user fee for animals in quarantine. The only animals officially in "quarantine" are animals being imported into the country. Therefore, these are the only animals for which an APHIS user fee will be payable.

However, many commenters referred to animals being held in isolation prior to export, and animals resident in artificial insemination and embryo transfer centers, as being in "quarantine." Under our regulations, these animals are not technically in "quarantine."

To eliminate any possible confusion, we have amended the heading and text of 9 CFR 130.4 and 130.5 to refer to "import-quarantine facilities."

Fee for Use of Entire Quarantine Building at Animal Import Centers

In our proposed regulations we included a provision allowing importers, at their option, to utilize an entire Animal Import Center quarantine building and pay a single user fee. This option would be available only for designated buildings. In our August 7, 1991, proposal we designated one building each at our Newburgh, NY, and Honolulu, HI, Animal Import Centers as available for exclusive use.



HeinOnline -- 57 Fed. Reg. 765 1992

We received one comment requesting that we not designate the Honolulu, HI, building for such use. The commenter pointed out that our Animal Import Center in Hawaii is small, and due to the high demand for space, allowing one importer to utilize an entire building would deprive numerous other importers of any opportunity to import animals through the facility. In addition, the space in the building we proposed to designate for such use has already been reserved for the next 2 years.

In view of these facts, we are amending proposed 9 CFR 130.3 to delete this building from the list of designated buildings. If, in the future, we determine that this or some other building can be made available for exclusive use, we will propose to amend the regulations.

Daily Fees at Animal Import Centers

Another commenter wrote to say that our daily fees for both partridges and large birds quarantined in our Animal Import Centers are too high. While the commenter presented some cost figures for feed, he did not take into account other costs which we must recover through APHIS user fees. Therefore, we are not adjusting our fee schedule based on this comment. However, as explained elsewhere in this document, we will review our fees at least annually, and, if we determine that our fees for partridges and for large birds, or any of our other fees, are either too high or too low, we will propose to adjust these fees in the **Federal Register**.

Conflict of Interest for APHIS

A few comments questioned whether APHIS could remain impartial or whether there would be a conflict of interest, when the proposed user fees become effective. The commenters did not give specific examples of potential conflicts of interest. However, the endorsement of export certificates presented to APHIS for endorsement are not endorsed, either because they are incomplete, incorrect, or have other problems.

When our user fees become effective, we will collect a fee only for actually endorsing a certificate. If a certificate presented to us cannot be endorsed, we will not collect an APHIS user fee. The commenter appears to be concerned that the potential loss of revenue will encourage APHIS employees to endorse certificates, whether correct or not, merely to collect the user fee.

While this may be a potential problem, we believe it is very unlikely to occur, for the following reasons. First, APHIS employees will not be paid directly from the user fees they collect. Individuals will not keep any fees they collect, as suggested by one comment, nor will salaries be dependent on the fees collected. In addition, employees will have no knowledge of the portion of their salaries attributable to user fee collections. Second, APHIS employees are responsible for maintaining the value of APHIS services and the Agency's reputation. Demand for some APHIS services would decrease if such services were inferior or the Agency's reputation was not maintained. Third, we attempt, through our personnel system, to hire and retain employees of demonstrated integrity. Fourth and finally, endorsing export health certificates which should be refused, or performing any other service in a fraudulent manner, is grounds for dismissal.

Financial Questions re: User Fees for Endorsing Export Health Certificates

One commenter asked questions about export health certificates: (1) How much additional revenue will be generated; (2) how many additional employees will be needed to account for billing and collection; and (3) will any of the funds be used to hire additional staff where needed.

No additional revenue will be generated. As we have explained, our appropriation has been reduced. The APHIS user fees we collect will replace the lost funds.

Until we implement these proposed APHIS user fees, we will not know if additional staff will be needed or not. For example, we do not know how many users will choose to be billed, and we therefore cannot predict the amount of billing work. We also do not know, if additional staff are needed, where they might be needed. We will have to wait until the user fees are implemented and assess their impact. We intend to adjust our staffing as necessary.

Basis of User Fees for Export Health Certificates

One comment asked why the user fees for export health certificates increase as the number of required tests increases. The commenter correctly states that the "function of this duty does not change regardless of the number of tests required." That is true, but the time it takes to perform the duty does change. As explained elsewhere in this document, one of the factors we used to determine the user fee for each service is the amount of staff time it takes to perform the service. Each test on a certificate must be verified. Therefore, certificates that involve more tests will require more staff time, and therefore the fee for endorsing such certificates will be higher.

Determining Correct User Fee for Export Health Certificates

One commenter asked what the user fee will be if a certificate lists several animals not requiring the same number of tests. The answer is that the user fee is the fee which would be due if all the animals on the certificate required the same number of tests as the animal which requires the greatest number of tests. For example, if 5 animals are listed on the certificate and the animal which requires the greatest number of tests requires 4 tests, the user fee for the certificate is $41.50, plus $1.25 for each of the additional 4 animals, for a total $46.50. We have amended proposed 9 CFR 130.6(b) to clarify this.

We would like to note that the situation described by the commenter is very rare. Consequently, we believe this method of determining the fee will be the easiest to administer and the most equitable. The reason for this is as follows. There are certain fixed costs involved with issuing an export certificate regardless of the number of animals on a certificate. Those fixed costs are for researching the test requirements for the country the animals will be exported to. The countries requiring more tests require more time to research since their import requirements are more stringent. This is reflected in the way the fees are structured—with the first animal on the certificate bearing those fixed costs. Therefore, in a case where there are animals on a certificate requiring different numbers of tests, the cost for the animals from the country requiring more tests must be used in order for APHIS to recover the full cost of issuing the certificate.

Multiple and Overtime Charges in Connection with Export Health Certificates

One commenter asked whether exporters who have health certificates endorsed outside of normal business hours will have to pay reimbursable overtime in addition to the export health certificate user fee.

Another commenter requested that we charge only one APHIS user fee if an APHIS veterinarian endorses the export health certificate during the course of supervising or inspecting export animals. The commenter is concerned that his business will have to pay two fees: An hourly fee for the inspection service and a separate fee for endorsement of the health certificate.

As proposed, our regulations required two fees—one user fee for the inspection



HeinOnline -- 57 Fed. Reg. 766 1992

and another user fee for the endorsement. Depending on when the inspection was conducted, reimbursable overtime could apply.

We have carefully considered these comments and have decided to amend proposed 9 CFR 130.6 by adding a new paragraph (c). The regulations will now provide that if an APHIS veterinarian endorses an export health certificate in the course of conducting supervision or inspection services concerning the export animals listed on the certificate, only the hourly rate will apply. We will not charge a separate APHIS user fee for the endorsement. However, under our regulations, if the export health certificate is endorsed at another time, not during the course of supervision or inspection services described above, a separate APHIS user fee will apply to the endorsement. Similarly, if inspection or supervision services are conducted outside of normal business hours, regardless of whether or not the veterinarian endorses a health certificate at that time, the reimbursable overtime hourly rate will apply.

User Fees for Endorsing Export Health Certificates for Semen and Embryos

Numerous commenters needed clarification regarding APHIS user fees for endorsing export health certificates for semen and embryos. Commenters were obviously confused by our explanation and some were unclear what fee would be due for these certificates. Commenters also explained why they believe the user fee we proposed for these certificates should be calculated differently than the user fees we proposed for other export certificates. Some commenters suggested other approaches.

We have carefully reviewed all of these comments. We must agree that the explanation we published in our document of August 7, 1991, was confusing. Also in light of the comments we received, we believe we should reconsider our approach to calculating the fee for these export health certificates.

Therefore, we are not including in this final rule a user fee for export health certificates for animal semen or embryos. We will reconsider this issue and will publish a new proposal for public comment in the **Federal Register** as soon as feasible.

In connection with this issue, one commenter wanted to know whether semen and embryos are animal products or animal byproducts. We do not, under these regulations, consider semen and embryos to be either animal products or byproducts.

User Fees for Endorsing Export Health Certificates for Animal Products and Byproducts

We did not receive any comments which specifically addressed our proposed user fee for export health certificates for animal products and byproducts (see proposed 9 CFR 130.6(a).) However, as we explained above, at least one commenter was confused as to whether semen and embryos were animal products or byproducts, and other comments we received indicated that our explanations concerning semen and embryos was not clear.

These comments indicate to us that there may be general confusion concerning this issue. Rather than adopting a user fee which may not be clear to the public, we have decided to reconsider our proposed user fee for export health certificates for animal products and byproducts, and have deleted all references to such animal products and byproducts in this final rule. We will publish a new proposal for public comment in the **Federal Register** as soon as feasible.

Billing for Export Health Certificates

One comment stated that requiring export health certificates to be paid for at the time of endorsement would be extremely inconvenient for many users. We have considered this comment, and have decided to amend the proposed regulations to provide optional billing for users who meet certain criteria (see 9 CFR 130.50(a)(6)).

Under the amended regulations, users who request export health certificates may either pay for the certificates at the time of endorsement, or if they have established an acceptable credit history, as determined by APHIS, may choose to be billed for the service. These requirements are similar to those which apply to overtime services at border ports, sea ports, and airports under 7 CFR 354.1(c). If a user chooses to be billed, we will endorse its certificates and bill the user at the end of the month in which services are rendered. Payment will be due within 30 days after receipt of the bill. If bills are not paid within that time, we will take action under 9 CFR 130.51.

User Fees for Diagnostic Reagents and for Services at the National Veterinary Services Laboratories and the Foreign Animal Disease Diagnostic Laboratory

We received numerous comments objecting to the proposal to charge user fees for tests performed at the National Veterinary Services Laboratories (NVSL) and the Foreign Animal Disease Diagnostic Laboratory (FADDL). Many commenters also objected to the proposal to charge for diagnostic reagents obtained from NVSL.

Some commenters believe NVSL and FADDL services will deteriorate or be curtailed because APHIS is imposing user fees for tests and reagents. Several comments expressed the opinion that the proposed user fees for reference assistance testing are not comparable or consistent with the fees proposed for import and export testing.

Some commenters felt that if NVSL charges for program disease tests, people will stop using NVSL for these tests and NVSL will no longer get the data it needs to compile its statistics. These commenters are concerned that if practitioners and laboratories stop requesting reference assistance testing from NVSL, valuable data will be lost and the NVSL will not be able to continue effective surveillance of disease.

One commenter is of the opinion that the NVSL will become increasingly dependent on user fees for its funding, and will, as a result, "perform more and more of the procedures whereby it generates the fees it needs to operate at the expense of diagnostic investigation and new method development."

One commenter expressed concern that "when it becomes widely known that NVSL is charging fees which cover the full cost of that lab's operation, there * * * will be a push from State officials for a similar fee structure in the State diagnostic labs." According to the commenter, this would mean a tripling of charges for animal disease diagnostic testing in his State. He is concerned that animal owners could not afford such an increase.

After considering these comments, we have decided not to adopt, at this time, the user fees we proposed for NVSL and FADDL test services and for diagnostic reagents obtained from NVSL. Proposed 9 CFR 130.9 through 130.12 are therefore not included in this final rule.

We will consider further the comments we received on this issue and decide what action to take as soon as feasible.

Misellaneous Comments Concerning Title 9

A commenter questioned why credit cards cannot be used at Veterinary Services Area Offices to pay APHIS user fees. At this time, Veterinary Services Area Offices are not equipped to accept credit card payments. If in the future this changes, we will amend the regulations to reflect that fact.



HeinOnline -- 57 Fed. Reg. 767 1992

One commenter inquired if proposed 9 CFR 130.7 applies to "semen storage or distribution sites or the sealing of semen for international shipment." As of this time we have not proposed any APHIS user fees as described by the commenter. Proposed 9 CFR 130.7 does not apply to these services.

A commenter stated that we should include an APHIS user fee for inspecting animals crossing our land borders with Canada and Mexico. In fact, we are considering such an APHIS user fee. A document proposing that and other user fees will be published in the Federal Register as soon as feasible.

Several commenters suggested changes in regulations which are not connected with the proposed APHIS user fees. One change relates to reserving quarantine space at Animal Import Centers. We are considering this request. If we determine that an amendment to the regulations is warranted, we will publish proposed regulations in the Federal Register as soon as feasible.

One commenter expressed concern that many State agencies would be unable to comply with the 30-day payment limitation we proposed. The commenter stated that it is "unworkable * * * given the restrictions of working within a State system subject to fiscal deadlines etc."

Since thirty days is the standard time allowed for bill payment, we will not change the proposed regulations at this time. If we find that in practice 30 days is impractical, we will consider extending the amount of time we allow for payment.

### Additional Changes to the Regulations

We have made minor non-substantive changes for clarity.

We are also amending proposed 7 CFR 354.3(i) and proposed 9 CFR 130.50 to clarify that we will accept payment only for the exact amount due. Most of our offices are not equipped to make change. Therefore we cannot accept any payment, including checks, which is for other than the exact amount due.

In order to clarify that we are charging a user fee for "endorsing" export health certificates, we are amending proposed 9 CFR 130.6 to insert "endorsing" in the heading, and to replace the word "issued" with the word "endorsed" in the text of that section.

We are also amending proposed 9 CFR 130.8 to clarify our intention that "an inspection" includes a bundle of related services—the inspection itself, testing, and supervision services. We are revising the first sentence in proposed 9 CFR 130.8(a) to read: "If inspection services, including inspection, testing, and supervision services, are performed outside the United States, in accordance with this title, and the regulations do not contain a provision for payment of the cost of the service, the person requesting the service must pay a user fee under this section."

### Executive Order 12291 and Regulatory Flexibility Act

In accordance with Executive Order 12291, it has been determined that this rule is part of a series of documents which are being considered as a "major rule." This final rule is one of several rules requiring certain persons to pay user fees for APHIS services they receive. We have already published, in two separate documents, final rules adopting user fees for various passengers and means of conveyance. One final rule covered user fees for commercial vessels, commercial trucks, commercial railroad cars, and passengers on commercial aircraft arriving in the United States from outside the country. It was published April 12, 1991 (56 FR 14837–14846), and was effective May 13, 1991. The other final rule covered user fees for passengers on commercial airlines departing Hawaii and Puerto for other parts of the United States. It was published April 23, 1991 (56 18496–18502). As explained above, its effective date has been postponed indefinitely.

The Final Regulatory Impact Analysis indicates that the implementation of user fees on the three service categories (inspection of international commercial aircraft, issuance of phytosanitary certificates, and export/import of animals and birds) is expected to save taxpayers over $26 million per year. The total discounted value at 10 percent over 5 years is estimated to be about $106 million. Total administrative costs to the Department associated with fee collection for the inspection of international commercial aircraft and the issuance of phytosanitary certificates are estimated to be about $1.6 million annually, or a discounted value of about $6.5 million over 5 years.

The implementation of user fees for the inspection of international commercial aircraft is expected to provide tax savings of $19 million a year (a discounted value over 5 years of about $79 million). User fees for the issuance of phytosanitary certificates are expected to accrue savings of at least $3 million annually (a discounted value over 5 years of about $13 million).

Administrative costs associated with the collection and implementation of user fees for the inspection of international commercial aircraft is estimated at about $179,000 annually (a discounted value over 5 years of about $746,000). Administrative costs associated with the collection and implementation of fees for phytosanitary certificates are estimated at about $300,000 a year (a discounted value over 5 years about $1.3 million).

The implementation of user fees for services related to the export and import of animals or birds is expected to yield savings to taxpayers of $4 million per year (a discounted value over 5 years of about $17 million).

The two final user fee rules that have already been published (one for international air passengers and commercial trucks, rail cars and foreign vessels, and one for domestic air travel) were estimated to have a combined annual impact of $93 million in the form of savings to taxpayers. The savings estimated to accrue from the first rule on international air passengers and commercial vehicles comprise 83 percent of this total while the remaining 17 percent in savings is attributed to passenger fees for domestic travel.

These previous rules and the regulations proposed in this document are expected to provide a combined total savings of about $119 million annually. The discounted value of this amount is estimated at about $496 million over 5 years. The fees on the three categories of service proposed in this rule are expected to contribute 22 percent of the total savings.

Total administrative costs associated with implementing all user fee rules are estimated at about $2 million annually (a discounted value in the amount of $9 million). Only 20 percent of this amount is expected to be incurred in implementing the fees proposed in this rule.

The Regulatory Flexibility Act requires that APHIS specifically consider the economic impact of imposing user fees on "small" affected entities. The number of entities which may be qualified as small in each category is not available. However, except for airlines, it is likely that the majority of exporters of agricultural goods and importers of animals and birds can be categorized as small. The impact of user fees on all these groups is expected to be minor since the fee in each category represents a small fraction of the total operating costs for each small entity.

Our final Regulatory Impact Analysis is available for inspection at USDA, room 1141, South Building, 14th Street and Independence Avenue, SW., Washington, DC, between 8 a.m. and 4:30 p.m., Monday through Friday,



HeinOnline -- 57 Fed. Reg. 768 1992

except holidays, or by telephoning (202) 382–1368.

**Executive Order 12606**

We have analyzed these regulations in accordance with Executive Order 12606, and have determined that this rule has no potential impact on the family well-being. We have determined that this rule: does not affect the stability of the family, and particularly, the martial commitment; does not affect the authority and rights of parents in the education, nurture, and supervision of their children; does not help or hinder the family to perform its functions; does not substitute governmental activity for family functions; and does not affect family earnings. We have also determined that the benefits of this action justify and impact it may have on the family budget, and that this activity cannot be carried out by a lower level of government or by the family itself. This rule sends no message, intended or otherwise, to the public concerning the status of the family or to young people concerning the relationship between their behavior, their personal responsibiltity, and the norms of our society.

**Paperwork Reduction Act**

In accordance with section 3507 of the Paperwork Reduction Act of 1980 (44 U.S.C. Chapter 35), the information collection provisions that are included in this final rule have been submitted for approval to the Office of Management and Budget.

**Executive Order 12372**

This program activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 7 CFR part 3015, subpart V.)

**Lists of Subjects**

*7 CFR Part 354*

Agricutural commodities, Exports, Government employees, Imports, Phytosanitary certificates, Plants (agriculture), Quarantine, Transportation.

*9 CFR Part 130*

Animals, Birds, Exports, Imports, Poultry, Quarantine, Tests.

Accordingly, we are amending 7 CFR part 354 and 9 CFR chapter I as follows:

**7 CFR PART 354—OVERTIME SERVICES RELATING TO IMPORTS AND EXPORTS; AND USER FEES**

1. The authority citation for part 354 continues to read as follows:

**Authority:** 7 U.S.C. 2260, 21 U.S.C. 136 and 136a; 49 U.S.C. 1741, 7 CFR 2.17, 2.51, and 371.2(c).

**§ 354.3 [Amended]**

2. In § 354.3, paragraph (a) is amended to add, in alphabetical order, the following definitions:

* * * * *

*Commercial purpose.* The intention of receiving compensation, or making a gain or profit.

* * * * *

*Commercial shipment.* A shipment for gain or profit.

* * * * *

*Designated State inspector.* A State employee designated by APHIS to conduct inspections for phytosanitary export certification and to sign certificates on behalf of APHIS.

* * * * *

*Phytosanitary certificate.* A document certifying that agricultural products moving from one country to another are free from quarantine pests, and particularly free from other injurious pests.

*Phytosanitary certificate for reexport.* A document certifying that agricultural products which moved into the United States from another country and which are now moving from the United States to another country, remained free from quarantine pests, and practically free from other injurious pests while in the United States.

*Processed product certificate.* A document certifying that processed agricultural products moving from the United States are believed to be free from injurious plant pests.

3. In § 354.3, paragraph (e) is redesignated as paragraph (f), and a new paragraph (e) is added to read as follows:

**§ 354.3 User fees for certain international services.**

* * * * *

(e) *Fee for inspection of commercial aircraft.* (1) Except as provided in paragraph (e)(2) of this section, an APHIS user fee will be charged for each commercial aircraft which is arriving, or which has arrived and is proceeding from one United States airport to another under a United States Customs Service "Permit to Proceed," as specified in title 19, Code of Federal Regulations, §§ 122.81 through 122.85, or an "Agricultural Clearance or Safeguard Order" (PPQ Form 250), used pursuant to title 7, Code of Federal Regulations, § 330.400 and title 9, Code of Federal Regulations, § 94.5, and which is subject to inspection under part 330 of this chapter or 9 CFR chapter I, subchapter D. Each carrier is responsible for paying the APHIS user fee. The APHIS user fee is $76.75 for each arrival.

(2) The following categories of commercial aircraft are exempting from paying an APHIS user fee:

(i) Any aircraft moving solely between the United States and Canada;

(ii) Any aircraft used exclusively in the governmental services of the United States or a foreign government, including any Agency or political subdivision of the United States or a foreign government, so long as the aircraft is not carrying persons or merchandise for commercial purposes;

(iii) Any aircraft making an emergency or forced landing when the original destination of the aircraft was a foreign port;

(iv) Any aircraft with 30 or fewer seats, which is not carrying cargo and which is not equipped to offer inflight food service;

(v) Any aircraft moving from the United States Virgin Islands to Puerto Rico; and

(vi) Any aircraft making an intransit stop at a port of entry, during which the aircraft does not proceed through any portion of the Federal clearance process, such as inspection or clearance by APHIS, by the United States Customs Service, or by the Immigration and Naturalization Service, no cargo is removed from or placed on the aircraft, no passengers get on or off the aircraft, no crew members get on or off the aircraft, no food is placed on the aircraft, and no garbage is removed from the aircraft.

(3) *Remittance and statement procedures.* (i) Each carrier must remit the appropriate fees to the United States Department of Agriculture, National Finance Center, COD Field Office, P.O. Box 73562, Chicago, IL 60673, for receipt no later than 31 days after the close of the calendar quarter in which the vessel arrivals occurred. Late payments will be subject to interest, penalty, and handling charges as provided in the Debt Collection Act of 1982 (31 U.S.C. 3717).

(ii) At the same time a remittance is submitted the remitter must mail a written statement to the United States Department of Agriculture, National Finance Center, Billings and Collections Branch, P.O. Box 60950, New Orleans, LA 70160. The statement must include the following information:



HeinOnline -- 57 Fed. Reg. 769 1992

(A) Name and address of the person remitting payment;

(B) Taxpayer identification number of the person remitting payment;

(C) Calendar quarter covered by the payment;

(D) Ports of entry at which inspections occurred;

(E) Number of arrivals at each port; and

(F) Amount remitted.

(iii) Remittances must be made by check or money order, payable in United States dollars, through a United States bank, to "The Animal and Plant Health Inspection Service."

(4) *Compliance.* Each carrier subject to this section must allow APHIS personnel to verify the accuracy of the APHIS user fees remitted and to otherwise determine compliance with 21 U.S.C. 136a and this paragraph. Each carrier must advise the United States Department of Agriculture, National Finance Center, Billings and Collections Branch, P.O. Box 60950, New Orleans, LA 70160, of the name, address, and telephone number of a responsible officer who is authorized to verify APHIS user fee calculations and remittances. The United States Department of Agriculture, National Finance Center, Billings and Collections Branch, P.O. Box 60950, New Orleans, LA 70160, must be promptly notified of any changes in the identifying information submitted.

(5) *Limitations on charges.* (i) Airlines will not be charged reimbursable overtime for inspection of aircraft if the aircraft is subject to the APHIS user fee for arriving aircraft as prescribed by this section.

(ii) Airlines will not be charged reimbursable overtime for inspection of cargo from an aircraft if:

(A) the aircraft is subject to the APHIS user fee for arriving aircraft as prescribed by this section; and

(B) the cargo is inspected between 8 a.m. and 4:30 p.m., Monday through Friday; or

(C) the cargo is inspected concurrently with the aircraft.

**§ 354.3 [Amended]**

4. In § 354.3(f)(1), the words "paragraph (e)(2)" is removed and "paragraph (f)(2)" is added in their place.

5. In § 354.3, new paragraphs (g), (h), and (i) are added to read as follows:

**§ 354.3 User fees for certain international services.**

* * * * *

(g) *Fees for export certification of plants and plant products.* (1) For each certificate issued by APHIS personnel, the recipient must pay the applicable APHIS user fee at the time and place the certificate is issued, or, in the case of a block of certificates, at the time the certificates are given to the shipper.

(2) There is no APHIS user fee for a certificate issued by a designated State inspector.

(3) If a designated State inspector issues a certificate, the State where the certificate is issued may charge for inspection services provided in that State.

(4) Any State which wishes to charge a fee for services it provides to issue certificates must establish fees in accordance with the following guidelines:

(i) The State must:

(A) Estimate the annual number of certificates to be issued;

(B) Determine the total cost of issuing certificates by adding together delivery,[2] support,[3] and administrative[4] costs; and

(C) Divide the cost of issuing certificates by the estimated number of certificates to be issued to obtain a "raw" fee.

(ii) The State may round the "raw" fee up to the nearest quarter, if necessary for ease of calculation, collection, or billing.

(5) The APHIS user fees are:

(i)(A) $30 for a certificate for a commercial shipment; or

(B) $19 for a certificate for a low-value commercial shipment, if the following criteria are met:

(*1*) the items being shipped are identical to those identified on the phytosanitary certificate;

(*2*) the shipment is accompanied by an invoice which states that the items being shipped are worth less than $1,250; and

(*3*) the shipper requests that user fee charged be based on the low value of the shipment;

(ii) $19 for a certificate for a noncommercial shipment;

(iii) $30 for a certificate for reexport of a commercial shipment;

(iv) $30 for a processed product certificate for a commercial shipment;

(v) $6 for reissuing any certificate or certificate for reexport; and

(h) *Refunds of APHIS user fees.* (1) A shipper who pays for a block of certificates to cover commercial shipments may obtain a refund or a credit against future APHIS user fees under the following circumstances:

(i) If a certificate from the block is voided;

(ii) If a certificate from the block is returned unused;

(iii) If the shipper pays for inspection outside of normal business hours (8 a.m. to 4:30 p.m.) under § 354.1 of this part.

(iv) If a certificate from the block is used for a noncommercial shipment; or

(v) If a certificate from the block is used to reissue another certificate.

(2) The amount of any refund or credit will be the amount overcharged, less $6 to cover APHIS administrative expenses.

(i) *Payment methods.* For payment of any of the APHIS user fees required in paragraph (g) of this section, we will accept personal checks for amounts less than $100, and checks drawn on commercial accounts, cashier's checks, certified checks, traveler's checks, and money orders for any amount. All payments must be for the exact amount due.

6. In § 354.4 new paragraph (c) is added to read as follows:

**§ 354.4 User fees for certain domestic services.**

* * * * *

(c) *Individual agreements for inspection services at ports of entry.* (1) Operators and owners of vessels or aircraft, or their agents, may enter into agreements with APHIS to receive, at points of entry in the United States inspection services in addition to the regular or on-call services available in connection with such vessels or aircraft.

(2) Agreements may be made to cover the following types of services;

(i) Opening and operating a new inspection station at a port of entry; and

(ii) Providing one-time or occasional inspection services at a location where APHIS does not normally provide such services.

(3) Owners and operators of vessels or aircraft, or their agents, must contact the Regional Director, USDA, APHIS, Plant Protection and Quarantine,[5] for

---

[2] Delivery costs are costs such as employee salary and benefits, transportation, per diem, travel, purchase of specialized equipment, and all costs associated with maintaining filed offices.

[3] Support costs are costs at supervisory levels which are similar to delivery costs, and costs such as training, automated data processing, public affairs, enforcement, communications, postage, budget and accounting services, and payroll, purchasing, billing and collection services.

[4] Administrative costs are costs incurred as a direct result of collecting and monitoring federal phytosanitary certificates.

[5] A list of the Regional Directors, USDA, APHIS, Plant Protection and Quarantine and the States for which they are responsible, may be obtained from the Deputy Administrator, Plant Protection and Quarantine, APHIS, USDA, Federal Building, 6505 Belcrest Road, Hyattsville, MD 20782.



HeinOnline -- 57 Fed. Reg. 770 1992

the State where they want APHIS to provide services, to make an agreement.

(4) All agreements must include the following:

(i) Name, mailing address, and telephone number of the operator or owner of the vessel or aircraft, or, if applicable, the operator's or owner's agent;

(ii) Explanation of inspection services to be provided;

(iii) Date(s) and time(s) inspection services will be provided;

(iv) Location (street address, port of entry, berth, dock, gate, etc.) and if applicable, identity (identification number, name, etc.) of vessel or aircraft or other thing to be inspected;

(v) An estimate of the actual cost, as calculated by APHIS, to provide the described inspection services for 6 months;

(vi) A statement that APHIS agrees to provide the described inspection services;

(vii) A statement that the owner or operator of the vessel or aircraft, or if appropriate, his or her agent, agrees to pay, at the time the agreement is entered into, a user fee equal to the estimated cost of providing the described inspection services for 6 months;

(viii) A statement that APHIS will credit an amount equal to all user fees received for services provided at the location to the owner or operator's account, until the total amount of user fees credited to the account is equal to the amount of money paid into the account by the owner or operator of the vessel or aircraft, or if appropriate, his or her agent, at the time the agreement was entered into; and

(ix) A statement that the owner or operator of the vessel or aircraft, or if appropriate, his or her agent, agrees to maintain a balance in the user fee payment account equal to the cost of providing the services described for 6 months, as calculated monthly by APHIS.

(5) APHIS will enter into an agreement only if qualified personnel can be made available to provide the services to be provided.

(6) An agreement can be terminated by either party on 30 days written notice.

(7) If, at the time an agreement is terminated, any unobligated funds remain in the user fee account, APHIS will return them to the owner or operator, or his or her agent.

7. A new § 354.5 is added to read as follows:

**§ 354.5 Penalties for nonpayment or late payment of user fees.**

(a) If a person requesting a service for which an APHIS user fee is payable, is delinquent in paying any APHIS user fee due under either title 7 or title 9, Code of Federal Regulations, or is delinquent in paying the interest on any delinquent APHIS user fee, then APHIS will not provide the service requested.

(b) If APHIS is in the process of providing a service for which an APHIS user fee is due, and the user has not paid the fee within the time required, or if the payment offered by the user is insufficient or not in compliance with the regulations in this part, then APHIS will take the following action:

(1) If an APHIS user fee is due for a certificate or a certificate for reexport, APHIS will not issue the certificate.

(2) If an APHIS user fee is past due by more than 30 days, APHIS will impose a late payment penalty and interest charges in accordance with 31 U.S.C. 3717.

## 9 CFR CHAPTER I—ANIMAL AND PLANT HEALTH INSPECTION SERVICE, DEPARTMENT OF AGRICULTURE

8. Chapter I is amended by redesignating subchapters F, G, H, I, J and K as subchapters G, H, I, J, K and L, and a new subchapter F consisting of part 130 is added to read as follows:

## SUBCHAPTER F—USER FEES

## PART 130—USER FEES

Sec.

130.1 Definitions.
130.2 User fees for individual animals and birds quarantined in APHIS Animal Import Centers.
130.3 User fees for exclusive use of buildings at APHIS Animal Import Centers.
130.4 User fees for services at privately operated permanent import-quarantine facilities.
130.5 User fees for services at privately operated temporary import-quarantine facilities.
130.6 User fees for endorsing export health certificates.
130.7 User fees for inspection and supervision services provided within the United States for export animals and birds.
130.8 User fees for inspection services outside the United States.
130.9 through 49 [Reserved]
130.50 Payment of user fees.
130.51 Penalties for nonpayment or late payment of user fees.

Authority: 21 U.S.C. 136 and 136a; 7 CFR 2.17, 2.51, and 371.2(d).

**§ 130.1 Definitions.**

As used in this part, the following terms shall have the meaning set forth in this section.

*Administrator.* The Administrator of the Animal and Plant Health Inspection Service, or any person authorized to act for the Administrator.

*Animal.* All animals except birds, but including poultry.

*Animal and Plant Health Inspection Service (APHIS).* The Animal and Plant Health Inspection Service of the United States Department of Agriculture.

*Animal Import Center.* Quarantine facilities operated by APHIS in Newburgh, New York; Miami, Florida; and Honolulu, Hawaii.[1]

*APHIS animal health technician.* An animal health technician employed by APHIS, who is authorized to perform services required by Title 9, Code of Federal Regulations, Chapter I.

*APHIS veterinarian.* A veterinarian employed by APHIS, who is authorized to perform the services required by Title 9, Code of Federal Regulations, Chapter I.

*Bird.* Any member of the class aves, other than poultry.

*Domestic animal.* Any animal imported into the United States for any purpose other than exhibition in a zoo, park or other place maintained for the exhibition of live animals for recreational or educational purposes.

*Equine.* Any horse, ass, mule, or zebra.

*Export health certificate.* An official document endorsed by an APHIS veterinarian which, as required by the importing country, states that animals or birds to be exported from the United States are free of certain diseases and pests.

*Game cock.* Any chicken bred, trained, or imported for cock fighting.

*Person.* An individual, corporation, partnership, trust, association, or any other public or private entity, or any officer, employee, or agent thereof.

*Poultry.* Chickens, doves, ducks, geese, grouse, guinea fowl, partridges, pea fowl, pheasants, pigeons, quail, swans, and turkeys.

*Standard feed.* Seed, or dry feeds such as dog food or monkey biscuits, whether soaked in water or not.

*Zoo animal.* Any animal, including poultry, intended for exhibition in a zoo, park or other place maintained for the

[1] The addresses of Animal Import Centers may be obtained from the Deputy Administrator, Veterinary Services, APHIS, USDA, Federal Building, 6505 Belcrest Road, Hyattsville, MD 20782.



HeinOnline -- 57 Fed. Reg. 771 1992

exhibition of live animals for recreational or educational purposes.[2]

*Zoo bird.* Any bird intended for exhibition in a zoo, park or other place maintained for the exhibition of live animals or birds for recreational or educational purposes.[3]

*Zoo equine.* Any equine intended for exhibition in a zoo, park or other place maintained for the exhibition of live animals for recreational or educational purposes.[4]

**§ 130.2 User fees for individual animals and birds quarantined in APHIS Animal Import Centers.**

(a) The following user fees, which include standard care, feed, and handling, must be paid for each animal or bird quarantined in an Animal Import Center: [5]

| Animal or bird | Daily fee |
|---|---|
| Birds (including zoo birds): | |
| 0–250 grams | $0.75 |
| 251–1,000 grams | 2.75 |
| over 1,000 grams, and any bird in nonstandard housing or receiving non-standard care and handling | 6.50 |
| Poultry (including zoo poultry): | |
| A. doves, pigeons, quail | 1.75 |
| B. chickens, ducks, grouse, guinea fowl, partridge, pea fowl, pheasants | 3.00 |
| C. game cocks, geese, swans, turkeys, any poultry housed in non-standard housing or receiving non-standard care and handling | 7.00 |
| Equines (including zoo equines): | |
| 1st through 3rd day | 128.50 |
| 4th through 7th day | 93.25 |
| 8th and later days | 79.00 |
| Zoo animals (except equines, birds, and poultry) | 28.00 |
| Domestic animals: | |
| Camels, cattle, bison, buffalo | 49.00 |
| All others: | 13.00 |

(b) The importer may, at his or her option, request that birds or poultry be housed in nonstandard housing. Nonstandard housing is individual housing, any housing not normally available at the Animal Import Center, any housing constructed or purchased at the request of the importer, any housing with blinds, dense foliage, or plants, and any housing where the temperature can be adjusted.

(c) The importer may, at his or her option, request that birds or poultry be given nonstandard care and handling. Nonstandard care and handling includes hand-feeding, more than one feeding a day, frequent observation, and any handling or observation which requires personnel to attend to the birds or poultry outside of normal business hours.[6]

(d) If any bird or poultry is fed a diet other than seed, including but not limited to diets of fruit, insects, nectar or fish, the importer must either provide feed or pay for it on an actual cost basis, including the cost of delivery to the Animal Import Center.

(e) Any reservation fee paid by the importer under part 92 of this chapter, will be applied to the APHIS user fees due for animals or birds quarantined in an Animal Import Center.

**§ 130.3 User fees for exclusive use of buildings at APHIS Animal Import Centers.**

(a) An importer may, at his or her option, occupy entire quarantine buildings at the Animal Import Centers specified below. A user fee will be charged for each building as follows:

| Animal import center | Building size | Montly fee |
|---|---|---|
| Newburgh, New York. | 72 feet x 82 feet | $39,450 |

(b) Users must provide APHIS personnel at the Animal Import Center, at the time they make a reservation for quarantine space, with the following information:

(1) Species of animals and birds to be quarantined;

(2) Ages of animals and birds to be quarantined; and

(3) Sizes of animals and birds to be quarantined.

(c) APHIS personnel at the Animal Importer Center will determine, based on the information provided by the importer under paragraph (b) of this section, and on routine husbandry needs, the maximum number of animals and birds permitted in the requested building.

(d) The importer must provide feed, or pay for it on an actual cost basis, including cost of delivery to the Animal Import Center.

**§ 130.4 User fees for services at privately operated permanent import-quarantine facilities.**

A daily user fee of $49.25 must be paid for each animal quarantined in a privately operated permanent import-quarantine facility.

**§ 130.5 User fees for services at privately operated temporary import-quarantine facilities.**

(a) A user fee must be paid for each animal quarantined in a privately operated temporary import-quarantine facility.

(b) The user fees are:

(1) $33.50 per hour for service performed by an APHIS veterinarian;

(2) $21.75 per hour for service performed by an APHIS Animal Health Technician.

**§ 130.6 User fees for endorsing export health certificates.**

(a) The following user fees must be paid for each export health certificate requested [7] for the following types of animals, regardless of the number of animals covered by the certificate:

| Certificate categories | User fee |
|---|---|
| Slaughter animals, of any type, moving to Canada or Mexico | $10.00 |
| Non-slaughter horses to Canada | 10.00 |
| Poultry | 2.00 |
| Hatching eggs | 2.00 |
| Other animals and birds | 4.00 |

(b)(1) The following user fees must be paid for each export certificate requested for animals and birds, depending on the number animals or birds covered by the certificate and the number of tests required:

| Number of tests required | Number of animals on certificate | Fee |
|---|---|---|
| 1–2 | First animal | $38.00 |
| | Each additional animal. | 1.00 |
| 3–6 | First animal | 41.50 |
| | Each additional animal. | 1.25 |
| 7 or more | First animal | 44.00 |
| | Each additional animal. | 1.50 |

(2) If an export certificate covers more than one animal, but the number of tests required for different animals are not the same, the user fee for the certificate is the fee which would be due if all the animals on the certificate required the same number of tests as the animal which requires the greatest number of tests.

(c) The user fees prescribed in this section will not apply to an export health certificate if it is endorsed by an APHIS veterinarian in the course of performing inspection or supervision

[2] Regulations concerning approval of zoos and requirements for importing wild animals are found in part 912 of this chapter.

[3] See footnote 2.

[4] See footnote 2.

[5] APHIS Animal Import Centers are located in Honolulu, HI, Miami, FL, and Newburgh, NY. The addresses of these facilities are published in part 92 of this chapter.

[6] Normal business hours at the Animal Import Centers are: 7:30 a.m. to 11:30 a.m., Honolulu, HI; 7 a.m. to 3:30 p.m., Miami, FL; and 8 a.m. to 4:30 p.m., Newburgh, NY.

[7] An export certificate may need to be endorsed for an animal being exported from the United States if the country to which the animal is being shipped requires one. APHIS endorses export certificates as a service to the public.



HeinOnline -- 57 Fed. Reg. 772 1992

services for the animals listed on the certificate, and an APHIS user fee is payable under § 130.7 of this part for the inspection or supervision services performed by the veterinarian.

**§ 130.7 User fees for inspection and supervision services provided within the United States for export animals or birds.**

(a) A user fee must be paid for the following APHIS services provided within the United States for export animals or birds:

(1) Inspect an export isolation facility;

(2) Supervise animal or bird rest periods prior to export; and

(3) Supervise loading or unloading of animals or birds for export shipment.

(b) The user fees are:

(1) $33.50 per hour for service performed by an APHIS veterinarian;

(2) $21.75 per hour for service performed by an APHIS Animal Health Technician.

**§ 130.8 User fees for inspection services outside the United States.**

(a) If inspection services (including inspection, testing, and supervision services) are performed outside the United States, in accordance with this title, and the regulations do not contain a provision for payment of the cost of the service, the person requesting the service must pay a user fee under this section.

(b) Any person who wants APHIS to provide inspection services outside the United States must contact the Import/Export Staff, USDA, APHIS, Veterinary Services, Federal Building, Hyattsville, MD 20782, to make an agreement.

(c) All agreements must include the following:

(1) Name, mailing address, and telephone number of either the person requesting the inspection services, or his or her agent;

(2) Explanation of inspection services to be provided, including the regulations in Title 9, Code of Federal Regulations which provide for the services;

(3) Date(s) and time(s) the inspection services are to be provided;

(4) Location (including street address) where inspection services are to be provided;

(5) An estimate of the actual cost, as calculated by APHIS, to provide the described inspection services for 6 months;

(6) A statement that APHIS agrees to provide the inspection services;

(7) A statement that the person requesting the inspection services, or, if appropriate, his or her agent, agrees to pay, at the time the agreement is entered into, a user fee equal to the estimated cost of providing the described inspection services for 6 months; and

(8) A statement that the person requesting the inspection services, or, if appropriate, his or her agent, agrees to maintain a user fee payment account equal to the cost of providing the described inspection services for 6 months, as calculated monthly by APHIS.

(d) APHIS will enter into an agreement only if qualified personnel can be made available to provide the inspection services.

(e) An agreement can be terminated by either party on 30 days written notice.

(f) If, at the time an agreement is terminated, any unobligated funds remain in the user fee payment account, APHIS will refund the funds to the person who requested the inspection services, or his or her agent.

**§§ 130.9 through 130.49 [Reserved]**

**§ 130.50 Payment of user fees.**

(a) All user fees must be paid as follows:

(1) User fees for animals in Animal Imports Centers or privately-operated permanent import-quarantine facilities must be paid at the time the animals are released from quarantine;

(2) User fees for animals in privately-operated temporary import-quarantine facilities must be paid when billed;

(3) User fees for supervision and inspection services specified in § 130.7 must be paid when billed; and

(4) User fees for export health certificates must be paid either prior to receipt of endorsed certificates or when billed. Payment prior to receipt of endorsed certificates must continue until APHIS determines that the user has established an acceptable credit history, at which time payment may, at the option of the user, be made when billed.

(b) User fees may be paid by the following methods:

(1) Cash, if payment is made at an area office [8] or an Animal Import Center;

(2) All types of checks, including traveler's checks;

(3) Money orders; or

(4) Credit cards (VISA and Master Card) if payment is made at the Animal Import Centers in Newburgh, NY, or in Miami, FL, or at the USDA, APHIS, VS, office at John F. Kennedy International Airport, Jamaica, NY.

[8] A list of APHIS Area Offices may be obtained from the Deputy Administrator, Veterinary Services, APHIS, USDA, Federal Building, 6505 Belcrest Road, Hyattsville, MD 20782.

(c) Payment must be for the exact amount due.

**§ 130.51 Penalties for nonpayment or late payment of user fees.**

(a) If a person requesting a service for which an APHIS user fee is payable, is delinquent in paying any APHIS user fee due under either title 7 or title 9, Code of Federal Regulations, or is delinquent in paying the interest on any delinquent APHIS user fee, then APHIS will not provide the service requested.

(b) If APHIS is in the process of providing a service for which an APHIS user fee is due, and the user has not paid the fee within the time required, or if the payment offered by the user is inadequate or unacceptable, then APHIS will take the following action:

(1) If an APHIS user fee is due for animals or birds in quarantine at an Animal Import Center or at a privately-operated import-quarantine facility, APHIS will not release them; and

(2) If an APHIS user fee is due for an export health certificate, APHIS will not release the certificate.

(c) If user fees are paid later than 30 days after payment is due, APHIS will impose a late payment penalty and interest charges as in accordance with 31 U.S.C. 3717.

(d) Animals or birds left in quarantine at an Animal Import Center for more than 30 days after the end of the required quarantine period will be deemed to be abandoned.

(1) After APHIS releases the abandoned animals or birds from quarantine, APHIS may seize them and sell or otherwise dispose of them, as determined by the Administrator, provided that their sale is not contrary to any Federal law or regulation, and may recover all expenses of handling the animals or birds from the proceeds of their sale or disposition.

(2) If animals or birds abandoned in quarantine at an Animal Import Center cannot be released from quarantine, APHIS may seize and dispose of them, as determined by the Administrator, and may recover all expenses of handling the animals or birds from the proceeds of their disposition.

Done in Washington, DC, this 6th day of January 1992.

**Robert Melland,**

*Administrator, Animal and Plant Health Inspection Service.*

[FR Doc. 92-536 Filed 1-8-92; 8:45 am]

BILLING CODE 3410-34-M



HeinOnline -- 57 Fed. Reg. 773 1992