# Rules and Regulations

Federal Register
Vol. 62, No. 142
Thursday, July 24, 1997

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF AGRICULTURE

## Animal and Plant Health Inspection Service

## 7 CFR Part 354

**[Docket No. 96-038-3]**

**RIN 0579-AA81**

## User Fees; Agricultural Quarantine and Inspection Services

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** We are amending the user fee regulations by adjusting the fees charged for certain agricultural quarantine and inspection services we provide in connection with certain commercial vessels, commercial trucks, commercial railroad cars, commercial aircraft, and international airline passengers arriving at ports in the customs territory of the United States. We are setting user fees in advance for these services for fiscal years 1997 through 2002. We have determined that the fees must be adjusted to reflect the anticipated actual cost of providing these services through fiscal year 2002.

**EFFECTIVE DATE:** September 1, 1997.

**FOR FURTHER INFORMATION CONTACT:** For information concerning Program Operations, contact Mr. Jim Smith, Operations Officer, Program Support, PPQ, APHIS, 4700 River Road Unit 60, Riverdale, MD 20737-1236, (301) 734-8295.

For information concerning rate development, contact Ms. Donna Ford, User Fees Section Head, FSSB, BAD, APHIS, 4700 River Road Unit 54, Riverdale, MD 20737-1232, (301) 734-8351.

**SUPPLEMENTARY INFORMATION:**

### Background

The regulations in 7 CFR 354.3 (referred to below as the "regulations") contain provisions for the collection of user fees for certain agricultural quarantine and inspection (AQI) services provided by the Animal and Plant Health Inspection Service (APHIS). These services include, among other things, inspecting certain commercial vessels, commercial trucks, commercial railroad cars, commercial aircraft, and international airline passengers arriving at ports in the customs territory of the United States from points outside the United States. (The customs territory of the United States is defined in the regulations as the 50 States, the District of Columbia, and Puerto Rico.)

These user fees are authorized by section 2509(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136a). This statute, known as the Farm Bill, was amended by section 504 of the Federal Agriculture Improvement and Reform Act of 1996 (Pub. L. 104-127), on April 4, 1996.

As amended, the Farm Bill provides that APHIS may prescribe and collect fees sufficient to cover the cost of providing AQI services in connection with the arrival, at a port in the customs territory of the United States, of commercial vessels, commercial trucks, commercial railroad cars, commercial aircraft, and international airline passengers. The Farm Bill, as amended, also provides that APHIS may prescribe and collect fees sufficient to cover the cost of providing preclearance or preinspection at a site outside the customs territory of the United States to such passengers and vehicles. The Farm Bill, as amended, further states that the fees should be sufficient to cover the cost of administering the fee program, and sufficient to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account. In addition to user fees, the Farm Bill, as amended, authorizes APHIS to assess late payment penalties and interest charges if a person fails to pay a fee when due. The Farm Bill, as amended, establishes a no-year fund, known as the "Agricultural Quarantine Inspection User Fee Account" (Account), in the Treasury of the United States. All fees, late payment penalties, and interest charges collected by APHIS through fiscal year (FY) 2002 are to be deposited in the Account. For each FY 1997 through 2002, funds in the Account are available to APHIS, until expended, to cover the costs of providing AQI services and administering the AQI program.

For each of FYs 1997 through 2002, fees collected in excess of $100 million may be used to cover the costs of providing AQI services and are automatically available.

Under the Farm Bill, as amended, we may spend all AQI user fees we collect in excess of $100 million for FYs 1997 through 2002, as long as we spend the money only to provide AQI services. Any money we do not spend must remain in the Account. After FY 2002, any unobligated balance in the Account and any other amounts collected but not disbursed will be credited to APHIS for future AQI activities.

On January 27, 1997, we published in the **Federal Register** (62 FR 3823-3830, Docket No. 96-038-1) a proposal to amend the regulations by adjusting our user fees for servicing certain commercial vessels, commercial trucks, commercial railroad cars, commercial aircraft, and international airline passengers arriving at ports in the customs territory of the United States from points outside the United States and setting user fees in advance for these services for FY 1997 through 2002.

We solicited comments concerning our proposal for 60 days ending March 28, 1997. We received 15 comments by that date. They were from county and State government agencies, airline industry representatives, maritime representatives, and agriculture representatives, including producers and farmers.

Five commenters approved of the proposal as written. Ten commenters opposed some portion of the proposal, supported part of the proposal, or offered suggestions for improvements. Several commenters disagreed with the amount of our fees, questioned our projections, or questioned fees such as the annual truck decal, the vessel fee, and the aircraft fee versus the international passenger fee. We carefully considered the comments, all of which are discussed below by topic, and reviewed our analysis. However, none of the commenters offered additional information to revise our analysis. In the absence of any new



HeinOnline -- 62 Fed. Reg. 39747 1997

information, we continue to believe that the analysis presented in the proposal is sound and that the proposed fees are appropriate. Therefore, based on the rationale set forth in the proposed rule and in this document, we are adopting the provisions of the proposed rule as a final rule without change.

**Fees for 6 Years in Advance**

Two commenters disliked our proposal to adopt user fees for 6 years in advance; three commenters liked the idea.

By proposing user fees in advance for a 6-year period, we are responding to comments we received in response to past proposals. Those commenters stated that it was difficult to make business plans without knowing in advance when fees would change and by how much. Also, commenters have, in the past, objected to large fee increases, even though they occurred infrequently. We believe adopting user fees for 6 years in advance alleviates these concerns. Under this rule, business planning should be easier and fee increases will be more gradual.

**Vessel Inspection Fee**

Two commenters objected to the increase in the vessel inspection fee. They based their objections on the small percentage of ships that are boarded in the Port of Hampton Roads in Virginia.

We inspect almost all internationally arriving vessels at ports of entry in the United States. The user fees for these inspections are based on the total cost of the vessel inspection program. The type of inspection ranges from an exterior inspection from outside the vessel to a boarding of the vessel for full-scale inspection of the interior and cargo. The decision to board a vessel is based on numerous variables, including the origin, cargo, and type of the vessel, which indicate the risk presented by a vessel of introducing foreign pests and diseases into the United States. A system that attempted to account for every possible inspection situation would be unwieldy and expensive to administer and would most likely result in higher user fees.

One commenter suggested that all options to reduce costs should be considered before raising vessel inspection fees.

We agree with the commenter's approach. We are constantly trying to reduce costs and minimize necessary cost increases. We raise our user fees only when necessary to reflect unavoidable cost increases. Likewise, because APHIS user fees reflect the actual cost of providing a service, if we can reduce the cost of a service, we can reduce the user fee for that service.

**User Fees for Commercial Trucks**

One commenter questioned why commercial trucks entering the United States from Canada are exempt from paying an APHIS user fee and suggested that trucks from Canada should pay the same fee as trucks entering from Mexico.

APHIS restricts the importation of plants and animals and/or plant and animal products from foreign countries based on the pest or disease risk associated with those imports. In many cases, such imports from Canada present a very low risk, and few restrictions apply. Under these circumstances it is not necessary for APHIS to provide inspection services for commercial trucks from Canada. Because APHIS provides no inspection services, an APHIS user fee is not justified.

One commenter agreed that the lower truck decal price for FY 1997 is warranted. However, the commenter suggested that equity might call for a 1-year moratorium on increasing the individual truck crossing fee so that the two fees would not have a noticeable difference. Another commenter questioned who is subsidizing the shortfall in user fees for providing AQI inspections for trucks using the annual decal during FY 1997.

As explained in the proposed rule, both the truck decal and individual truck crossing fees must be raised. The FY 1997 truck decal cannot be changed because the decals have already been printed and many have been sold. Therefore, APHIS is covering the FY 1997 truck decal shortfall from the reserve fund. However, we believe the individual crossing fee must be increased for FY 1997, to help ensure that the full cost of inspecting these trucks is covered by user fees. It should be noted that, by the date this rule is effective, FY 1997 will be more than half over, and most truck decals are purchased early in the year. Therefore, the disparity between the FY 1997 truck decal fee and the individual crossing fee will be temporary and most likely minimal.

In addition, it is less expensive and more efficient to allow prepayment of fees for commercial trucks than to attempt to collect and process a fee for each arrival. It is possible that individual trucks might pay more in user fees if there were no prepayment provisions. However, the possible loss that will be incurred in FY 1997 if there is a shortfall is more than offset by the savings of a more efficient collection system.

One commenter stated that the annual decal for commercial trucks violates the law, stating that the decal user fee would not cover the cost of inspections. For example, if the truck with a decal entered the United States enough times, then the average fee per inspection would be lower than the actual cost for the service.

Our user fees cover the cost of providing services for the entire inspection program. Therefore, sometimes fees may be more or less than the actual cost of services received for individual cases. As explained in our proposal, the user fee for the annual decal for commercial trucks is calculated as 20 times the individual crossing fee. The total collected for commercial truck user fees for annual decals and individual crossing fees is expected to recover the cost of providing those inspection services.

**Commercial Truck Versus Commercial Aircraft User Fees**

One commenter stated that inspecting a commercial truck takes approximately the same amount of time as inspecting a commercial aircraft and implied that the fees should be the same.

In our experience, inspecting a commercial aircraft is much more involved than inspecting a commercial truck, and, therefore, takes longer. The result is a higher user fee for aircraft.

One commenter complained that commercial airlines should be offered quantity discounts similar to that offered commercial trucks through our decal system.

The annual decal available for trucks is a joint APHIS–U.S. Customs Service (Customs) decal covering fees for inspections by both agencies. Commercial trucks may purchase an annual decal for APHIS inspections when they purchase an annual decal from Customs. Although this exact approach would probably not be applicable to aircraft, we appreciate the commenter's suggestion. If we decide to make any changes based on this comment, we will publish a proposal in the **Federal Register** for public comment.

**Commercial Aircraft and Airline Passenger User Fees**

One commenter pointed out that passenger and aircraft inspection fees would represent a large percent of AQI collections in each year from FY 1997 through 2002. The commenter implied that passenger and aircraft inspection fees subsidize other AQI services. Further, the commenter asserted that

HeinOnline -- 62 Fed. Reg. 39748 1997

since we do not charge user fees for private vehicles entering the United States at land border ports, it appears that those individuals and vehicles who do pay user fees are subsidizing the inspection process.

Each service category was considered separately. Each category must, through user fee receipts, return enough money to APHIS to cover the cost of providing AQI services to that particular category. Costs were assigned directly to a category when the cost directly related to providing the service. For example, our detector dog program only applies to passenger inspections. Therefore, the passenger inspection fees includes the full costs for the detector dog program. However, where a cost benefits all categories of service, it was pro-rated among the categories based on historic direct labor staff hours.

AQI user fees are used only for user fee related activities. APHIS receives appropriated funds to cover the costs of those AQI services not covered by user fees. This includes, among other things, inspection of passengers and aircraft from Hawaii and Puerto Rico, and certain Mexican land border activities, including pedestrian and personal vehicle inspections. Commercial aircraft and aircraft passenger fees do not subsidize any other AQI services.

One commenter stated that the air passenger fee should cover the inspection of the aircraft as well. Two commenters stated that a separate fee for inspection of the aircraft and its passengers violates the law. The commenters asserted that the inspection of the aircraft for food items and garbage is specifically passenger related. The commenters point out that neither Customs nor the Immigration and Naturalization Service (INS) assess a commercial aircraft fee separate from a passenger fee.

On January 9, 1992, we published a final rule in the **Federal Register** (57 FR 755–773, Docket No. 91–135) that amended our user fees to shift all passenger-related inspection costs from the aircraft user fee to the airline passenger user fee. The airline passenger user fee includes the cost of inspections related to the presence of passengers on aircraft, such as inspection of the passenger cabin. Specifically, the airline passenger user fee covers inspection of the aircraft galley, including garbage, the passenger compartment, the baggage hold, and all related administrative and overhead expenses. The aircraft fee covers the inspection of the aircraft and its cargo.

Passengers and aircraft, and the cargo it carries, pose different risks of bringing foreign diseases and pests into the United States. For example, passengers may have visited a farm that may present agricultural concerns, or they may be carrying infested fruits or vegetables or infected meat on their persons or in their baggage. Aircraft may be infested with a pest that has escaped from infested cargo or entered the aircraft when it was in an infested locality. Therefore, aircraft or cargo may need to be fumigated or disinfected. For all these reasons, passengers and their baggage must be inspected separately and in a different manner than the aircraft and its cargo.

It seems appropriate that passengers themselves pay the APHIS user fees for passengers. Although airlines collect the APHIS passenger user fee along with the price of the ticket and then remit the APHIS user fee to APHIS, the airlines could be charged a user fee that would cover the entire cost of both aircraft and passenger inspections. If we decide to consider such a change, we will publish a proposal in the **Federal Register** for public comment.

**International Trade**

One commenter asserted that raising user fees could decrease exports.

Although some countries do not currently charge for export-related services, such as inspections, user fees for these services are being adopted by more and more countries. Therefore, we do not believe that U.S. exporters are at a competitive disadvantage compared with exporters in other countries.

**Unrestricted Access to Resources**

One commenter suggested that APHIS should not have unrestricted access to resources.

We do not have unrestricted access to the funds collected through our user fees. Congress only gives access to the amount appropriated plus any amount of collected user fees above $100 million. Our access is also restricted in that we may only use the funds for AQI services rendered.

**Congressional Funding**

One commenter suggested that "if Congress stopped funding APHIS as a cost cutting measure, then APHIS should reduce spending and expenses."

Congress still funds APHIS with appropriated funds; however, the source of most of the appropriations for AQI services is collected user fees. The cost of providing AQI services is projected to exceed $100 million for each of the years 1997 through 2002, and the AQI user fees should generate enough funds to cover these costs. As explained in the proposed rule, APHIS automatically has access to user fee funds in excess of $100 million that are collected each year, but it takes appropriation action to make that first $100 million available to APHIS each year. If the full $100 million is not appropriated during any year between 1997 and 2002, APHIS may find it necessary to increase the amounts of individual user fees through rulemaking, thereby increasing the amount of fees collected in excess of $100 million. Increasing the fees by the proper amount would generate enough funds to compensate for the user fee funds diverted by an appropriation of less than $100 million, and would ensure that APHIS has enough funds to cover the costs of providing the AQI services.

**Automated Commercial System Investment in FY 1997 and 1998**

One commenter approved of our dedicating funds to fully implement our use of Customs' Automated Commercial System (ACS). Several other commenters expressed confusion about how and when the $3.175 million investment would be made.

We understand the confusion. To clarify, the implementation costs totaling $6.35 million were originally intended to be spent in FY 1996. Due to technology constraints, we did not implement the system in FY 1996. Therefore, our plan is to spread the implementation over 2 years with a one-time investment of $3.175 million each year. In the proposed rule, the spending estimates for FYs 1997 and 1998 included $3.175 million in each year for a total investment of $6.35 million for ACS implementation.

**Cost Cutting and Changes in Inspection Process**

One commenter suggested a USDA-wide reorganization in an effort to streamline costs.

A USDA-wide reorganization is outside the scope of our control and beyond the scope of the proposed rule. Nonetheless, we would like to point out that USDA has and is still undergoing reorganization to reduce costs and increase efficiency. As part of this reorganization, APHIS has taken actions to reduce costs and increase efficiency. Many of these actions are discussed later on in this document in response to other comments.

Several commenters questioned increasing the number of inspectors. One commenter asserted the percentage of these increases during FY 1996 did not relate to the growth in airline operations or a change in the form of the agricultural inspections. The commenter also questioned whether the large increase in staff in FY 1996 was a one

HeinOnline -- 62 Fed. Reg. 39749 1997

time augmentation or a new rate of growth.

The large increase in staff in FY 1996 was mandated by Congress to bring APHIS up to a reasonable level of service. With these new hires, we staffed new terminals, extended service hours, and provided more and better service. We increased staff based on need; however, we do not foresee increases such as in FY 1996 to become the trend. In fact, as stated in our proposal, we are planning to hire only 30 additional officers each year, which is fully in line with our estimates of volume increases.

Several commenters suggested that we should cut costs before raising user fees.

We are always looking for ways to reduce our costs. One cost cutting change we made this year was to centralize our detector dog training program. Previously, we had three separate training centers. These have all been combined into a single facility in Orlando, FL. This facility trains dogs to detect agricultural products.

We are planning in the near future to combine our regional offices into regional hubs over the next several years. Cost savings and better program delivery are two factors considered in this and other reorganizations. In addition, we have reduced Headquarters staffing, which lowers overhead costs.

Several commenters suggested that we should improve efficiency before raising user fees. One commenter specifically suggested that we should find new methods to improve efficiency and enforcement via risk assessment and selective or targeted inspection. One commenter suggested that we need a new approach to the inspection process and should look for innovative ways of performing inspections. One commenter complained that APHIS currently does not seem to use computers for its work. One commenter stated that cost estimates need to consider the need for technology upgrades, such as the development and use of tomographic X-ray equipment.

We are always looking for innovative approaches to improve our efficiency. Along with manual inspections, we use alternative inspection methods and technologies such as automated information systems, X-ray systems, and specially trained detector dogs. Examples of what we are doing in these areas and planned enhancements are described below.

We determine where we need our resources based on risk assessment.

We are focusing on facilitation, education, and compliance. Technology and other more efficient approaches facilitate inspections. Education informs the public of our mission.

To facilitate passenger clearance, we use the Interagency Border Inspection System (IBIS), where it is available. IBIS contains incoming passenger information. To facilitate cargo movement, we use Customs' ACS and Automated Targeting Systems (ATS), where they are available. Today, more ports are using these systems, and we are continuing to expand the use of these systems to all of our ports. In addition, we are developing a system that will be integrated to ACS and ATS, so we will provide better information and communication with the public about the release and approval of cargo.

In addition, we, along with other Federal inspection agencies, are negotiating with the airlines to develop an advance passenger information system to provide better technology to facilitate passenger clearance.

We continue to expand the use of X-ray equipment as a screening tool in passenger baggage clearance at major international airports. There are X-ray scanning machines located at all foreign-arrival and predeparture sites. X-ray machines are used at international airports and on the U.S.-Mexico border. We replaced old X-ray equipment with modern X-rays which have integrated computers and provide improved quality through enhanced imaging.

In partnership with the Federal Aviation Administration and the Department of the Army, we are developing a tomographic X-ray system that will automatically detect agricultural products in luggage and alert inspectors. When operational, we expect this system to provide more accurate images of the contents of baggage than current X-ray equipment can. We expect to improve our ability to make decisions about inspecting passenger baggage prior to passengers' picking up their baggage. Therefore, we expect to decrease the number of passengers in the inspection area and over time decrease the size of the inspection area thus reducing costs and time delays associated with the inspection process.

The prototype for this tomographic X-ray system is scheduled to be tested in San Juan, PR, in April 1998. As with all of our enhancements, after the pilot test, we plan to implement this new technology at the largest, most active airports where the most people will benefit and there will be the greatest impact. We will adapt the implementation, as needed, to other locations and gradually incorporate this tool throughout all international airports.

We continue to use specially trained dogs to detect prohibited items at major international airports. Detector dogs have proven useful in selecting bags to inspect and we plan to expand this program to meet increased risk.

Several commenters questioned the apparent change in APHIS' role as compared to other Federal inspection agencies. One commenter asserted that APHIS' function in the airport environment is secondary to Customs, as Customs inspectors perform all primary inspections. The comment further asserted that this serves the needs of all agencies adequately without multiplying the hurdles confronting the arriving passenger.

In the past, Customs inspectors opened passenger baggage and notified our inspectors when agricultural products were found. Customs has shifted their focus away from passenger processing to other areas that are more important from its perspective. Our priority continues to be finding agricultural products that could introduce foreign pests and diseases. One of the highest risks is from agricultural products in passenger baggage. Passengers may inadvertently carry infested fruits or vegetables or infected meat in their baggage. Therefore, we still need to open baggage to check for these agricultural products.

In conjunction with both Customs and INS, we find ways to improve processing of passengers and cargo. Along with other Federal inspection agencies, we meet with the aircraft industry at least once a month as a member of the Federal Inspection Committee. As a result of the efforts of these groups and our continued attention to modernizing and improving our inspections, we have several efforts underway to improve efficiency and cut costs.

One commenter questioned whether user fees have any correlation to the amount of services received by the user. One commenter questioned the relative efficiency of one port operation over another. One commenter suggested a sliding scale of fees based on location, efficiency, and general overhead.

We realize that the amount of service for each user varies. However, the number of variables that determines the amount of service or length of time required to provide service is virtually infinite. A system that attempted to account for every possible inspection situation would be unwieldy and expensive to administer and would require the additional expenses to be included in the fee calculation.

HeinOnline -- 62 Fed. Reg. 39750 1997

### Interpretations/Violations

One commenter stated that the Farm Bill, as amended, does not eliminate the annual review requirement.

Since the inception of our user fees, we have performed annual reviews of our user fees and adjusted fees as required. As stated in our proposed rule, we not only intend to monitor our fees throughout each year, but we intend to look closely at adjustments to fees that may be needed in future years. If we determine that any fees are too high and are contributing to unreasonably high reserve levels, we will publish lower fees in the **Federal Register** and make them effective as quickly as possible. If it becomes necessary to increase any fees because reserve levels are being drawn too low, we will publish proposed fee increases in the **Federal Register** for public comment.

One commenter asserted that the Farm Bill, as amended, does not permit adjustment in advance of a determination of need.

We disagree with the commenter's interpretation of the requirements of the Farm Bill, as amended. The Secretary is under no formal obligation to make a specific determination of need prior to the adjustment of fees. Nonetheless, the user fee adjustments we propose for FYs 1997 through 2002 were all based on cost estimates (i.e. a determination of need) for providing AQI services for future years. None of the fee adjustments will be effective until the fiscal year for which they were proposed. As we stated in our proposed rulemaking (see 62 FR 3824), "(w)e * * * plan to publish a notice in the **Federal Register** prior to the beginning of each fiscal year to remind or notify the public of the user fees for that particular fiscal year * * *. If we determine that any fees are too high and are contributing to unreasonably high reserve levels, we will publish lower fees in the **Federal Register** and make them effective as quickly as possible. If it becomes necessary to increase any fees because reserve levels are being drawn too low, we will publish, for public comment, proposed fee increases in the **Federal Register**." Therefore, contrary to the commenter's assertions, no fees are being adjusted "in advance of a determination of need."

One commenter suggested that by proposing user fees for 6 years, we avoid notice and comment rulemaking mandated by the Administrative Procedure Act (APA) (5 U.S.C. 551 *et seq.*). The commenter also stated that APHIS should be held accountable for timely rulemaking.

APHIS has been actively pursuing different avenues to make user fee rulemaking more timely. Although beneficial for the result, the time spent to develop the user fees, analyze their potential impacts, and have other government organizations review our documents can cause significant delays in implementing our user fees. Therefore, in the past, our user fees have been out of date by the time they are effective. Proposing potential user fees in advance is an attempt to ensure timely rulemaking. Our 6-year proposal has gone through the standard notice and comment rulemaking process as required by the APA. Also, by proposing user fees for a 6-year period, we are responding to comments received in the past by providing information sooner for planning purposes and phasing in gradual increases rather than large increases.

### Projections and Cost Estimates

Several commenters stated that our proposed fees were either too high or too low.

We have determined, using the best data available, the cost of each of the services for which we will charge an APHIS user fee. In addition, the services we provide and the cost of providing those services will change over time. Therefore, as stated in our proposal, we intend to monitor our fees throughout the year and review them at least annually. If we determine that any fees are too high and are contributing to unreasonably high reserve levels, we will publish lower fees in the **Federal Register** and make them effective as quickly as possible. If it becomes necessary to increase any fees because reserve levels are being drawn too low, we will publish proposed fee increases in the **Federal Register** for public comment.

To calculate the proposed user fees, we projected the direct costs of providing AQI services in FYs 1997 through 2002 for each category of service: Commercial vessels, commercial trucks, commercial railroad cars, commercial aircraft, and international airline passengers. The cost of providing these services in prior FYs served as a basis for calculating our projected costs.

In FY 1992, APHIS established accounting procedures to segregate AQI user fee program costs. On December 31, 1992, we published a final rule in the **Federal Register** (57 FR 62469–62471, Docket No. 92–148–1) that amended some of our user fees and included a detailed description of these accounting procedures.

As part of our accounting procedures, we established distinct accounting codes to record costs that can be directly related to each inspection activity.

Other costs that cannot be directly charged to individual accounts are charged to "distributable" accounts. The costs in these distributable accounts are prorated (or distributed) among all the activities that benefit from the expense, based on the ratio of the costs that are directly charged to each activity divided by the total costs directly charged to each account at the field level.

Using these accounting procedures, we calculated the total cost of providing AQI services in each past year by determining the amounts in each direct-charge account, then adding the pro rata share of the distributable accounts.

We then projected total costs to provide each category of service during each future year. Each projection included the costs of program delivery, which are incurred at the State level and below. Also included was a pro rata share of the program direction and support costs, which include items at the regional and headquarters program staff levels. Finally, each projection included a pro rata share of agency-level support costs, which includes activities that support the entire agency, such as recruitment and development, legislative and public affairs, regulations development, regulatory enforcement, budget and accounting services, and payroll and purchasing services. Costs for billing and collection services, legal counsel, and rate development services that are directly related to user fee activities are directly added to the user fee activities they support and are not included in the proration of agency-level costs.

Each service category was considered separately. Each category must, through user fee receipts, return enough money to APHIS, to cover the cost of providing AQI services to that particular category.

Several commenters questioned our cost estimates and variances between years. Specifically, commenters questioned the use of volumes, past estimates, and differences between FYs 1995, 1996, and 1997.

In the proposed rule, different components were included in different categories. For example, because FY 1996 spending was used as the basis for calculations, the base amount did not include all of the components that were added to estimated projected costs for FY 1997.

As explained in our proposed rule, we hired 217 new inspectors in FY 1996. Therefore, there was a large increase between FYs 1995 and 1996. In addition, there were differences in the

per employee costs for new employees in various years, because all new hires were not employed for the full year.

The information regarding spending estimates that we provided in the proposed rule was, in scope, the same information that we used to set the new user fees. Our user fees are based on data gathered at the work unit, region, and headquarters levels. For members of the public who, like the commenters, wish to obtain additional information, the names, addresses, and telephone numbers of knowledgeable APHIS personnel were provided in the proposed rule, and are provided in this document, under the heading **FOR FURTHER INFORMATION CONTACT**.

One commenter stated APHIS' vessel volume was a low figure compared with the number that Customs reported entering in FY 1996. A similar comment was received comparing APHIS' international air passenger volume with INS' international air passenger volume.

We acknowledge that our volume figures are lower, but it is easy to explain. First, the Customs number of vessels entering the United States for FY 1996 was for all vessel arrivals. APHIS only charges for the first 15 arrivals of vessels over 100 net tons and exempts vessels sailing solely between the United States and Canada. Secondly, the INS international air passenger volumes include all arriving international passengers. Again, APHIS is interested in a different portion of total international passengers and various passengers are exempt, including all passengers arriving from Canada. Therefore, our projections are and should be different from other Federal inspection agencies.

**Reserve Fund**

Commenters suggested that the size of the APHIS reserve fund is unjustified. Two commenters stated that a far smaller reserve fund would be adequate. Both of these commenters compared APHIS' reserve fund with INS', which, according to one commenter, maintains a reserve fund of approximately 8 percent of annual operating expenses, or, according to the other commenter, maintains a reserve fund of approximately 1 month's worth of operating costs.

APHIS' user fee authority provides for the maintenance of a reasonable balance in the user fee account. We link the reserve requirement in each category to the category's collection schedule. The reserves for the commercial aircraft and international air passenger user fee accounts are one-fourth of their respective annual costs because those fees are collected in arrears on a quarterly basis. The reserve requirement for commercial vessels and trucks is one-twelfth of that category's annual costs because those fees are remitted to APHIS monthly. The reserve requirement for loaded railroad cars is one-sixth of that category's annual costs because those fees are remitted to APHIS 2 months in arrears. We continue to believe that a fully funded reserve in each category's user fee account is essential to ensure the continuity of service in cases of bad debt, carrier insolvency, and fluctuations in activity volumes.

**Additional Uses for Fees**

One commenter suggested additional services that could be funded from the AQI user fees.

We have made no change to the rule based upon this comment since it is ouside the scope of this rulemaking proceeding.

**Advisory Committee**

Two commenters suggested that APHIS should establish an advisory committee to assist in determining appropriate changes to the user fee amounts and expenditure of user fee funds. Both commenters referred to Customs' and INS' advisory committees.

Both Customs and INS are mandated to establish advisory committees. The Farm Bill, as amended, has not authorized an advisory committee for APHIS' AQI user fees. We are taking no action based on these comments at this time. The establishment of an advisory committee is outside the scope of this rulemaking proceeding.

**Miscellaneous Comments**

Two commenters questioned a USDA reorganization, which would consolidate the labs into five "super-labs" to reduce USDA expenses. They questioned the effect this would have on ship inspections.

APHIS is not involved in any such reorganization. In addition, we are not aware of any such planned USDA reorganization to establish five "super-labs." However, if there was a USDA reorganization to reduce the Department's expenses, that reorganization might not reduce APHIS' vessel inspection expenses.

**Miscellaneous**

We have made a correction to a typographical error in the user fee for vessel inspections for FY 1997. In the proposed rule, the user fee was shown as $447.00 in the **SUPPLEMENTARY INFORMATION** under the background and as $447.50 in the rule portion. The correct fee should be $447.00; we have changed the rule portion accordingly.

**Executive Order 12866 and Regulatory Flexibility Act**

This rule has been reviewed under Executive Order 12866. The rule has been determined to be significant for the purposes of Executive Order 12866 and, therefore, has been reviewed by the Office of Management and Budget.

This rule, will, over a 6-year period, generally increase user fees for certain international airline passengers, commercial aircraft, commercial vessels, commercial trucks, and commercial railroad cars, in order to recover the cost to APHIS of providing services. Some user fees are initially reduced. Amendments to user fees are necessary to adjust for changes in service volume and in costs.

These fee changes will directly affect international commercial maritime vessels of 100 net tons or more, commercial trucks, loaded commercial railroad cars, and commercial aircraft arriving at ports in the customs territory of the United States. The impact of adjusting each fee is discussed separately below.

The fee changes will also directly impact international airline passengers arriving at ports in the customs territory of the United States. However, we have not included a discussion of the effect on airline passengers, as individuals are not covered by the Regulatory Flexibility Act.

**Commercial Vessels**

According to the Bureau of the Census, there were 334 U.S. businesses in 1992 engaged in water transportation of freight internationally between the United States and foreign ports. Of these businesses, at least 93 percent would be considered small according to SBA criteria for a small entity in this category (i.e., an entity that employs fewer than 500 persons).

APHIS user fees for commercial vessels apply only to those of 100 net tons or more arriving from foreign ports, except vessels sailing solely between Canadian and U.S. ports. All of the United States' oceangoing fleet exceeds 100 net tons, but only a limited portion engages in foreign trade. Data from the Department of Transportation's Maritime Administration shows that there were 319 private oceangoing merchant vessels in the United States at the beginning of 1996. Of these vessels, 127 are tankers and the remainder are dry cargo vessels. The vast majority of the tankers operate nearly exclusively between United States ports. They are therefore not subject to the APHIS

HeinOnline -- 62 Fed. Reg. 39752 1997

commercial vessel user fee. Those vessels subject to the APHIS user fee are mostly dry cargo vessels operating between the United States and foreign ports. We believe, however, that the impact of the revised APHIS user fees on these vessels is likely to be minimal, whether a vessel is operated by a small or a large entity. Total daily operating costs for dry cargo vessels idle in port averages between $23,600 and $26,800. The $77.50 user fee increase for FY 1997 represents less than 0.4 percent of one day's operating costs of an average dry cargo vessel while in port, and remains $97.00 below the original fee set in 1991.

For subsequent years, there is either no fee increase (FY 1999) or much smaller increases ($7.50, FY 1998; $7.25, FY 2000; $9.50, FY 2001; and $9.00, FY 2002). Therefore, we believe the impact of our commercial vessel user fees on small businesses will be minimal.

### Commercial Trucks

The SBA criterion for a small trucking firm is one whose annual receipts are less than $18.5 million. We are unable to accurately estimate the number of U.S. firms that would be considered small by this criterion. However, we believe U.S. firms will be largely unaffected by the proposed fee changes. In 1991, transportation expenses for commercial U.S. trucks traveling from Mexico to the United States varied between $85.00 and $175.00 per trip for trucks carrying non-agricultural commodities. Assuming constant costs, adding $2.00 to the user fee per truck, per crossing,[1] will represent an increase in operating expenses of between 1.1 and 2.4 percent for trucks carrying non-agricultural commodities. Transportation expenses for trucks hauling agricultural commodities ranged from $300.00 to $1,700.00 per trip in 1991. Again, assuming constant costs, our user fee increases will represent operating expense increases of between 0.12 and 0.67 percent for trucks hauling agricultural goods. It therefore appears that the impact on small U.S. independent trucking firms will not be significant.

### Commercial Railroad Cars

There are five U.S. railroad companies currently transporting goods across the U.S.-Mexican border. These railroad companies will be directly affected by our reduced user fee for this service. These railroad companies will also be directly affected by the subsequent fee increases. However, we are not increasing this fee until FY 2002, at which time the fee will increase to an amount equal to the current fee. We are not increasing the user fee beyond the current rate. User fee changes will affect direct operating expenses. Two of these railroad companies met the SBA criterion for small entities (i.e., fewer than 1,500 employees). As of 1991, the most recent year for which figures are available, these small railroad companies were transporting between 960 and 2,000 loaded railroad cars into the United States from Mexico annually. These cars were all subject to the APHIS user fee. Assuming a similar number of cars subject to inspection in future years, in FY 1997 reduced user fees will result in a cost savings for these railroad companies of between $480.00 and $1,000.00. Specific data on the operating expenses or profit margins of these railroad companies is not available to us. However, we believe the fee changes will not have any significant economic effect on small railroad companies.

### Commercial Airlines

We received a comment that suggested that there were basic flaws in our analysis of the impact on commercial airlines required by the Regulatory Flexibility Act. Specifically, the commenter suggested that the analysis should have analyzed the impact on the airline industry's component parts. In addition, the analysis should have taken into consideration that the impact will fall disproportionately on certain airlines.

In the Regulatory Flexibility Analysis prepared for the proposed rule, we used information available from the Bureau of the Census on domestic and international airlines. Our user fees are spread evenly across all incoming international flights, both domestic and international carriers are charged the same fee, regardless of size or location. Certain exceptions are specified in our regulations. All exemptions have been added over time based on suggestions and analysis that their pest risk is close to zero. In response to the comment, we have reviewed the available data and revised our analysis on commercial airlines.

In FY 1995, 241 different companies, both foreign and domestic, had accounts with APHIS to pay user fees for commercial aircraft inspections. The separation of these companies into large and small categories according to Small Business Administration size classifications cannot be determined. While the size distribution of these carriers that enter the continental United States and subject to the user fee[2] is unknown, APHIS still anticipates that the impact of the user fee increase will be small regardless of carrier size. The increase of $6.25 in the first year, and a total increase of $9.25 over the 6-year period should represent a very small portion of operating costs for an international flight arriving in the United States.

In addition to user fees paid directly by airlines for aircraft inspection, airlines collect user fees on our behalf from passengers. Airlines already have collection and disbursement systems in place for international passengers. We believe it is unlikely that there would be any significant increase in the costs of maintaining these systems as a result of our rule. Airlines will establish trust accounts for user fees collected from passengers. However, airlines may retain any interest earned by monies in such accounts.

Under these circumstances, the Administrator of the Animal and Plant Health Inspection Service has determined that this action would not have a significant economic impact on a substantial number of small entities.

### Executive Order 12372

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 7 CFR part 3015, subpart V.)

### Executive Order 12988

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule: (1) Preempts all State and local laws and regulations that are inconsistent with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

### Paperwork Reduction Act

This rule contains no new information collection or recordkeeping requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

[1] A decal is also available which allows unlimited border crossings per year for one fee. This decal is available only for trucks which prepay the Customs user fee which applies to them.

[2] The following are exempt from the user fee: aircraft moving solely between the United States and Canada, aircraft used exclusively in governmental purposes of the United States or a foreign government, aircraft making an emergency landing, any passenger plane with 64 or fewer seats not carrying cargo such as fresh fruit, aircraft moving from the U.S. Virgin Islands to Puerto Rico, and aircraft making an in transit stop at a port of entry, but not required to go through any portion of the federal clearance process.

HeinOnline -- 62 Fed. Reg. 39753 1997

**List of Subjects in 7 CFR Part 354**

Exports, Government employees, Imports, Plant diseases and pests, Quarantine, Reporting and recordkeeping requirements, Travel and transportation expenses.

Accordingly, 7 CFR part 354 is amended as follows:

## PART 354—OVERTIME SERVICES RELATING TO IMPORTS AND EXPORTS; AND USER FEES

1. The authority citation for part 354 continues to read as follows:

**Authority:** 7 U.S.C. 2260; 21 U.S.C. 136 and 136a; 49 U.S.C. 1741; 7 CFR 2.22, 2.80, and 371.2(c).

2. Section 354.3 is amended by revising paragraphs (b)(1), (c)(1), (c)(3)(i) introductory text, (d)(1), (e)(1), and (f)(1) and by adding a new paragraph (f)(4)(i)(C) to read as follows:

**§ 354.3 User fees for certain international services.**

* * * * *

(b) * * * (1) Except as provided in paragraph (b)(2) of this section, the master, licensed deck officer, or purser of any commercial vessel which is subject to inspection under part 330 of this chapter or 9 CFR chapter I, subchapter D, and which is either required to make entry at the customs house under 19 CFR 4.3 or is a United States-flag vessel proceeding coastwise under 19 CFR 4.85, shall, upon arrival, proceed to Customs and pay an APHIS user fee. The APHIS user fee for each arrival, not to exceed 15 payments in a calendar year, is shown in the following table. The APHIS user fee shall be collected at each port of arrival.

| Effective dates | Amount |
|---|---|
| September 1, 1997 through September 30, 1997 | $447.00 |
| October 1, 1997 through September 30, 1998 | 454.50 |
| October 1, 1998 through September 30, 1999 | 454.50 |
| October 1, 1999 through September 30, 2000 | 461.75 |
| October 1, 2000 through September 30, 2001 | 471.25 |
| October 1, 2001 | 480.25 |

* * * * *

(c) * * * (1) Except as provided in paragraph (c)(2) of this section, the driver or other person in charge of a commercial truck which is entering the customs territory of the United States and which is subject to inspection under part 330 of this chapter or under 9 CFR, chapter I, subchapter D, must, upon arrival, proceed to Customs and pay an APHIS user fee for each arrival, as shown in the following table:

| Effective dates | Amount |
|---|---|
| September 1, 1997 through September 30, 1997 | $3.75 |
| October 1, 1997 through September 30, 1998 | 4.00 |
| October 1, 1998 through September 30, 1999 | 4.00 |
| October 1, 1999 through September 30, 2000 | 4.00 |
| October 1, 2000 through September 30, 2001 | 4.00 |
| October 1, 2001 | 4.25 |

* * * * *

(3) * * *

(i) The owner or operator of a commercial truck, *if* entering the customs territory of the United States from Mexico *and* applying for a prepaid Customs permit for a calendar year, must apply for a prepaid APHIS permit for the same calendar year. Applicants must apply to Customs for prepaid APHIS permits.[1] The following information must be provided, together with payment of an amount 20 times the APHIS user fee for each arrival, *except*, that through September 30, 1997, the amount to be paid is $40.00:

* * * * *

(d) * * * (1) Except as provided in paragraph (d)(2) of this section, an APHIS user fee will be charged for each loaded commercial railroad car which is subject to inspection under part 330 of this chapter or under 9 CFR chapter I, subchapter D, upon each arrival. The railroad company receiving a commercial railroad car in interchange at a port of entry or, barring interchange, the railroad company moving a commercial railroad car in line haul service into the customs territory of the United States, is responsible for paying the APHIS user fee. The APHIS user fee for each arrival of a loaded railroad car is shown in the following table. If the APHIS user fee is prepaid for all arrivals of a commercial railroad car during a calendar year, the APHIS user fee is an amount 20 times the APHIS user fee for each arrival.

| Effective dates | Amount |
|---|---|
| September 1, 1997 through September 30, 1997 | $6.50 |
| October 1, 1997 through September 30, 1998 | 6.50 |
| October 1, 1998 through September 30, 1999 | 6.50 |
| October 1, 1999 through September 30, 2000 | 6.75 |
| October 1, 2000 through September 30, 2001 | 6.75 |
| October 1, 2001 | 7.00 |

[1] Applicants should refer to Customs Service regulations (19 CFR part 24) for specific instructions.

* * * * *

(e) * * * (1) Except as provided in paragraph (e)(2) of this section, an APHIS user fee will be charged for each commercial aircraft which is arriving, or which has arrived and is proceeding from one United States airport to another under a United States Customs Service "Permit to Proceed," as specified in title 19, Code of Federal Regulations, §§ 122.81 through 122.85, or an "Agricultural Clearance or Safeguard Order" (PPQ Form 250), used pursuant to title 7, Code of Federal Regulations, § 330.400 and title 9, Code of Federal Regulations, § 94.5, and which is subject to inspection under part 330 of this chapter or 9 CFR chapter I, subchapter D. Each carrier is responsible for paying the APHIS user fee. The APHIS user fee for each arrival is shown in the following table:

| Effective dates | Amount |
|---|---|
| September 1, 1997 through September 30, 1997 | $59.25 |
| October 1, 1997 through September 30, 1998 | 59.75 |
| October 1, 1998 through September 30, 1999 | 59.75 |
| October 1, 1999 through September 30, 2000 | 60.25 |
| October 1, 2000 through September 30, 2001 | 61.25 |
| October 1, 2001 | 62.25 |

* * * * *

(f) * * * (1) Except as specified in paragraph (f)(2) of this section, each passenger aboard a commercial aircraft who is subject to inspection under part 330 of this chapter or 9 CFR, chapter I, subchapter D, upon arrival from a place outside of the customs territory of the United States, must pay an APHIS user fee. The APHIS user fee for each arrival is shown in the following table:

| Effective dates | Amount |
|---|---|
| September 1, 1997 through September 30, 1997 | $1.95 |
| October 1, 1997 through September 30, 1998 | 2.00 |
| October 1, 1998 through September 30, 1999 | 2.00 |
| October 1, 1999 through September 30, 2000 | 2.05 |
| October 1, 2000 through September 30, 2001 | 2.10 |
| October 1, 2001 | 2.15 |

* * * * *

(4) * * *

(i) * * *

(C) APHIS user fees collected from international passengers pursuant to paragraph (f) of this section shall be held in trust for the United States by the person collecting such fees, by any person holding such fees, or by the person who is ultimately responsible for remittance of such fees to APHIS. APHIS user fees collected from international passengers shall be accounted for separately and shall be regarded as trust funds held by the person possessing such fees as agents, for the beneficial interest of the United States. All such user fees held by any person shall be property in which the person holds only a possessory interest and not an equitable interest. As compensation for collecting, handling, and remitting the APHIS user fees for international passengers, the person holding such user fees shall be entitled to any interest or other investment return earned on the user fees between the time of collection and the time the user fees are due to be remitted to APHIS under this section. Nothing in this section shall affect APHIS' right to collect interest for late remittance.

* * * * *

Done in Washington, DC, this 18th day of July 1997.

**Terry L. Medley,**

*Administrator, Animal and Plant Health Inspection Service.*

[FR Doc. 97-19499 Filed 7-23-97; 8:45 am]

**BILLING CODE 3410-34-P**

## SECURITIES AND EXCHANGE COMMISSION

### 17 CFR Parts 228, 229, 230, 232, 239, 240, and 249

**[Release Nos. 33-7431 and 34-38850; S7-15-96]**

**RIN 3235-AG80**

### Phase Two Recommendations of Task Force on Disclosure Simplification

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rules.

**SUMMARY:** In response to the Report of the Task Force on Disclosure Simplification, the Commission proposed for comment the elimination and amendment of certain forms and rules to simplify the disclosure process. After reviewing the comment letters received on the Commission's proposals, the Commission is rescinding two forms and one rule that are no longer necessary or appropriate for the protection of investors. The Commission also is adopting one rule and amending a number of rules and forms in order to eliminate unnecessary requirements and to streamline the disclosure process.

**EFFECTIVE DATE:** The new rule and amendments will become effective September 2, 1997. If the EDGAR programming on the amendments affecting Form 8-A (17 CFR 249.208a) and Rule 462(d) (17 CFR 230.462(d)) is not completed by this date, the Commission will select a later effective date for these two amendments and issue an appropriate notice of that date.

**FOR FURTHER INFORMATION CONTACT:** Felicia H. Kung, Division of Corporation Finance, at (202) 942-2990.

**SUPPLEMENTARY INFORMATION:** After considering certain recommendations of the Task Force on Disclosure Simplification, as well as the comment letters received by the Commission on its proposals to implement these recommendations, the Commission today is adopting amendments to Item 701 [1] of Regulation S-B,[2] Item 701 [3] of Regulation S-K,[4] Rule 401,[5] Rule 404,[6] Rule 424,[7] Rule 462,[8] Rule 463,[9] and Rule 497 [10] under the Securities Act of 1933 ("Securities Act").[11] In addition, the Commission is rescinding Rule 101(c)(5) under Regulation S-T.[12] Amendments are being adopted to Form D,[13] Form SB-1,[14] Form SB-2,[15] Form S-1,[16] Form S-2,[17] Form S-3,[18] Form S-11,[19] Form S-4,[20] Form F-1,[21] Form F-2,[22] and Form F-4 [23] under the Securities Act. In addition, the Commission is rescinding Form SR [24] under the Securities Act, and Rule 13a-2 [25] and Form 8-B [26] under the Securities Exchange Act of 1934 ("Exchange Act").[27] The Commission is adopting Rule 12a-8 [28] under the Exchange Act. In addition, amendments are being adopted with respect to the following Exchange Act rules and forms: Rule 12d1-2,[29] Rule 12g-3,[30] Rule 13a1,[31] Rule 15d-3,[32] Rule 15d-5,[33] Form 8-A,[34] Form 10,[35] Form 20-F,[36] Form 10-Q,[37] Form 10-QSB,[38] Form 10-K,[39] and Form 10-KSB.[40]

## I. Background

In March 1996, the Commission's Task Force on Disclosure Simplification ("Task Force") presented its Report [41] recommending the elimination or modification of many rules and forms, and proposing suggestions for simplifying significant aspects of securities offerings to the Commission. As a result of the Task Force Report, the Commission eliminated 44 rules and four forms last May.[42]

At the same time that the Commission adopted those changes, it issued a release proposing for comment the elimination or streamlining of additional requirements.[43] The proposals contained in that release were based on the Commission's further consideration of the Task Force recommendations.

After reviewing the comment letters received [44] and further considering the proposals, the Commission has determined to adopt most of the proposals, with certain modifications discussed below. Two of the proposals are not being adopted. First, the Commission had proposed that the Form D federal filing requirement be eliminated for the Regulation D and Section 4(6) exemptions. Filers would have had to continue to prepare Form D and retain it, but not file it with the

[1] 17 CFR 228.701.
[2] 17 CFR part 228.
[3] 17 CFR 229.701.
[4] 17 CFR part 229.
[5] 17 CFR 230.401.
[6] 17 CFR 230.404.
[7] 17 CFR 230.424.
[8] 17 CFR 230.462.
[9] 17 CFR 230.463.
[10] 17 CFR 230.497.
[11] 15 U.S.C. 77a *et seq.*
[12] 17 CFR 232.101(c)(5).
[13] 17 CFR 239.500.
[14] 17 CFR 239.9.
[15] 17 CFR 239.10.
[16] 17 CFR 239.11.
[17] 17 CFR 239.12.
[18] 17 CFR 239.13.
[19] 17 CFR 239.18.
[20] 17 CFR 239.25.
[21] 17 CFR 239.31.
[22] 17 CFR 239.32.
[23] 17 CFR 239.34.
[24] 17 CFR 239.61.
[25] 17 CFR 240.13a-2.
[26] 17 CFR 249.208b.
[27] 15 U.S.C. 78a *et seq.*
[28] 17 CFR 240.12a-8.
[29] 17 CFR 240.12d1-2.
[30] 17 CFR 240.12g-3.
[31] 17 CFR 240.13a-1.
[32] 17 CFR 240.15d-3.
[33] 17 CFR 240.15d-5.
[34] 17 CFR 249.208a.
[35] 17 CFR 249.210.
[36] 17 CFR 249.220f.
[37] 17 CFR 249.308a.
[38] 17 CFR 249.308b.
[39] 17 CFR 249.310.
[40] 17 CFR 249.310b.
[41] The Task Force Report is available for inspection and copying in the Commission's public reference room. The Report also is posted on the Commission's Internet web site (http:// www.sec.gov).
[42] Release No. 33-7300 (May 31, 1996) [61 FR 30397].
[43] Release No. 33-7301 (May 31, 1996) [61 FR 30405] ("Proposing Release").
[44] The eight comment letters received are available for inspection and copying in the Commission's public reference room. Refer to file number S7-15-96. Comment letters that were submitted via electronic mail may be viewed at the Commission's web site: http://www.sec.gov.

HeinOnline -- 62 Fed. Reg. 39755 1997

REV. RULS.
59-227 TO
59-422

REV. PROCS.
59-23 TO
59-41

C.B.
1959-2

TREASURY
DEPARTMENT

KF
6301
.U5
C8
59-2
c.1

# Internal Revenue Bulletin

CUMULATIVE BULLETIN 1959-2

JULY-DECEMBER 1959

from that taxpayer. See Rev. Rul. 58-158, C.B. 1958-1, 562, and Rev. Rul. 59-127, C.B. 1959-1, 656.

Revenue Ruling 58-274 is hereby amplified.

---

26 CFR 301.6501(c)-1: Exceptions to general period of limitations on assessment and collection.
(Also Section 4231.)

Rev. Rul. 59-295

Where a person files a Form 720, Quarterly Federal Excise Tax Return, on which he reports and pays the tax on admissions but makes no entry concerning his liability for the cabaret tax, such return does not constitute a cabaret tax return. Accordingly, in such cases, the cabaret tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Advice has been requested concerning the applicability of the statute of limitations on assessment and collection under the circumstances described below.

The operator of an establishment filed timely Forms 720, Quarterly Federal Excise Tax Returns, reporting and paying the tax on admissions on the amounts collected from patrons for admission to his place. He made no other entries on the Forms 720 concerning liability for any other excise tax. Subsequently, it was determined that the cabaret tax instead of the admissions tax was due and should have been reported and paid. Specifically, the question presented is whether, for purposes of starting the running of the statute of limitations on assessment and collection, the filing of a Form 720 reporting and paying admissions tax satisfies the requirement for filing a cabaret tax return.

Section 4231(1) of the Internal Revenue Code of 1954, as amended by the Excise Tax Technical Changes Act of 1958, Public Law 85-859, C.B., 1958-3, 92, imposes a tax of one cent for each ten cents or major fraction thereof of the amount in excess of one dollar paid for admission to any place. The tax is to be paid by the person paying for the admission.

Section 4231(6) of the Code imposes a tax equivalent to 20 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. With certain exceptions not here material, the tax is to be returned and paid by the person receiving such payments.

Insofar as it is applicable here, section 6501(a) of the Code, as amended by the Excise Tax Technical Changes Act of 1958, Public Law 85-859, provides the general rule that the amount of any tax imposed by the Internal Revenue Code of 1954 shall be assessed within three years after the return was filed (whether or not such return was filed on or after the date prescribed) and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. However, section 6501(c)(3) of the Code provides that in the case of a failure to file a return, the tax

may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

The admissions tax is one of the so-called "collected" taxes. That is, the person paying the admissions charges is the taxpayer, whereas the person collecting the charge is responsible under the law for collecting and returning the tax to the Government. Thus, the person collecting the charge is not the taxpayer and, even if he fails to collect the tax, willfully or otherwise, the tax as such cannot be asserted against him. In the case of a willful failure to collect or pay over the tax, the law provides sanctions in the form of penalties.

In contrast to the admissions tax, the cabaret tax is one of the so-called "incurred" taxes. That is, the proprietor of the establishment collecting the payments for admission, refreshment, service, and merchandise is the taxpayer. Therefore, the proprietor remains liable for the tax without regard to whether he passes it on to his patrons.

Although amounts paid for admission may be subject to either, the admissions tax and the cabaret tax are separate and distinct taxes and the requirements for filing a return apply separately to each tax, even though for convenience the return for both taxes may be made on the same form. Accordingly, it is held that where a person files a return on which he reports and pays the tax on admissions but makes no entry on the return concerning his liability for the cabaret tax, such return does not constitute a cabaret tax return. Therefore, the cabaret tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

See Revenue Ruling 58–274, C.B. 1958–1, 495, which holds that if a retailer, who is liable for the retailers excise taxes imposed by two or more sections of the Internal Revenue Code, files a return on which he reports his liability for the tax imposed by one or more of those sections but makes no entry on the return concerning his liability for the tax imposed by any other section or sections, he has filed no return for the category or categories of tax for which no entry was made. Therefore, the tax for the category or categories for which no entry was made may be assessed, or a proceeding in court for the collection of such may be begun without assessment, at any time.

See also Revenue Ruling 59–127, C.B. 1959–1, 656, which states that the tax on initiation fees and the tax on dues and membership fees are separate and distinct, even though they are imposed by the same section of the Code.

## SUBCHAPTER B.—LIMITATIONS ON CREDIT OR REFUND

## SECTION 6511.—LIMITATIONS ON CREDIT OR REFUND

26 CFR 301.6511(a)–1: Period of limitation on filing claim.

Applicability of the delinquency penalty for failure to file a return and allowability of a credit or refund where a person incorrectly pays the special tax for coin-operated amusement devices which are in fact gaming devices. See Rev. Rul. 59–405, page 424.

# CHAPTER 67.—INTEREST

## SUBCHAPTER A.—INTEREST ON UNDERPAYMENTS

### SECTION 6601.—INTEREST ON UNDERPAYMENT, NONPAYMENT, OR EXTENSIONS OF TIME FOR PAYMENT, OF TAX

26 CFR 301.6601: Statutory provisions; interest on underpayment, nonpayment, or extensions of time for payment, of tax.

Regulations under the Internal Revenue Code of 1954 are amended. See T.D. 6425, page 384.

---

26 CFR 301.6601–1: Interest on underpayments. (Also Section 4291.) **Rev. Rul. 59–306**

Interest is due on a delinquent payment of the so-called "collected" excise taxes irrespective of whether the person liable for the tax makes a delinquent payment to a collecting agency, or whether a direct assessment of the tax is made against the person by the Internal Revenue Service. However, under the provisions of section 6601(f)(1) of the Internal Revenue Code of 1954, the Service has the responsibility for assessment and collection of such interest.

Revenue Ruling 58–300, C.B. 1958–1, 454, amplified.

The Internal Revenue Service has been asked whether interest is due on the amount of delinquent payments of the so-called "collected" excise taxes when made by a taxpayer to a collecting agency and, if such interest is due, whether the collecting agency is responsible for collection of the interest.

The term "collected" excise taxes refers to those miscellaneous excise taxes under Chapter 33 of the Internal Revenue Code of 1954 which are imposed upon payments for specified facilities and services. The person paying for the facilities and services is liable for payment of the tax; accordingly, that person is the "taxpayer." The person receiving payment for the facilities and services is required to collect the tax and is known as the "collecting agency." The "collected" excise taxes are those imposed upon payments for admission, club dues and initiation fees, communications, transportation of persons, and leases of safe deposit boxes. The tax on transportation of property also was included in this category prior to the repeal of that tax, effective August 1, 1958.

*M* Company performed transportation services for *A*, but through error did not collect any tax at the time *A* paid for the services. Subsequently, when *M* Company's records were examined by an agent of the Internal Revenue Service, it was determined that *A*'s transportation payment was subject to the tax imposed by section 4261

CUMULATIVE

BULLETIN

69-1

REV. RULS.

69-1 to 69-366

REV. PROCS.

69-1 to 69-14

KF
6301
.U5
C8
69-1
c.2

### Appeals and Review Memorandum (A.R.M.) Ruling Series

A.R.M.
23, C.B. 2, 231
105, C.B. 4, 322

### Appeals and Review Recommendation (A.R.R.) Ruling Series

A.R.R.
1115, C.B. I-2, 200
1167, C.B. I-2, 211
2394, C.B. II-1, 174
2615, C.B. II-2, 286

### (Solicitor's) Law Opinion (L.O. or O.) Ruling Series

L.O. (or O.)
809, C.B. 1, 192
811, C.B. 1, 186
818, C.B. 1, 247
833, C.B. 1, 249
879, C.B. 1, 262
884, C.B. 1, 244
897, C.B. 1, 263
907, C.B. 1, 261
926, C.B. 1, 241
1008, C.B. 2, 232
1009, C.B. 2, 222
1011, C.B. 2, 199
1025, C.B. 2, 194
1028, C.B. 2, 233
1072, C.B. 5, 240
1095, C.B. I-1, 313
1106, C.B. I-2, 221
1107, C.B. I-2, 223
1116, C.B. III-1, 350

### Solicitor's Memorandum (S.M. or S.) Ruling Series

S.M. (or S.)
926, C.B. 1, 248
931, C.B. 1, 259
972, C.B. 1, 233
1156, C.B. 1, 243
1301, C.B. 2, 259
1334, C.B. 2, 229
1359, C.B. 2, 230
1404, C.B. III-1, 335
1652, C.B. III-2, 297
1813, C.B. III-1, 315
2040, C.B. III-2, 192
2073, C.B. III-2, 322
2109, C.B. IV-2, 96
2113, C.B. III-2, 352
2353, C.B. III-2, 327
2389, C.B. III-2, 318
2531, C.B. III-2, 302
2538, C.B. III-2, 286
2575, C.B. III-2, 329
2586, C.B. III-2, 303
2660, C.B. III-2, 314
2690, C.B. IV-1, 65
2836, C.B. IV-1, 68
2874, C.B. IV-1, 76
2883, C.B. IV-1, 66
3380, C.B. IV-1, 80
3389, C.B. IV-1, 49
3508, C.B. IV-2, 100
3572, C.B. IV-2, 249
3646, C.B. IV-2, 107
3733, C.B. IV-2, 219

S.M. (or S.)—Continued
3772, C.B. IV-2, 96
3774, C.B. IV-2, 72
4049, C.B. IV-2, 104
4170, C.B. IV-2, 102
4486, C.B. IV-2, 94
3764A, C.B. V-1, 309
3804A, C.B. V-1, 110
4294, C.B. V-1, 311
5323, C.B. V-1, 125
5359, C.B. V-1, 359
5779, C.B. V-1, 113

### Solicitor's Opinion (Sol. Op.) Ruling Series

Sol. Op.
7, C.B. 2, 239
52, C.B. 3, 290
77, C.B. 3, 286
90, C.B. 4, 236
91, C.B. 4, 302
92, C.B. 4, 325
93, C.B. 4, 305
106, C.B. 4, 339
107, C.B. 4, 336
143, C.B. I-2, 261
147, C.B. I-2, 213
150, C.B. II-1, 164
151, C.B. II-2, 224

### Solicitor's Recommendation (S.R.) Ruling Series

S.R.
3119, C.B. IV-1, 233

The purpose of this declaration of obsolescence is to make clear to all concerned that the above-listed rulings are not determinative with respect to future transactions. It is not the purpose of this Revenue Ruling to determine the applicability of any of the listed rulings to past transactions.

Other rulings relating to administrative provisions published before 1953 are currently being reviewed. Therefore, failure to include any particular ruling in this or previous lists should not be construed as indicating that the ruling necessarily has continuing application to future transactions.

---

*26 CFR 301.7805-1: Rules and regulations.*

*Certain Revenue Rulings which were published after 1952 have been declared obsolete.*

## Rev. Rul. 69-227

Revenue Procedure 67-6, C.B. 1967-1, 576, announced a program for the review of rulings published in the Internal Revenue Bulletin before 1953 with an objective of identifying and publishing lists of those rulings which, although not specifically revoked or superseded, are not considered determinative with respect to future transactions.

Consistent with the objectives of that program, the Internal Revenue Service has undertaken a review of certain rulings that were published in the Internal Revenue Bulletin after 1952. The purpose of this Revenue Ruling is to publish a list of post-1952 rulings having primary application in the excise tax area which, although not specifically revoked or superseded, are not considered determinative with respect to future transactions because (1) the applicable statutory provisions or regulations have been changed or repealed; (2) the ruling position is specifically covered by statute, regulations, or a subsequent published position; or (3) the facts set forth no longer exist or are not sufficient to permit application of the current statute. Accordingly, the rulings listed below are hereby declared to be obsolete.

### Revenue Ruling (Rev. Rul.) Series

Rev. Rul. No.
40, C.B. 1953-1, 452
42, C.B. 1953-1, 463
57, C.B. 1953-1, 425
58, C.B. 1953-1, 453
59, C.B. 1953-1, 464
66, C.B. 1953-1, 422
67, C.B. 1953-1, 423
68, C.B. 1953-1, 469
69, C.B. 1953-1, 472
85, C.B. 1953-1, 410
86, C.B. 1953-1, 454
97, C.B. 1953-1, 424
98, C.B. 1953-1, 424
112, C.B. 1953-1, 411
113, C.B. 1953-1, 412
114, C.B. 1953-1, 426
115, C.B. 1953-1, 426
116, C.B. 1953-1, 465
124, C.B. 1953-2, 327
125, C.B. 1953-2, 329
126, C.B. 1953-2, 331
127, C.B. 1953-2, 332
128, C.B. 1953-2, 430
136, C.B. 1953-2, 333
149, C.B. 1953-2, 352
161, C.B. 1953-2, 334
163, C.B. 1953-2, 335
164, C.B. 1953-2, 336
167, C.B. 1953-2, 428
176, C.B. 1953-2, 329
177, C.B. 1953-2, 341
178, C.B. 1953-2, 352
179, C.B. 1953-2, 399
191, C.B. 1953-2, 352
203, C.B. 1953-2, 345
204, C.B. 1953-2, 350
206, C.B. 1953-2, 429
223, C.B. 1953-2, 329
224, C.B. 1953-2, 428
245, C.B. 1953-2, 337
246, C.B. 1953-2, 338
249, C.B. 1953-2, 437
250, C.B. 1953-2, 438
253, C.B. 1953-2, 342
262, C.B. 1953-2, 338
265, C.B. 1953-2, 433
281, C.B. 1952-3, 344
284, C.B. 1953-2, 436
285, C.B. 1953-2, 435
297, C.B. 1953-2, 340
298, C.B. 1953-2, 340

Rev. Rul No.—Continued
300, C.B. 1953-2, 431
54-7, C.B. 1954-1, 234
54-8, C.B. 1954-1, 275
54-22, C.B 1954-1, 234
54-23, C.B. 1954-1, 236
54-24, C.B. 1954-1, 236
54-38, C.B. 1954-1, 242
54-46, C.B. 1954-1, 237
54-47, C.B. 1954-1, 269
54-54, C.B. 1954-1, 273
54-60, C.B. 1954-1, 241
54-100, C.B. 1954-1, 245
54-101, C.B. 1954-1, 247
54-102, C.B. 1954-1, 273
54-108, C.B. 1954-1, 269
54-115, C.B. 1954-1, 239
54-116, C.B. 1954-1, 245
54-123, C.B. 1954-1, 271
54-124, C.B. 1954-1, 274
54-136, C.B. 1954-1, 262
54-182, C.B. 1954-1, 266
54-183, C.B. 1954-1, 274
54-196, C.B. 1954-1, 256
54-211, C.B. 1954-1, 236
54-212, C.B. 1954-1, 242
54-228, C.B. 1954-1, 261
54-239, C.B. 1954-1, 234
54-298, C.B. 1954-2, 427
54-307, C.B. 1954-2, 377
54-314, C.B. 1954-2, 378
54-315, C.B. 1954-2, 385
54-318, C.B. 1954-2, 398
54-321, C.B. 1954-2, 422
54-328, C.B. 1954-2, 378
54-330, C.B. 1954-2, 409
54-331, C.B. 1954-2, 410
54-333, C.B. 1954-2, 420
54-345, C.B. 1954-2, 385
54-346, C.B. 1954-2, 386
54-347, C.B. 1954-2, 386
54-358, C.B. 1954-2, 372
54-359, C.B. 1954-2, 388
54-360, C.B. 1954-2, 415
54-362, C.B. 1954-2, 427
54-370, C.B. 1954-2, 379
54-373, C.B. 1954-2, 423
54-385, C.B. 1954-2, 385
54-386, C.B. 1954-2, 414
54-387, C.B. 1954-2, 423
54-402, C.B. 1954-2, 374
54-403, C.B. 1954-2, 375
54-406, C.B. 1954-2, 414
54-413, C.B. 1954-2, 387
54-434, C.B. 1954-2, 380
54-435, C.B. 1954-2, 414
54-461, C.B. 1954-2, 394
54-462, C.B. 1954-2, 410
54-463, C.B. 1954-2, 424
54-472, C.B. 1954-2, 381
54-473, C.B. 1954-2, 382
54-476, C.B. 1954-2, 421
54-487, C.B. 1954-2, 376
54-488, C.B. 1954-2, 395
54-491, C.B. 1954-2, 425
54-504, C.B. 1954-2, 383
54-505, C.B. 1954-2, 384
54-524, C.B. 1954-2, 421
54-541, C.B. 1954-2, 426
54-546, C.B. 1954-2, 394
54-557, C.B. 1954-2, 374
54-604, C.B. 1954-2, 373
54-617, C.B. 1954-2, 400
55-8, C.B. 1955-1, 518
55-21, C.B. 1955-1, 540
55-46, C.B. 1955-1, 126

Rev. Rul No.—Continued
55-50, C.B. 1955-1, 506
55-51, C.B. 1955-1, 514
55-52, C.B. 1955-1, 528
55-54, C.B. 1955-1, 533
55-55, C.B. 1955-1, 537
55-70, C.B. 1955-1, 506
55-84, C.B. 1955-1, 531
55-97, C.B. 1955-1, 512
55-125, C.B. 1955-1, 518
55-126, C.B. 1955-1, 536
55-146, C.B. 1955-1, 528
55-147, C.B. 1955-1, 534
55-148, C.B. 1955-1, 538
55-161, C.B. 1955-1, 508
55-162, C.B. 1955-1, 541
55-183, C.B. 1955-1, 542
55-185, C.B. 1955-1, 513
55-198, C.B. 1955-1, 510
55-199, C.B. 1955-1, 511
55-259, C.B. 1955-1, 513
55-260, C.B. 1955-1, 525
55-280, C.B. 1955-1, 529
55-281, C.B. 1955-1, 538
55-318, C.B. 1955-1, 509
55-320, C.B. 1955-1, 526
55-336, C.B. 1955-1, 519
55-337, C.B. 1955-1, 534
55-338, C.B. 1955-1, 543
55-398, C.B. 1955-1, 535
55-409, C.B. 1955-1, 126
55-420, C.B. 1955-1, 527
55-421, C.B. 1955-1, 539
55-432, C.B. 1955-2, 455
55-467, C.B. 1955-2, 457
55-501, C.B. 1955-2, 469
55-507, C.B. 1955-2, 659
55-527, C.B. 1955-2, 637
55-533, C.B. 1955-2, 642
55-546, C.B. 1955-2, 461
55-548, C.B. 1955-2, 646
55-562, C.B. 1955-2, 647
55-563, C.B. 1955-2, 666
55-564, C.B. 1955-2, 667
55-565, C.B. 1955-2, 661
55-576, C.B. 1955-2, 641
55-577, C.B. 1955-2, 667
55-588, C.B. 1955-2, 647
55-599, C.B. 1955-2, 461
55-602, C.B. 1955-2, 650
55-614, C.B. 1955-2, 462
55-624, C.B. 1955-2, 456
55-625, C.B. 1955-2, 463
55-626, C.B. 1955-2, 463
55-632, C.B. 1955-2, 668
55-647, C.B. 1955-2, 460
55-648, C.B. 1955-2, 463
55-649, C.B. 1955-2, 473
55-659, C.B. 1955-2, 464
55-660, C.B. 1955-2, 465
55-684, C.B. 1955-2, 640
55-685, C.B. 1955-2, 643
55-686, C.B. 1955-2, 644
55-687, C.B. 1955-2, 645
55-688, C.B. 1955-2, 669
55-710, C.B. 1955-2, 658
55-719, C.B. 1955-2, 459
55-720, C.B. 1955-2, 465
55-721, C.B. 1955-2, 471
55-725, C.B. 1955-2, 671
55-735, C.B. 1955-2, 455
55-751, C.B. 1955-2, 465
55-752, C.B. 1955-2, 466
55-753, C.B. 1955-2, 468
55-761, C.B. 1955-2, 656
56-7, C.B. 1956-1, 675

Rev. Rul No.—Continued
56-16, C.B. 1956-1, 524
56-38, C.B. 1956-1, 512
56-39, C.B. 1956-1, 513
56-40, C.B. 1956-1, 516
56-45, C.B. 1956-1, 521
56-55, C.B. 1956-1, 682
56-57, C.B. 1956-1, 525
56-61, C.B. 1956-1, 521
56-62, C.B. 1956-1, 525
56-91, C.B. 1956-1, 522
56-111, C.B. 1956-1, 513
56-112, C.B. 1956-1, 526
56-115, C.B. 1956-1, 596
56-120, C.B. 1956-1, 514
56-122, C.B. 1956-1, 689
56-167, C.B. 1954-1, 515
56-175, C.B. 1956-1, 516
56-178, C.B. 1956-1, 676
56-190, C.B. 1956-1, 517
56-197, C.B. 1956-1, 677
56-217, C.B. 1956-1, 509
56-218, C.B. 1956-1, 527
56-219, C.B. 1956-1, 690
56-229, C.B. 1956-1, 528
56-231, C.B. 1956-1, 686
56-243, C.B. 1956-1, 501
56-255, C.B. 1956-1, 508
56-258, C.B. 1956-1, 528
56-261, C.B. 1956-1, 556
56-273, C.B. 1956-1, 500
56-274, C.B. 1956-1, 502
56-276, C.B. 1956-1, 507
56-283, C.B. 1956-1, 507
56-292, C.B. 1956-1, 503
56-293, C.B. 1956-1, 505
56-294, C.B. 1956-1, 529
56-307, C.B. 1956-2, 808
56-308, C.B. 1956-2, 882
56-321, C.B. 1956-2, 872
56-333, C.B. 1956-2, 829
56-334, C.B. 1956-2, 831
56-349, C.B. 1956-2, 793
56-354, C.B. 1956-2, 1007
56-362, C.B. 1956-2, 842
56-363, C.B. 1956-2, 870
56-364, C.B. 1956-2, 888
56-377, C.B. 1956-2, 829
56-378, C.B. 1956-2, 873
56-388, C.B. 1956-2, 808
56-389, C.B. 1956-2, 814
56-422, C.B. 1956-2, 786
56-423, C.B. 1956-2, 805
56-441, C.B. 1956-2, 786
56-442, C.B. 1956-2, 814
56-443, C.B. 1956-2, 950
56-444, C.B. 1956-2, 832
56-454, C.B. 1956-2, 787
56-455, C.B. 1956-2, 894
56-465, C.B. 1956-2, 830
56-481, C.B. 1956-2, 833
56-491, C.B. 1956-2, 881
56-503, C.B. 1956-2, 789
56-504, C.B. 1956-2, 811
56-532, C.B. 1956-2, 1010
56-544, C.B. 1956-2, 797
56-545, C.B. 1956-2, 827
56-546, C.B. 1956-2, 886
56-563, C.B. 1956-2, 799
56-565, C.B. 1956-2, 874
56-566, C.B. 1956-2, 888
56-569, C.B. 1956-2, 1002
56-570, C.B. 1956-2, 831
56-576, C.B. 1956-2, 875
56-577, C.B. 1956-2, 889
56-578, C.B. 1956-2, 787

Rev. Rul No.—Continued
56-590, C.B. 1956-2, 876
56-591, C.B. 1956-2, 877
56-606, C.B. 1956-2, 805
56-607, C.B. 1956-2, 809
56-608, C.B. 1956-2, 878
56-619, C.B. 1956-2, 813
56-620, C.B. 1956-2, 834
56-621, C.B. 1956-2, 835
56-641, C.B. 1956-2, 828
56-642, C.B. 1956-2, 879
56-649, C.B. 1956-2, 787
56-661, C.B. 1956-2, 788
56-662, C.B. 1956-2, 790
56-664, C.B. 1956-2, 813
56-665, C.B. 1956-2, 839
56-666, C.B. 1956-2, 892
56-684, C.B. 1956-2, 806
56-685, C.B. 1956-2, 811
56-686, C.B. 1956-2, 880
56-687, C.B. 1956-2, 887
56-688, C.B. 1956-2, 889
56-695, C.B. 1956-2, 790
56-696, C.B. 1956-2, 791
56-697, C.B. 1956-2, 801
56-698, C.B. 1956-2, 801
56-699, C.B. 1956-2, 806
56-700, C.B. 1956-2, 807
57-4, C.B. 1957-1, 378
57-5, C.B. 1957-1, 414
57-14, C.B. 1957-1, 357
57-23, C.B. 1957-1, 357
57-36, C.B. 1957-1, 551
57-43, C.B. 1957-1, 358
57-44, C.B. 1957-1, 385
57-57, C.B. 1957-1, 399
57-64, C.B. 1957-1, 358
57-65, C.B. 1957-1, 377
57-66, C.B. 1957-1, 422
57-81, C.B. 1957-1, 379
57-94, C.B. 1957-1, 359
57-96, C.B. 1957-1, 374
57-111, C.B. 1957-1, 376
57-136, C.B. 1957-1, 362
57-146, C.B. 1957-1, 359
57-147, C.B. 1957-1, 377
57-148, C.B. 1957-1, 409
57-156, C.B. 1957-1, 386
57-157, C.B. 1957-1, 423
57-169, C.B. 1957-1, 400
57-171, C.B. 1957-1, 499
57-181, C.B. 1957-1, 383
57-182, C.B. 1957-1, 386
57-183, C.B. 1957-1, 401
57-192, C.B. 1957-1, 362
57-194, C.B. 1957-1, 373
57-207, C.B. 1957-1, 410
57-208, C.B. 1957-1, 411
57-209, C.B. 1957-1, 413
57-220, C.B. 1957-1, 380
57-222, C.B. 1957-1, 402
57-223, C.B. 1957-1, 403
57-230, C.B. 1957-1, 388
57-231, C.B. 1957-1, 366
57-232, C.B. 1957-1, 367
57-238, C.B. 1957-1, 380
57-239, C.B. 1957-1, 389
57-247, C.B. 1957-1, 360
57-248, C.B. 1957-1, 360
57-249, C.B. 1957-1, 362
57-252, C.B. 1957-1, 375
57-262, C.B. 1957-1, 361
57-264, C.B. 1957-1, 363
57-266, C.B. 1957-1, 375
57-267, C.B. 1957-1, 405
57-280, C.B. 1957-1, 361

Rev. Rul No.—Continued
57-281, C.B. 1957-1, 382
57-282, C.B. 1957-1, 388
57-283, C.B. 1957-1, 389
57-284, C.B. 1957-1, 407
57-285, C.B. 1957-1, 408
57-302, C.B. 1957-2, 752
57-303, C.B. 1957-2, 753
57-304, C.B. 1957-2, 754
57-338, C.B. 1957-2, 755
57-339, C.B. 1957-2, 757
57-349, C.B. 1957-2, 770
57-355, C.B. 1957-2, 728
57-356, C.B. 1957-2, 758
57-382, C.B. 1957-2, 739
57-393, C.B. 1957-2, 758
57-394, C.B. 1957-2, 759
57-404, C.B. 1957-2, 738
57-405, C.B. 1957-2, 761
57-410, C.B. 1957-2, 761
57-416, C.B. 1957-2, 762
57-426, C.B. 1957-2, 728
57-438, C.B. 1957-2, 735
57-457, C.B. 1957-2, 736
57-458, C.B. 1957-2, 763
57-459, C.B. 1957-2, 725
57-472, C.B. 1957-2, 731
57-473, C.B. 1957-2, 796
57-498, C.B. 1957-2, 764
57-519, C.B. 1957-2, 772
57-520, C.B. 1957-2, 777
57-531, C.B. 1957-2, 748
57-532, C.B. 1957-2, 774
57-533, C.B. 1957-2, 785
57-552, C.B. 1957-2, 709
57-553, C.B. 1957-2, 715
57-568, C.B. 1957-2, 710
57-569, C.B. 1957-2, 711
57-570, C.B. 1957-2, 711
57-571, C.B. 1957-2, 712
57-573, C.B. 1957-2, 737
57-577, C.B. 1957-2, 716
57-579, C.B. 1957-2, 742
57-580, C.B. 1957-2, 768
57-581, C.B. 1957-2, 771
57-596, C.B. 1957-2, 740
57-597, C.B. 1957-2, 741
57-598, C.B. 1957-2, 765
57-605, C.B. 1957-2, 727
57-609, C.B. 1957-2, 713
57-610, C.B. 1957-2, 714
57-611, C.B. 1957-2, 730
57-612, C.B. 1957-2, 743
57-613, C.B. 1957-2, 766
57-614, C.B. 1957-2, 767
58-6, C.B. 1958-1, 440
58-27, C.B. 1958-1, 414
58-28, C.B. 1958-1, 415
58-29, C.B. 1958-1, 466
58-35, C.B. 1958-1, 412
58-36, C.B. 1958-1, 420
58-37, C.B. 1958-1, 370
58-38, C.B. 1958-1, 376
58-47, C.B. 1958-1, 422
58-48, C.B. 1958-1, 408
58-49, C.B. 1958-1, 457
58-58, C.B. 1958-1, 408
58-60, C.B. 1958-1, 436
58-72, C.B. 1958-1, 393
58-73, C.B. 1958-1, 458
58-83, C.B. 1958-1, 451
58-102, C.B. 1958-1, 364
58-104, C.B. 1958-1, 394
58-116, C.B. 1958-1, 410
58-125, C.B. 1958-1, 561
58-146, C.B. 1958-1, 387

Rev. Rul No.—Continued
58-148, C.B. 1958-1, 397
58-149, C.B. 1958-1, 442
58-150, C.B. 1958-1, 443
58-157, C.B. 1958-1, 444
58-159, C.B. 1958-1, 444
58-160, C.B. 1958-1, 446
58-170, C.B. 1958-1, 397
58-172, C.B. 1958-1, 465
58-173, C.B. 1958-1, 468
58-183, C.B. 1958-1, 383
58-185, C.B. 1958-1, 398
58-186, C.B. 1958-1, 410
58-188, C.B. 1958-1, 434
58-196, C.B. 1958-1, 366
58-197, C.B. 1958-1, 368
58-198, C.B. 1958-1, 383
58-199, C.B. 1958-1, 384
58-202, C.B. 1958-1, 416
58-203, C.B. 1958-1, 431
58-204, C.B. 1958-1, 432
58-205, C.B. 1958-1, 447
58-206, C.B. 1958-1, 448
58-213, C.B. 1958-1, 368
58-227, C.B. 1958-1, 449
58-228, C.B. 1958-1, 460
58-249, C.B. 1958-1, 384
58-250, C.B. 1958-1, 423
58-254, C.B. 1958-1, 417
58-271, C.B. 1958-1, 418
58-272, C.B. 1958-1, 435
58-285, C.B. 1958-1, 401
58-298, C.B. 1958-1, 410
58-311, C.B. 1958-1, 369
58-312, C.B. 1958-1, 418
58-314, C.B. 1958-1, 453
58-330, C.B. 1958-1, 370
58-331, C.B. 1958-1, 385
58-334, C.B. 1958-1, 432
58-344, C.B. 1958-2, 784
58-345, C.B. 1958-2, 796
58-362, C.B. 1958-2, 785
58-363, C.B. 1958-2, 831
58-364, C.B. 1958-2, 807
58-368, C.B. 1958-2, 855
58-375, C.B. 1958-2, 752
58-379, C.B. 1958-2, 844
58-386, C.B. 1958-2, 785
58-387, C.B. 1958-2, 797
58-388, C.B. 1958-2, 808
58-401, C.B. 1958-2, 803
58-408, C.B. 1958-2, 745
58-409, C.B. 1958-2, 751
58-410, C.B. 1958-2, 753
58-411, C.B. 1958-2, 786
58-427, C.B. 1958-2, 830
58-437, C.B. 1958-2, 746
58-441, C.B. 1958-2, 839
58-458, C.B. 1958-2, 787
58-459, C.B. 1958-2, 822
58-460, C.B. 1958-2, 824
58-468, C.B. 1958-2, 798
58-478, C.B. 1958-2, 840
58-491, C.B. 1958-2, 789
58-492, C.B. 1958-2, 814
58-493, C.B. 1958-2, 820
58-494, C.B. 1958-2, 822
58-507, C.B. 1958-2, 765
58-508, C.B. 1958-2, 789
58-509, C.B. 1958-2, 801
58-519, C.B. 1958-2, 790
58-520, C.B. 1958-2, 805
58-521, C.B. 1958-2, 856
58-528, C.B. 1958-2, 766
58-530, C.B. 1958-2, 841
58-531, C.B. 1958-2, 853

**Rev. Rul No.—Continued**
58-537, C.B. 1958-2, 753
58-538, C.B. 1958-2, 791
58-539, C.B. 1958-2, 795
58-540, C.B. 1958-2, 802
58-542, C.B. 1958-2, 824
58-543, C.B. 1958-2, 792
58-551, C.B. 1958-2, 747
58-559, C.B. 1958-2, 851
58-571, C.B. 1958-2, 793
58-573, C.B. 1958-2, 843
58-574, C.B. 1958-2, 876
58-584, C.B. 1958-2, 770
58-587, C.B. 1958-2, 842
58-590, C.B. 1958-2, 800
58-611, C.B. 1958-2, 819
58-619, C.B. 1958-2, 749
59-2, C.B. 1959-1, 294
59-3, C.B. 1959-1, 447
59-4, C.B. 1959-1, 295
59-16, C.B. 1959-1, 340
59-18, C.B. 1959-1, 362
59-19, C.B. 1959-1, 363
59-20, C.B. 1959-1, 472
59-36, C.B. 1959-1, 345
59-52, C.B. 1959-1, 386
59-62, C.B. 1959-1, 290
59-75, C.B. 1959-1, 381
59-88, C.B. 1959-1, 325
59-124, C.B. 1959-1, 291
59-127, C.B. 1959-1, 656
59-132, C.B. 1959 1, 310
59-133, C.B. 1959-1, 298
59-135, C.B. 1959-1, 341
59-137, C.B. 1959-1, 343
59-138, C.B. 1959-1, 346
59-145, C.B. 1959-1, 326
59-146, C.B. 1959-1, 364
59-147, C.B. 1959-1, 366
59-155, C.B. 1959-1, 292
59-156, C.B. 1959-1, 439
59-164, C.B. 1959-1, 365
59-178, C.B. 1959-1, 298
59-181, C.B. 1959-1, 329
59-182, C.B. 1959-1, 348
59-183, C.B. 1959-1, 440
59-194, C.B. 1959-1, 312
59-200, C.B. 1959-1, 698
59-202, C.B. 1959-1, 331
59-214, C.B. 1959-1, 293
59-225, C.B. 1959-1, 346
59-226, C.B. 1959-1, 347
59-231, C.B. 1959-2, 297
59-246, C.B. 1959-2, 289
59-263, C.B. 1959-2, 298
59-275, C.B. 1959-2, 330
59-281, C.B. 1959-2, 317
59-287, C.B. 1959-2, 239
59-291, C.B. 1959-2, 326
59-292, C.B. 1959-2, 327
59-295, C.B. 1959-2, 420
59-301, C.B. 1959-2, 291
59-302, C.B. 1959-2, 292
59-303, C.B. 1959-2, 299
59-304, C.B. 1959-2, 320
59-305, C.B. 1959-2, 328
59-312, C.B. 1959-2, 241
59-313, C.B. 1959-2, 294
59-315, C.B. 1959-2, 321
59-317, C.B. 1959-2, 290
59-321, C.B. 1959-2, 241
59-365, C.B. 1959-2, 299
59-372, C.B. 1959-2, 318
59-374, C.B. 1959-2, 256
59-376, C.B. 1959-2, 319
59-381, C.B. 1959-2, 267

**Rev. Rul No.—Continued**
59-404, C.B. 1959-2, 243
59-420, C.B. 1959-2, 300
59-421, C.B. 1959-2, 322
60-10, C.B. 1960-1, 473
60-11, C.B. 1960-1, 518
60-12, C.B. 1960-1, 552
60-30, C.B. 1960-1, 512
60-40, C.B. 1960-1, 416
60-64, C.B. 1960-1, 551
60-79, C.B. 1960-1, 492
60-105, C.B. 1960-1, 472
60-108, C.B. 1960-1, 516
60-126, C.B. 1960-1, 493
60-136, C.B. 1960-1, 472
60-150, C.B. 1960-1, 470
60-151, C.B. 1960-1, 513
60-154, C.B. 1960-1, 400
60-173, C.B. 1960-1, 514
60-174, C.B. 1960-1, 519
60-186, C.B. 1960-1, 491
60-198, C.B. 1960-1, 475
60-207, C.B. 1960-1, 401
60-208, C.B. 1960-1, 471
60-231, C.B. 1960-1, 402
60-234, C.B. 1960-2, 345
60-251, C.B. 1960-2, 322
60-252, C.B. 1960-2, 325
60-253, C.B. 1960-2, 327
60-259, C.B. 1960-2, 318
60-263, C.B. 1960-2, 320
60-272, C.B. 1960-2, 281
60-273, C.B. 1960-2, 344
60-308, C.B. 1960-2, 311
60-309, C.B. 1960-2, 311
60-318, C.B. 1960-2, 339
60-339, C.B. 1960-2, 346
60-347, C.B. 1960-2, 319
61-3, C.B. 1961-1, 487
61-4, C.B. 1961-1, 510
61-12, C.B. 1961-1, 486
61-22, C.B. 1961-1, 636
61-26, C.B. 1961-1, 480
61-27, C.B. 1961-1, 481
61-48, C.B. 1961-1, 516
61-60, C.B. 1961-1, 515
61-61, C.B. 1961-1, 492
61-69, C.B. 1961-1, 467
61-73, C.B. 1961-1, 716
61-104, C.B. 1961-1, 469
61-105, C.B. 1961-1, 468
61-106, C.B. 1961-1, 492
61-108, C.B. 1961-1, 471
61-109, C.B. 1961-1, 479
61-114, C.B. 1961-1, 470
61-116, C.B. 1961-1, 472
61-117, C.B. 1961-1, 483
61-120, C.B. 1961-1, 464
61-124, C.B. 1961-2, 158
61-135, C.B. 1961-2, 160
61-144, C.B. 1961-2, 202
61-160, C.B. 1961-2, 178
61-165, C.B. 1961-2, 175
61-168, C.B. 1961-2, 179
61-169, C.B. 1961-2, 187
61-172, C.B. 1961-2, 200
61-176, C.B. 1961-2, 188
61-183, C.B. 1961-2, 181
61-184, C.B. 1961-2, 202
61-197, C.B. 1961-2, 190
61-202, C.B. 1961-2, 176
61-204, C.B. 1961-2, 161
61-212, C.B. 1961-2, 205
62-11, C.B. 1962-1, 224
62-18, C.B. 1962-1, 276
62-19, C.B. 1962-1, 211

**Rev. Rul No.—Continued**
62-32, C.B. 1962-1, 191
62-34, C.B. 1962-1, 207
62-41, C.B. 1962-1, 194
62-44, C.B. 1962-1, 209
62-52, C.B. 1962-1, 276
62-57, C.B. 1962-1, 226
62-61, C.B. 1962-1, 221
62-62, C.B. 1962-1, 208
62-72, C.B. 1962-1, 192
62-84, C.B. 1962-1, 195
62-87, C.B. 1962-1, 196
62-88, C.B. 1962-1, 205
62-100, C.B. 1962-2, 218
62-110, C.B. 1962-2, 274
62-119, C.B. 1962-2, 256
62-126, C.B. 1962-2, 254
62-129, C.B. 1962-2, 228
62-134, C.B. 1962-2, 236
62-151, C.B. 1962-2, 223
62-159, C.B. 1962-2, 258
62-168, C.B. 1962-2, 242
62-170, C.B. 1962-2, 244
62-184, C.B. 1962-2, 244
62-185, C.B. 1962-2, 253
62-192, C.B. 1962-2, 229
62-193, C.B. 1962-2, 246
62-207, C.B. 1962-2, 224
62-219, C.B. 1962-2, 219
62-220, C.B. 1962-2, 228
63-4, C.B. 1963-1, 219
63-9, C.B. 1963-1, 255
63-17, C.B. 1963-1, 221
63-25, C.B. 1963-1, 223
63-35, C.B. 1963-1, 224
63-36, C.B. 1963-1, 225
63-38, C.B. 1963-1, 257
63-39, C.B. 1963-1, 262
63-78, C.B. 1963-1, 185
63-130, C.B. 1963-2, 546
63-133, C.B. 1963-2, 483
63-135, C.B. 1963-2, 577
63-146, C.B. 1963-2, 460
63-147, C.B. 1963-2, 463
63-153, C.B. 1963-2, 516
63-154, C.B. 1963-2, 541
63-158, C.B. 1963-2, 464
63-159, C.B. 1963-2, 488
63-160, C.B. 1963-2, 489
63-161, C.B. 1963-2, 508
63-164, C.B. 1963-2, 543
63-171, C.B. 1963-2, 451
63-172, C.B. 1963-2, 454
63-175, C.B. 1963-2, 512
63-176, C.B. 1963-2, 544
63-184, C.B. 1963-2, 465
63-187, C.B. 1963-2, 513
63-188, C.B. 1963-2, 515
63-197, C.B. 1963-2, 495
63-199, C.B. 1963-2, 457
63-200, C.B. 1963-2, 459
63-201, C.B. 1963-2, 572
63-202, C.B. 1963-2, 575
63-203, C.B. 1963-2, 580
63-212, C.B. 1963-2, 514
63-213, C.B. 1963-2, 542
63-214, C.B. 1963-2, 544
63-237, C.B. 1963-2, 509
63-251, C.B. 1963-2, 455
63-276, C.B. 1963-2, 511
63-279, C.B. 1963-2, 578
64-5, C.B. 1964-1 (Part 1), 395
64-52, C.B. 1964-1 (Part 1), 357
64-53, C.B. 1964-1 (Part 1), 383
64-57, C.B. 1964-1 (Part 1), 382
64-65, C.B. 1964-1 (Part 1), 384

Rev. Rul No.—Continued
64-66, C.B. 1964-1 (Part 1), 393
64-77, C.B. 1964-1 (Part 1), 352
64-78, C.B. 1964-1 (Part 1), 385
64-79, C.B. 1964-1 (Part 1), 386
64-80, C.B. 1964-1 (Part 1), 386
64-81, C.B. 1964-1 (Part 1), 387
64-87, C.B. 1964-1 (Part 1), 388
64-88, C.B. 1964-1 (Part 1), 388
64-96, C.B. 1964-1 (Part 1), 389
64-119, C.B. 1964-1 (Part 1), 356
64-130, C.B. 1964-1 (Part 1), 401
64-136, C.B. 1964-1 (Part 1), 372
64-142, C.B. 1964-1 (Part 1), 397
64-143, C.B. 1964-1 (Part 1), 402
64-164, C.B. 1964-1 (Part 1), 351
64-165, C.B. 1964-1 (Part 1), 378
64-168, C.B. 1964-1 (Part 1), 400
64-179, C.B. 1964-1 (Part 1), 375
64-181, C.B. 1964-1 (Part 1), 382
64-185, C.B. 1964-1 (Part 1), 354
64-188, C.B. 1964-1 (Part 1), 376
64-190, C.B. 1964-1 (Part 1), 382
64-199, C.B. 1964-2, 391
64-200, C.B. 1964-2, 391
64-204, C.B. 1964-2, 443
64-209, C.B. 1964-2, 394
64-226, C.B. 1964-2, 388
64-227, C.B. 1964-2, 389
64-262, C.B. 1964-2, 429
64-263, C.B. 1964-2, 432
64-268, C.B. 1964-2, 433
64-270, C.B. 1964-2, 434
64-294, C.B. 1964-2, 428
64-318, C.B. 1964-2, 395
64-319, C.B. 1964-2, 417
64-320, C.B. 1964-2, 435
64-321, C.B. 1964-2, 444
64-336, C.B. 1964-2, 418
64-337, C.B. 1964-2, 420
64-338, C.B. 1964-2, 426
64-339, C.B. 1964-2, 429
65-8, C.B. 1965-1, 476
65-9, C.B. 1965-1, 491
65-15, C.B. 1965-1, 541
65-27, C.B. 1965-1, 477
65-43, C.B. 1965-1, 449
65-44, C.B. 1965-1, 481
65-49, C.B. 1965-1, 494
65-53, C.B. 1965-1, 482

Rev. Rul No.—Continued
65-76, C.B. 1965-1, 483
65-77, C.B. 1965-1, 484
65-84, C.B. 1965-1, 451
65-102, C.B. 1965-1, 485
65-103, C.B. 1965-1, 474
65-112, C.B. 1965-1, 478
65-113, C.B. 1965-1, 480
65-120, C.B. 1965-1, 473
65-133, C.B. 1965-1, 487
65-135, C.B. 1965-1, 501
65-151, C.B. 1965-1, 501
65-157, C.B. 1965-1, 475
65-169, C.B. 1965-1, 486
65-170, C.B. 1965-1, 486
65-171, C.B. 1965-1, 496
65-204, C.B. 1965-2, 421
65-205, C.B. 1965-2, 426
65-206, C.B. 1965-2, 426

The purpose of this declaration of obsoleteness is to make it clear to all concerned that the above-listed rulings in the excise tax area are not determinative with respect to future transactions. It is not the purpose of this Revenue Ruling to determine their applicability to past transactions. In this particular Revenue Ruling most of the listed rulings are inapplicable to future transactions because the statutory provisions under which they were issued have subsequently been repealed or amended.

Failure to include in the foregoing list any excise tax ruling published after 1952 that relates to a repealed excise tax should not be taken to imply that such ruling has been determined to have continuing application to future transactions.

---

*26 CFR 301.7805-1: Rules and regulations.*

Whether the tax imposed by section 4061(a)(1) of the Internal Revenue Code of 1954 on accessorial equipment sold on or in connection with the sale of truck, trailer, or semitrailer tank bodies will be applied retroactively. See Rev. Rul. 69-143, page 280.

---

*26 CFR 301.7805-1: Rules and regulations.*

Applicability of the manufacturers excise tax imposed by section 4061(a)(1) of the Internal Revenue Code of 1954 to situations where dump truck hoists are associated with truck bodies or truck chassis. See Rev. Rul. 69-195, page 276.

---

*26 CFR 301.7805-1: Rules and regulations.*

Whether the tax imposed by section 4061(a)(1) of the Code on accessorial equipment sold on or in connection with the sale of tank bodies designed to transport liquid bituminous materials will be applied retroactively. See Rev. Rul. 69-206, page 278.

---

*26 CFR 301.7805-1: Rules and regulations.*

Whether the tax imposed by section 4181 of the Code on sales of pistols and revolvers to law enforcement officers of a State will be applied retroactively. See Rev. Rul. 69-209, page 287.

---

*26 CFR 301.7805-1: Rules and regulations.*

Prospective application of Revenue Ruling relating to income received from the United States Government by a Federal employee who is a United States citizen domiciled in Spain and who is the wife of a Spanish citizen. See Rev. Rul. 69-213, page 34.

**Private Letter Rulings**

# Private Letter Ruling 8426003, 3/09/1984, IRC Sec(s). 6501

---

**UIL No.** 4261.00-00; 6501.00-00

## Headnote:

***Reference(s):*** Code Sec. 6501;

Private Letter Ruling 8426003

Code Sec. 6501 ADMINISTRATIVE PROVISIONS APPLICABLE TO EXCISE TAXES -- limitations on assessment and collection -- air transportation tax .

IRS ruled that Sec. 6501(a) period of limitation had expired preventing assessment of additional amounts under Sec. 4261(a) District office proposed assessment of additional tax on taxpayer (T), user of aircraft, because of determination that variable hourly rate taxable under Sec. 4261(a) should have been greater. Although T's return did not reflect tax imposed by Sec.4261(a), and T didn't disclaim liability by showing zero amount, T was under no obligation to file return. B billed and collected air transportation tax from T and remitted tax to A who filed Form 720. Because T paid tax to B, it didn't file Form 720 to report and pay tax. IRS concluded that if assessment was allowed there would be no period of limitation where amount of liability was in dispute. Although six year period of limitation under Sec. 6501(e)(3) didn't apply to T because T had no obligation to file return, it may apply to return filed by A. (Technical Advice Memorandum.)

Copyright 1984, Tax Analysts.

## Full Text:

Mar. 9, 1984

### Issues

(1) Whether the period of limitations under section 6501(a) of the Internal Revenue Code has expired with respect to the Taxpayer preventing the assessment of additional amounts under section 4261(a) of the Code.

(2) Whether the 6 year period of limitation under section 6501(e)(3) of the Code applies.

### Facts

Taxpayer was involved with two exclusive use lease agreements with A and B which began in 1975 and ended in May 1978 at which time Taxpayer leased and operated its own aircraft and conducted its own operations. B provided the air transportation service and collected and remitted the tax imposed by section 4261(a) of the Code to A. A filed Forms 720 for the periods in question as required by section 4291. B billed and collected the air transportation tax from Taxpayer, remitted the tax to A who filed Forms 720 for each period from the 4th quarter of 1976 to the 2nd quarter of 1978. Because Taxpayer paid the tax to B, it did not file a Form 720 to report and pay the tax. On May 24, 1982, the Internal Revenue Service proposed an assessment of tax against Taxpayer for each of the periods in question. The proposed assessment is based on the premise that the variable hourly rate taxable under section 4261(a) of

$ 300 to $ 325 that was charged to Taxpayer by A and B under the aircraft lease agreement should be raised to $ 437.15 per hour. The district office proposes to assess the additional tax to Taxpayer, the user of the aircraft. For the taxable periods in question, A filed timely Forms 720 and reported the tax collected from Taxpayer and other customers. For the same periods, Taxpayer filed timely Forms 720 and reported the tax on aviation fuel imposed by section 4041(c) of Code. Taxpayer made no entry on the Forms 720 that it filed on the line used for reporting the tax imposed by section 4261(a) on the transportation of persons by air.

## Applicable LAW

Section 4261(a) of the Code imposes an excise tax on the amount paid for taxable air transportation. Section 4261(d) states that the tax is paid by the person making the payment subject to the tax. Section 4291 requires every person receiving payment for services on which a tax is imposed upon the payor thereof under chapter 33 to collect the amount of the tax from the person making the payment.

Section 6011 of the Code provides that when required by regulations prescribed by the Secretary, any person made liable for any tax, or for the collection thereof, shall make a return or statement according to the forms or instructions prescribed.

Section 49.6011(a)-1(a) of the Excise Tax Regulations provides that liability for tax imposed under chapter 33 shall be reported on a quarterly basis on Form 720.

Section 6501(a) of the Code provides that the amount of any tax imposed by Title 26 shall be assessed within 3 years after the return was filed. Section 6501(b)(4) provides that in the case of returns of excise tax, the filing of a return for a specified period on which an entry has been made (including a return on which an entry has been made showing a liability for such period) shall constitute the filing of a return of all amounts of such tax which, if properly paid, would be required to be reported on such return for such period.

In Rev. Rul. 58-158, 1958-1 C.B. 562, which involved a so-called "collected" tax, the Service stated that the person making the payment subject to the tax (shipper) has a duty to pay the tax, while the person receiving the taxable payment for the service has a duty to collect the tax, file a return, and remit the tax to the government. Either party can dispose of his obligation to the government by performing the acts required of him and, having performed the required acts, will not be held liable for the other's failures. The ruling concluded that with respect to so-called "collected" taxes, where no return has been filed and there has been no attempt by either party to see that the tax has been received by the government, the period of limitations has not expired and the tax could be assessed directly against the shipper.

In Rev. Rul. 59-295, 1959-2 C.B. 420 the Service stated that the taxpayer in the case of the admissions tax, which is one of the so-called "collected" taxes, the person paying the admissions charge is the taxpayer. The person collecting the charge is not the taxpayer and if he fails to collect the tax, willfully or otherwise, the tax cannot be asserted against him.

Rev. Rul. 59-127, 1959-1 C.B. 656, involved the failure or refusal of certain members of a social,

athletic, or sporting club to pay the tax that was imposed under section 4241(a) of the Code. The club filed timely returns for the periods in question reporting the tax collected from other members, but did not report that it was unable to collect the tax from certain other members of the club as required by regulations applicable to such tax. The tax on initiation fees and the tax on membership fees and dues were separate and distinct taxes under section 4241 and were required to be paid separately by each member. The club was required to collect any such taxes due, make returns, and pay over to the government the amount collected. The ruling states that there was an obligation on the part of each member as well as the club to see that the government received the amount of tax due, and that technically a single separate return could have been required to be filed in respect of each member's payment of tax on dues or membership fees and a single separate return could likewise be required to be filed in respect of each member's payment of tax on initiation fees. As a matter of practicality and convenience to the taxpayers and the government, a club was permitted to file one return combining all payments of the tax on dues or membership fees and all payments of the tax on initiation fees received in a single filing period. The combined return could not be construed to mean that the filing of it started the period of limitation to run as to any taxes omitted from the return with respect to those members who refused or failed to pay their tax. Rev. Rul. 59-127 concluded that that where a member fails or refuses to pay either the tax on dues or membership fees or the tax on initiation fees and there has been no attempt by the club to put the government on notice, a direct assessment of the amounts due may be made at any time against the members even though the club filed timely returns reporting the tax paid by other members for the same period. The ruling states that the conclusion applies to other so-called "collected" taxes.

Rev. Rul. 59-366, 1959-2 C.B. 418 holds that, where a person who is required to file a Form 720 enters on any line of the form the word "none," a "zero," or some other comparable entry denying liability for the category of tax, such entry constitutes the filing of a return for the category of tax. The ruling notes that with respect to so-called "collected" excise taxes, the filing of a timely return by a collecting agency does not constitute the filing of a return for any "taxpayer" who has failed or refused to pay any category of tax to the collecting agency, unless the collecting agency reports that it has not collected the tax from that taxpayer. The "taxpayer" is under no duty to file a return (see Rev. Rul. 58-300, 1958-1 C.B. 454). Section 6501(e)(3) of the Code provides that in the case of a return of excise tax, if the taxpayer omits an amount of such tax properly includable on the return which exceeds 25 percent of the amount of such tax reported on the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return is filed.

## Rationale

In this particular case, the return filed by Taxpayer did not reflect any amount of the tax imposed by section 4261(a) of the Code and the line did not disclaim any liability by showing "zero" or "none." Therefore, under section 6501(a) of the Code no return of the tax imposed by section 4261(a) was filed by Taxpayer. However, Taxpayer was under no obligation to file a return in this particular case.

If a taxpayer fails or refuses to pay a so-called "collected" tax, a return filed by the collecting agency will generally not serve to constitute the filing of a return by the taxpayer for purposes of starting the period of limitations ( Rev. Rul. 59-127 and Rev. Rul. 59-366). However, the return filed by the collecting agency will be sufficient to start the period of limitations if the collecting agency puts the government on notice that the taxpayer has not paid the tax or that it has otherwise not collected the tax.

Rev. Rul. 58-158 makes clear that the person paying for the taxable service has a duty to pay the tax, while the person receiving the taxable payment has a duty to collect the tax, file a return, and remit the tax to the government. Either party can dispose of his obligation by performing the act required of him and will not be held liable for the other's failures. That ruling concluded that where no return had been filed and there was no attempt by either party to see to it that the tax was paid to the government, then the period of limitations has not expired and the tax could be assessed directly against the taxpayer (shipper).

In this particular case, the returns filed by A were sufficient to start the period of limitations on assessments against Taxpayer. The situation is not one in which Taxpayer failed or refused to pay the tax; thus, under Rev. Ruls. 59-127 and 59-366, the return filed by A can start the period of limitations. Further, the situation is not one in which no return had been filed or where no attempt was made by either party to fulfill its obligations as was the case in Rev. Rul. 58-158.

The situation involved in this particular case is one in which the Taxpayer paid a tax on the premise that the variable hourly rate taxable under section 4261(a) of the Code was $ 300 to $ 325 and the District Office takes the view that the hourly rate should be $ 437.15. To conclude that the additional tax based on the larger hourly rate can now be assessed against Taxpayer would mean there would effectively be no period of limitations where the amount of the tax liability was in dispute.

Finally, section 6501(e)(3) of the Code does not apply to Taxpayer in this situation because there was no obligation on the part of Taxpayer to file a return, the tax having been paid to the collecting agent. Section 6501(e)(3) may apply to the return filed by A if the amount of tax omitted from each quarterly Form 720 exceeds 25 percent of the total tax shown on each return.

## Conclusion

(1) The period of limitations has expired preventing assessment of additional tax against the Taxpayer.

(2) The 6 year period of limitations set forth in section 6501(e)(3) of the Code is inapplicable to the Taxpayer but may apply to the return filed by A.

A copy of this technical advice memorandum is to be given to the taxpayer, section 6110(j)(3) of the Code provides that it may not be used or cited as precedent.

© Copyright 2007 RIA. All rights reserved.