IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CONTINENTAL AIRLINES, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 06-432C<br>Judge Lawrence S. Margolis |

**DECLARATION OF DAVID V. BOWMAN**

I, David V. Bowman, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by Continental Airlines, Inc. ("Continental") in Houston, Texas. I have been employed by Continental since 1992. During my entire tenure with Continental, I have worked in the Tax Department. My current title is Director of Operating Taxes.

3. Continental is the fifth largest commercial air carrier in the world and, with its regional partners operating as Continental Express and Continental Connection, offers more than 3,200 daily flights serving 151 U.S. and 137 international locations, including to and from Canada, Latin America, Europe, and Asia.

4. I am familiar with the "Immigration User Fee" imposed by 8 U.S.C. § 1356 and 8 C.F.R. § 286.1-286.9, and with the "APHIS User Fee" imposed by 21 U.S.C. § 136a and 7 C.F.R. § 354.3(f).

5. The Government has audited Continental's compliance in connection with the "Immigration User Fee" (*i.e.*, the fee imposed by 8 U.S.C. § 1356 and 8 C.F.R. § 286.1-286.9) and with the "APHIS User Fee" (*i.e.*, the fee imposed by 21 U.S.C. § 136a and 7 C.F.R. § 354.3(f)) for audit periods beginning at least in 1999, on approximately an annual or biannual basis (the "User Fee Audits").

6. The Government has also audited Continental in connection with the "Customs User Fee" (*i.e.*, the fee imposed by 19 U.S.C. § 58c(a)(5)(A)), which is not at issue in this case.

7. In connection with each of the User Fee Audits, the Government prepared an audit report, which it sent to Continental. Sometimes, an audit report covered more than one of the three user fees (Immigration, APHIS, and Customs).

8. Since at least 1999, I have been the Government's primary contact at Continental regarding all of its User Fee Audits.

9. My department is the custodian for the audit reports and correspondence sent to Continental by the Government in connection with User Fee Audits and Continental's documentation regarding those audits. I have reviewed and am familiar with these documents.

10. In connection with the User Fee Audits, the Government tested for collection, recording, reporting, and remittance compliance.

11. For each of the User Fee Audits, the Government tested Continental's user fee collection compliance by reviewing Continental-issued tickets (*i.e.*, tickets sold on Continental ticket stock, which means it carries Continental's 005 code) from a sampling of Continental flights during the relevant period. The Government then checked each ticket for evidence that the user fees had been collected. Any ticket lacking such evidence (and for which Continental

could not produce any other evidence that the fees had been collected or that the passenger was exempt from the fees) was deemed an "error" by the Government auditors.

12. Many of these "errors" in which the tickets did not contain evidence of collection and for which Continental could not otherwise produce any evidence that the user fees had been collected, in fact represent instances where Continental did not collect a user fee. The reasons for this are as follows. The vast majority of user fees are collected at the time of ticketing through an automated process that prices the tickets and marks them with evidence of collection. As a practical matter, although Continental makes attempts to do so, very few user fees are collected after the time of ticketing. In any case, in the course of each User Fee Audit, Continental staff searched Continental's relevant records for evidence that the user fees had been collected after the time of ticketing in connection with the "errors" in that audit. Any evidence found was presented to the Government auditors during the audit. Based on that information, such a ticket would not be included as an "error" (unless there was some independent problem with it).

13. For each User Fee Audit, the Government auditors calculated an "error rate" by dividing the number of "errors" by the total number of qualifying tickets in the sample.

14. For each User Fee Audit, the Government auditors then used the "error rate" to assess a liability against Continental by applying the "error rate" to the total dollar amount of applicable Immigration User Fees or APHIS User Fees that Continental had remitted during the period covered by the audit.

15. Continental has paid each of the assessments from each of the User Fee Audits.

16. Since at least 1999 until the present, Continental has had effective policies,

procedures, and systems designed to collect Immigration User Fees and APHIS User Fees from all eligible passengers.

17. Since at least 1999, Continental has experienced difficulties in collecting user fees from some international passengers, especially those whose flights originate from certain Central and South American countries.

18. Continental offers flights to and from these countries.

19. Some passengers and travel agencies from these countries claim that either their country's laws prohibit, or its sovereignty would be injured, if the United States or its agents collected any fees or taxes from their country's citizens.

20. In my experience, it is well known within the airline industry that there are difficulties collecting user fees from some passengers, especially those in certain Central and South American countries.

21. These difficulties mean that some passengers will not have paid their fees at the time they purchase their tickets.

22. Some foreign passengers who did not pay user fees when they purchased their tickets also fail to pay the user fees at the airport.

23. Attached hereto as pages 8-17 is a true and correct copy of the audit report (and transmittal letter) that Continental received from the Government in connection with the Government's Immigration User Fee Audit of the period April 1, 1999 through December 31, 2000.

24. On or about October 18, 2001, Continental paid to the Government all of the assessments in that report, including $420,784 representing the "error rate" assessment as

described above.

25. Attached hereto as pages 18-25 is a true and correct copy of the audit report (and transmittal letter) that Continental received from the Government in connection with the Government's Immigration User Fee Audit of the period January 1, 2001 through December 31, 2001.

26. On or about December 2, 2002, Continental paid to the Government $414,639 representing the assessment in that report.

27. Attached hereto as pages 26-42 is a true and correct copy of the audit report (and transmittal letter) that Continental received from the Government in connection with the Government's Immigration User Fee and APHIS User Fee Audit of the period January 1, 2002 through December 31, 2003.

28. On or about July 21, 2004, Continental paid to the Government all of the assessments in that report, including $230,547 representing the Immigration User Fee assessment as stated in Finding 1 of that report, and $109,535 representing the APHIS User Fee assessment as stated in Finding 1 of that report.

29. In addition, the Government assessed interest and penalty charges of $15,476.68 on the $109,535. Continental paid that $15,476.68 to the Government on or about January 5, 2005.

30. Attached hereto as pages 43-70 is a true and correct copy of the audit report (and transmittal letter) that Continental received from the Government in connection with the Government's Immigration User Fee and APHIS User Fee Audit of the period January 1, 2004 through September 30, 2005.

31. On or about September 12, 2006, Continental paid to the Government all of the assessments in that report, including $62,503.29 (representing what the Government claimed in Finding 1 were Immigration user fees for which "Continental did not prove collection and remittance"), $188,607.54 (representing Immigration user fees the Government claimed in Finding 1 were collected but not properly remitted), $30,428.57 (representing what the Government claimed in Finding 3 were APHIS user fees for which "Continental did not prove collection and remittance"), $91,817.00 (representing APHIS user fees the Government claimed in Finding 3 were collected but not properly remitted), and $5,755.35 (representing $1.85 for each of 3,111 passengers for whom the Government claimed in Finding 4 that Continental failed to collect the correct amount in APHIS user fees).

32. On August 18, 2006, I sent a letter to the Government explaining that Continental would pay these assessments, but believed that the aforementioned $62,503.29, $30,428.57, and $5,755.35 amounts were being illegally exacted from it and that it reserved its rights to sue to recover such amount. That letter is attached as Appendix I to the Government's audit report.

33. Attached hereto as pages 71-79 is a true and correct copy of the audit report (and transmittal letter) that Continental received from the Government in connection with the Government's APHIS User Fee Audit of the period July 1, 1999 through December 31, 2001.

34. On or about July 30, 2002, Continental paid to the Government all of the assessments in that report, including $863,979.89 representing the APHIS User Fee assessment as stated in Finding 1 of that report.

35. In addition, the Government assessed interest charges of $48,687.60 on that amount. Continental paid that $48,687.60 to the Government on or about November 15, 2002.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 16th day of January, 2007.

David V. Bowman

**U.S. Department of Justice**
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

September 20, 2001

Mr. David Bowman, Director
Excise, Property, Use and Payroll Taxes
Continental Airlines
32nd Floor HQSTX
1600 Smith Street
Houston, TX 77002

Dear Mr. Bowman:

Attached is the Immigration and Naturalization Services (INS) report on our review of Continental Airlines compliance with Immigration User Fees (IUF) regulations between April 1, 1999 December 31, 2000. This report includes operational observations and an assessment of the liability due to INS. Details of the findings and financial liability were discussed with you at the exit conference and subsequent.

The audit was completed in March of this year and your staff has been working with the auditor since that time. We realize the tragic events of last week have had an impact on your business and we continue to be very interested in working with you to resolve audit issues.

Per agreement, the interim financial liability is $425,848 and does not include interest or penalties.

Of the total liability: Your firm will not be charged interest for the $425,848 interim liability amount, if received by INS within thirty (30) days from the date of this letter. As notified in our initial letter, audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of this audit report. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

In addition to the above finding, an estimated amount of $1,181,128 is potentially due in user fees on Trip and Buddy Travel Passes. We understand that you have been working to provide additional information to potentially clear some of this amount, but we are still awaiting data. As agreed, we are issuing this interim liability letter due to the time elapsed since the audit. We have collaborated on an additional 30day extension to resolve the issues regarding the Trip and Buddy Travel Passes. Failure to provide the additional information would make you liable for the additional liability after 35 days receipt of this letter.

For the additional liability: As notified in our initial letter to you, INS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the INS. When the Trip and Buddy Passes issue is resolved, the final audit report will identify principal amounts owed for the Immigration User Fee. The INS Debt Management Center (DMC) located in Williston, Vermont, will determine if interest and penalty amounts are due. Interest and penalties will be computed back to the period when the fees should have been remitted and you will be invoiced by DMC for these amounts after the issuance of this final audit report.

Remittances of the amount due INS may be made by wire transfer or check in U.S. dollars. Check must be payable to the U.S. Immigration and Naturalization Service. To ensure proper handling and crediting of your remittance, we ask that you include the INS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

By U.S. Postal Service:

U.S. Immigration and Naturalization Service
c/o Bank One
P.O. Box 93963
Chicago, IL 60673-3963

By Express Mail Center:

U.S. Immigration and Naturalization Service
c/o Bank One
INS Account Number 93963
525 West Monroe Street
7th Floor Mail Room
Chicago, IL 60661

If you remit your fee by wire transfer, Bank One requires the information below in order to process the transfer.

| | |
|---|---|
| Bank One's bank routing number: | 071000013 |
| INS electronic account number: | 1115146 |

Billing and payment questions should be addressed to Cheri Deschamps of the Debt Management Center, at 802-872-6200 Ext. 3061. Please contact Ms. Deschamps immediately if a payment plan of action is necessary given the current situation. The INS team greatly appreciates the cooperation and assistance that your staff provided us during this review.

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

Attachment

**U.S. DEPARTMENT OF JUSTICE**
*Immigration and Naturalization Service*

# INS Review Report

*on*

**Continental Airlines**

# IUF Remittance

*for the period*

**April 1, 1999 through December 31, 2000**

**Date of Review: March 27 - 30, 2001**



# INS Review of IUF Remittances

By

## Continental Airlines

*April 1, 1999 through December 31, 2000*

Reviewed March 27 through 30, 2001

U.S. Department of Justice
Immigration and Naturalization Service

# TABLE OF CONTENTS

Page

1. BACKGROUND ....1
   a. INS User Fees ....1
   b. Continental Airlines ....1
2. REVIEW OBJECTIVES ....1
3. SCOPE AND METHODS ....1
   a. Review Period ....1
   b. Methods ....2
4. OBSERVATIONS ....3
   a. Error Rate on Sampled Flight Coupons ....3
   b. Variance between General Ledger Liability and Remittance ....3
   c. Inadequate Documentation for Employee and "Buddy" Travel Pass Adjustments 3
   d. Comparison of Sampled Flights Travel Passes Ratio with User Fee Remittances..3
   e. Lumping of User Fees / Taxes on Ticket Lifts ....4
5. IUF LIABILITY ....4

EXHIBIT 1: IUF Liability Calculations ....5

# 1. BACKGROUND

## *a. INS User Fees*

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591) that permits the U.S. Immigration and Naturalization Service (INS) to collect inspection user fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the Continental States. On December 20, 1993, the user fee was established at $6.00 per passenger.

## *b. Continental Airlines*

Continental Airlines Inc. (Continental) headquarters is located at 1600 Smith Street, Houston, Texas. Continental is a major air carrier. The airline also transports cargo and mail. Continental Express, Inc. (CMI) and Continental Micronesia, Inc. are fully owned subsidiaries of Continental Airlines, Inc. The Annual Report for 2000 shows that the Continental group of Airlines serves 230 airports world wide as of January 16, 2001. Also, the annual report states that the airlines flies to 136 domestic and 94 international destinations and offers connecting services through alliances with domestic and foreign carriers. During the period reviewed, the airlines directly served 16 European cities, seven South American cities, Tel Aviv, Tokyo, Mexico and the Central America. In addition, through its Guam hub, CMI provides extensive service in the western Pacific, including many Japanese airports. The world aviation Directory of Summer 2001 listed the airlines as a scheduled passenger carrier with about 50,500 employees and $7,366,000,000 in sales.

# 2. REVIEW OBJECTIVES

a. Evaluate the adequacy and reliability of IUF collections, recording, reporting, and remittance systems.

b. Determine compliance with IUF regulations.

c. Provide information and advice to the carrier to facilitate continued compliance.

# 3. SCOPE AND METHODS

## *a. Review Period*

The review covered the period April 1, 1999 through June 30, 2000. The review was performed at Continental's headquarters in Houston, from March 27 through 30, 2001. During the period reviewed, Continental Airlines remitted the sum of $55,542,318 in Inspection User Fees to INS.

*b. Methods*

The airline based its remittances to INS on ticket sales. Therefore, we reviewed the internal control procedures associated with collecting, recording, reporting and remitting IUF.

To test **collection** compliance, we audited passenger ticket-lifts for a sample of 10 flights selected at random. This resulted in a net qualifying sample count of 1,3571ticket-lifts.

To audit **recording** compliance, we successfully traced a sample of auditor coupons selected at random from the American Reporting Corporation (ARC) to the sales reports for June 2000. Also, we satisfactorily traced a sample of auditor coupon selected at random from Airport Ticketing Office (ATO), Paris; City Ticketing Office (CTO), Osaka and the Billing and Settlement Plan (BSP) Sales in Korea to the associated sales report tax summary. We also traced a sample of employee travel pass to the summary report attached to the Journal Voucher.

To test **reporting** compliance, we satisfactorily traced the user fees from the sales reports containing the sampled auditors coupons tested for recording compliance to the applicable tax ledger detail report of the general ledger liability account.

To test **remittance** compliance, we satisfactorily compared remittance data from the INS database to Continental Airlines' payment voucher requests and general ledger liability account entries for the applicable remittance periods.

We satisfactorily analyzed a schedule of **charter flights** for the review period and compared the calculated user fees liability with the amount remitted.

We reviewed a schedule of user fee liability calculation on free international frequent flyer award tickets and satisfactorily traced the entries to the general ledger liability account.

Continental represented to the INS review team that user fee liability on **Employees and their "buddy" travel passes** are entered based on estimates. The monthly estimates are later adjusted, based upon actual travel coupons lifted. We reviewed the estimates for June 2000 and the applicable adjusting entries in November 2000. The documentation provided as the basis of the adjusting entries was insufficient to constitute a competent evidential matter. The actual travel pass lifts that were said to be the basis of the adjusting entries were not verifiable. They were neither listed nor provided for validation.

We therefore analyzed the sampled flight to determine the percentage of trip and buddy passes to revenue flight coupons and compared it with the ratio of remittances to INS for trip and buddy passes for reasonableness. Our analysis reveals a material variance between the two ratios.

We reviewed a sample of USIT World (student-consolidator) payments to Continental and successfully traced them to remittances to INS.

To obtain a reasonable assurance about the accuracy of our findings, we successfully conducted a comparative analysis of the passenger counts used as a basis for remittances.

## 4. OBSERVATIONS

### *a. Error Rate on Sampled Flight Coupons*

Of the 1,056 revenue ticket lifts that qualified for INS inspection user fees, Continental Airlines failed to collect IUF, or failed to allocate collected user fees to the proper authority, on 8 lifts. The associated error rate is 0.76%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $420,784 results (see Exhibit 1).

### *b. Variance between General Ledger Liability Balance and Remittance*

Our analysis of the of the general ledger liability account reveals that out of the balance of $7,392,853 for the period April through June 1999, Continental remitted only $7,387,789 resulting in a net due of $5,064.00. It is recommended that Continental remit the balance due to INS.

### *c. Inadequate Documentation for Employee and "Buddy" Travel Pass Adjustments*

As stated in 3b above, the basis for the adjusting entries posted in November 2000 for June 2000 estimates were not verifiable. The machine tape attached showed an inadequate trail of documentation to support the number of actual coupons lifted for the month. It is recommended that Continental maintain a listing of the travel passes used as the basis of its adjusting entries. Continental has tried for the past five months, without success, to provide adequate documentation to support the adjusting entries for the buddy pass. The details from its database did not support the reported amount and were therefore not submitted to INS.

### *d. Comparison of Sampled Flights Travel Passes Ratio with User Fee Remittances*

We performed an analytical review of travel passes qualifying passengers and user fee remittances to determine their correlation. As stated in 3b, our analysis reveal a material variance between the ratios of travel pass passengers and the user fee remittance. The sampled flights contained 34 qualifying travel passes and 1,056 ticket lifts. Therefore, the travel passes constituted 3.12 % of the qualifying passengers on the sampled flights. Based on this analysis, expected user fee on travel is $1,783,058. However, Continental remitted $601,930 in INS user fees for the review period, resulting in a difference of $1,181,128.

# *EXHIBIT 1*

## *Continental Airlines*

## *IUF LIABILITY CALCULATIONS*

Exhibit I

# Continental Airlines
## IUF Liability Calculations

| | Tickets | Passes | Total |
|---|---|---|---|
| Sampled qualifying tickets: | 1056 | 34 | 1090 |
| IUF not collected: | 8 | | |
| Error rate: | 0.76% | | |

**Trip & Buddy Passes Ratio Analysis:**

| | | | |
|---|---|---|---|
| Percentage of Coupons | 34 / 1090 | = | 3.12% |
| Expected Remittance | | | $ 1,783,058 **(2) |
| Amount Remited | | | $ 601,930 |
| Variance | | | $ 1,181,128 |

| | | Regular Ticket Lifts | | Trip & Buddy Passes | | | | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Months | XY on Ticket Sales posted to G/L | Amount Due to Error Rate *(1) | XY on Trip & Buddy Passes posted to G/L | Amount Due to Ratio Variance On Passes | Total IUF Due | IUF Remitted | IUF Outstanding |
| 1999 | Apr. - Jun. | $ 7,344,529 | $ 56,246 | $ 48,324 | $ 190,016 | $ 7,639,115 | 7,387,789 | $ 251,326 |
| | Jul. - Aug | 4,343,299 | 33,262 | 36,306 | 104,640 | 4,517,507 | 4,379,605 | 137,902 |
| | Sep. | 2,759,557 | 21,133 | 19,482 | 70,070 | 2,870,242 | 2,779,039 | 91,203 |
| | Oct. - Dec. | 7,466,183 | 57,178 | 47,136 | 195,152 | 7,765,649 | 7,513,319 | 252,330 |
| 2000 | Jan. - Mar. | 8,496,763 | 65,070 | 49,020 | 226,712 | 8,837,565 | 8,545,783 | 291,782 |
| | Apr. - Jun | 8,720,514 | 66,783 | 89,118 | 193,875 | 9,070,290 | 8,809,632 | 260,658 |
| | Jul. - Aug | 5,974,388 | 45,753 | 122,370 | 71,507 | 6,214,018 | 6,096,758 | 117,260 |
| | Sep. | 2,436,150 | 18,657 | 61,974 | 17,083 | 2,533,864 | 2,507,598 | 26,265 |
| | Oct. - Dec | 7,404,070 | 56,702 | 128,200 | 112,073 | 7,701,045 | 7,522,795 | 178,250 |
| | TOTAL | $ 54,945,453 | $ 420,784 | $ 601,930 | $ 1,181,128 | $ 57,149,295 | $ 55,542,318 | $ 1,606,976 |
| | Less deferred Liability on Travel Passes | | | | | | | $ (1,181,128) |
| | Net amount | | | | | | | $ 425,848 |

*(1) (Recorded+Unrecorded)/(1-error rate)

**(2) : 54,945,453+420,784 * (3.12% / 100%-3.12%)

U.S. Department of Justice
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

November 5, 2002

Mr. David Bowman, Director
Excise, Property Use & Payroll Taxes
Continental Airlines
32nd floor HQSTX
1600 Smith Street
Houston, TX 77002

Dear Mr. Bowman:

Attached is the Immigration and Naturalization Services (INS) report on our review of Continental Airline Ltd. compliance with Immigration User Fees (IUF) regulations from January 1, 2001 through December 31, 2001. This report includes operational observations and an assessment of the liability due to INS. Details of the findings and financial liability were discussed with you at the exit conference and subsequently.

The financial liability finding of $414,639 does not include interest or penalties. Your firm will not be charged interest for this liability amount, if received by INS within thirty (30) days from the date of this letter. As notified in our initial letter, audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of this audit report. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

As notified in our initial letter to you, INS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the INS. This final audit report identifies principal amounts owed for the Immigration User Fee.

Remittances of the amount due INS may be made by wire transfer or check in U.S. dollars. Check must be payable to the U.S. Immigration and Naturalization Service. To ensure proper handling and crediting of your remittance, we ask that you include the INS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

**U.S. Department of Justice**
*Immigration and Naturalization Service*

# Immigration User Fee Remittance

# Report of Compliance

# On

# ***Continental Airlines***

Review Period:
**January 1, 2001 through December 31, 2001**

Date Of Field Work:
**August 5 through 8, 2002**

# TABLE OF CONTENTS

Page

1. BACKGROUND ..... 1
   a. INS User Fees ..... 1
   b. Continental Airlines ..... 1

2. REVIEW OBJECTIVES ..... 1

3. SCOPE AND METHODS ..... 1
   a. Review Period ..... 1
   b. Methods ..... 2

4. OBSERVATIONS ..... 3
   a. Documentation for Employee and "Buddy" Travel Passes ..... 3
   b. Failure to submit Monthly Report to INS on IUF Collections ..... 3

5. FINDING AND RECOMMENDATION ..... 4
   a. Error Rate on Sampled Flight Coupons Sampled Flight Coupons Analysis ..... 4

6. IUF LIABILITY ..... 4

EXHIBIT 1: IUF Liability Calculations ..... 5

## 1. Background

### a. INS User Fees

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591), which permits the U.S. Immigration and Naturalization Service (INS) to collect inspection user fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6.00 per passenger. Effective May 1, 2002, the fee was increased to $7.00.

### b. Continental Airlines

Continental Airlines Inc. (Continental) was founded in 1934. Its headquarters is located at 1600 Smith Street, Houston, Texas. Continental is a major air carrier. The airline also transports cargo and mail. Continental Express, Inc. (CMI) and Continental Micronesia, Inc. are fully owned subsidiaries of Continental Airlines, Inc. Continental group of Airlines serves over 130 domestic and over 90 international destinations and offers connecting services through alliances with domestic and foreign carriers. During the period reviewed, the airlines directly served 16 European cities, 7 South American cities, Tel Aviv, Tokyo, Mexico and the Central America. In addition, through its Guam hub, CMI provides extensive service in the western Pacific. The most current issue of World Aviation Directory (Volume 4, Version 2.1, 2002) listed the airlines as a scheduled passenger carrier with about 50,500 employees and $7,366,000,000 in annual sales.

## 2. Review Objectives

a. Evaluate the adequacy and reliability of IUF internal controls, collections, recording, reporting, and remittance systems.

b. Determine compliance with IUF regulations.

c. Provide information and advice to the carrier to facilitate continued compliance.

## 3. Scope and Methods

### a. Review Period

The review covered the period January 1, through December 31, 2001 and was performed at the airline's head office in Houston, Texas, from August 5 through 8, 2002 by Mr. Muhamed Ayodeji, CPA of Federal Management Systems, Inc. During the period

reviewed, Continental remitted $32,756,501 in inspection user fees to INS.

**b. Methods**

INS reviewed the internal procedures and controls associated with **collecting, recording, reporting and remitting** INS user fees.

*Collection compliance:*

To test collection compliance, we audited passenger ticket-lifts for a sample of 10 flights that were selected at random as negotiated with the Carrier. This test resulted in a net qualifying sample count of 879 ticket-lifts.

*Recording activity:*

To test recording compliance, data regarding Airline Reporting Corporation (ARC), Bank Settlement Plan (BSP), Airport Ticket Offices (ATO), City Ticket Offices (CTO), Charter Flights, Employee Travels and Student Consolidator were traced.

We successfully traced a sample of auditor coupons selected at random from the **American Reporting Corporation (ARC)** to the sales reports for August 2001.

In addition, we satisfactorily traced a sample of auditor coupons selected at random from **Airport Ticketing Office (ATO)** at Houston International (IAH) for the period ended February 8, 2001 to the sales report.

A sample of auditor coupons from sales at Houston, Texas and New York, New York **City Ticketing Offices (CTO)** for December 2001 was successfully traced to the applicable sales reports.

We were able to trace a random sample of auditor coupons from the **Billing and Settlement Plan (BSP)** Sales in Mexico for the month of April 2002 to the associated sales report.

We satisfactorily reviewed a schedule of **charter flights** for the review period and compared the calculated user fees liability to the amount posted.

We satisfactorily reviewed a monthly schedule of user fee payments made by Continental on **employee travel passes** and **free international frequent flyer award tickets** which do not reflect user fee collections.

We selected a sample of one billing per month for the **student consolidator tickets** and successfully tested them for accuracy.

*Reporting activity:*

To test **reporting** compliance, we satisfactorily traced the user fees from the sales reports and schedules for the sales channels tested for recording compliance to the applicable detailed report for the General Ledger liability account.

*Remitting activity:*

To test **remittance** compliance, we compared remittance data from the INS database to Continental Airlines' payment voucher requests and General Ledger liability account entries for the applicable remittance periods.

To obtain a reasonable assurance about the accuracy of our findings, we successfully conducted a comparative analysis of the passenger counts used as a basis for user fee remittances to the INS, US Customs and Animal and Plant Health Inspection Service (APHIS). We also compared relevant data with Department of Transportation (DOT) segment data and Custom's Entrance and Clearance Replicated (ECAR).

## 4. OBSERVATIONS

### a. Documentation for Employee and "Buddy" Travel Pass

In the previous audit, the INS review team noted that the adding-machine tapes provided as the basis for the adjusting entries to the user fee liability on **Employees and their "buddy" travel passes** were not verifiable and insufficient to constitute a competent evidential matter.

For the current review period, Continental was able to provide a listing of the travel passes used to support its entries in the INS-IUF General Ledger Liability account.

### b. Failure to Submit Monthly Collection Statistics with Remittances

The Company does not submit monthly collection statistics when they exceed $50,000 as required by CFR 286.2(b). The section states that where monthly collections in any month exceed $50,000 a summary statement showing the amount of the user fees collected is to be submitted to INS. It is recommended that the required collection report be submitted immediately in adherence with the law.

# *EXHIBIT 1*

## *Continental Airlines*

## *IUF LIABILITY CALCULATIONS*

Exhibit I

# Continental Airlines
## IUF Liability Calculations

| | | |
|---|---|---|
| Sampled qualifying tickets: | 879 | |
| IUF not collected: | 11 | |
| Error rate: | 1.25% | 1.2514% |

| Year | Months | INS-IUF Collection Summary | Adjustment to Summary | Amount Due to Error Rate | Total IUF Due(1) | Less IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|---|
| 2001 | Jan. - Mar. | 9,615,803 | 0 | 121,719 | 9,737,522 | 9,615,803 | 121,719 |
| | Apr. - June | 9,274,479 | | 117,398 | 9,391,877 | 9,274,479 | 117,398 |
| | Jul. - Aug. | 6,493,196 | | 82,192 | 6,575,389 | 6,493,196 | 82,192 |
| | Sep | 1,771,786 | | 22,428 | 1,794,214 | 1,771,786 | 22,428 |
| | Oct. - Dec | 5,601,237 | | 70,902 | 5,672,139 | 5,601,237 | 70,902 |
| | TOTAL | $ 32,756,501 | $ - | $ 414,639 | $ 33,171,141 | $ 32,756,501 | $ 414,639 |

(1) (Recorded+Unrecorded)/(1-error rate)

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

SEP 1 0 2004

Mr. David Bowman
Manager, Domestic & International Taxes
Continental Airlines
P.O. Box 4607 HQSTX
Houston, Texas 77210-4607

Dear Mr. Bowman:

Enclosed is the U.S. Customs and Border Protection (CBP), Regulatory Audit Division report on our review of Continental Airlines' compliance with Immigration User Fees (IUF), Customs Passenger Processing Fees (PPF) and APHIS Passenger and Aircraft Landing Fees. The review covers period from January 1, 2002 through December 31, 2003. Details of the findings and financial liability were discussed with the company at the exit conference.

**Immigration User Fee (IUF) Liability:**

The financial liability finding of $283,634 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**Customs Passenger Processing Fee (PPF) Liability:**

The financial liability finding of $106,883 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**APHIS Passenger Fee Liability:**

The financial liability finding of $133,893 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

**APHIS Aircraft Landing Fee Liability:**

The financial liability finding of $234,672 represents findings regarding unremitted fees and errors only and does not include interest or penalties.

Additional Charges:

As stated in our initial letter to you, the Department of Homeland Security (DHS) and the U.S. Department of Agriculture (USDA) are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to issue interest and any administrative charge assessments and/or penalties considered appropriate as a result of the findings in this audit. Any interest or additional charges will be issued directly from the CBP, National Finance Center (NFC) for the IUF and PPF and from the APHIS collection office for the APHIS fees in a separate mailing from this final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

Remittances:

*Remittances of the IUF and PPF amounts due may be made by:*

CHECKS: Checks should be mailed to:

U.S. Customs and Border Protection
Attn: User Fee Team
6026 Lakeside Boulevard
Indianapolis, Indiana 46278

Please enclose the exhibits with your check for clarity of payment intent.

WIRE TRANSFERS: ABA #021030004
Account #70 05 0096
U.S. Treasury – FRB New York
33 Liberty Street
New York, New York 10045
(212) 720-5000

The sender should make certain the following information is put on the payment:

1. Company Name
2. Company IRS Number
3. An indication of what the payment is for (include Exhibit(s) from Audit):
   a. Passenger User Fees for quarter and year
   b. Railroad User Fees for month and year
   c. Promissory Note number, bill number or audit finding, if applicable.

Any questions concerning fed wire transfers can be addressed to Ms. Sue Warren at (202) 874-8896.

ACH CREDIT: Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the U.S. Customs and Border Protection, without disclosing their company's bank account information. If you have questions concerning the ACH credit process or would like to set up an account, please contact Ms. Dee Baskerville of U.S. Customs and Border Protection at (317) 614-4466.

IUF and PPF billing and payment questions should be addressed to Kara Welty of the NFC, at (317) 614-4614.

***Remittances due for the APHIS Passenger and Landing Fees:***

Remit funds for APHIS fees to:

Lockbox:
USDA, APHIS, AQI
P.O. Box 952181
St. Louis, Missouri 63195-2181

Physical address for overnight deliveries:
US Bank
Attn: Government Lockbox – P.O. Box 952181
1005 Convention Plaza
St. Louis, Missouri 63101

*ACH Credit*: Automated Clearinghouse (ACH) credit is an electronic process that allows companies to transmit their payment directly to the APHIS account at US Bank in St. Louis, Missouri. Please process your electronic payment to the account listed below:

ABA Router Number – 081000210
Account Number - 1001104072
Refer to Lockbox Number: 952181
For ACH, please include your company name, company IRS taxpayer identification number and indicate that the payment is for an audit liability.

Any questions regarding payment of APHIS user fees should be addressed to the collection office via e-mail to abshelpine@aphis.usda.gov or by telephone to (612) 336-3400 or toll free in the U.S. at (877) 777-2128.

To aid in all payments, please include a copy of the exhibits with the appropriate payments.

The CBP team greatly appreciates the cooperation and assistance your staff provided us during this review.

Sincerely,

Daune I. Robinson
Director
Field Oversight Division I

Enclosures

# Inspection User Fee

# Report of Compliance

# On

# Continental Airlines

Review Period
**January 1, 2002 through December 31, 2003**

Review Dates:
May 10 through 14, 2004

# TABLE OF CONTENTS

Page

1. BACKGROUND .......... 1
   a. Immigration User Fees
   b. Customs PPF
   c. APHIS Passenger and Landing Fees
   d. Continental Airlines

2. REVIEW OBJECTIVES .......... 2

3. SCOPE AND METHODOLOGY .......... 2

4. FINDINGS AND RECOMMENDATIONS .......... 5

5. LIABILITY .......... 6

EXHIBIT 1: IUF Liability Calculations

EXHIBIT 2: PPF Liability Calculations

EXHIBIT 3: APHIS Passenger Liability Calculations

EXHIBIT 4: APHIS Landing Liability Calculations

## 1. BACKGROUND

### a. Immigration User Fees (IUF)

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591). This legislation permits the U.S. Department of Homeland Security (DHS) to collect Immigration User Fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6 per passenger. Effective May 1, 2002, the fee was increased to $7. Effective February 28, 2003, a $3 fee was established for the previously exempt areas for cruise line travel.

### b. Customs Passenger Processing Fees (PPF)

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized U.S. Customs and Border Protection to collect user fees for certain services. On June 25, 1999 the Miscellaneous Trade and Technical Corrections Act of 1999 (Public Law 106-36) was signed into law. This law authorized: (1) continuation of the $5.00 fee for those passengers aboard commercial vessels or aircraft arriving in the United States territories, possessions, and adjacent islands, and (2) establishment of a new fee of $1.75 per passenger arriving aboard commercial vessels form Canada, Mexico, or the United States territories, possessions, and adjacent islands. Effective November 1, 2003, the authority provided Customs and Border Protection (CBP), within the Department of Homeland Security (DHS), to collect certain user fees under the Consolidated Omnibus Budget and Reconciliation Act was extended to March 31, 2005. The fees affected are those authorized by 19 U.S.C. 58c, subpart a.

### c. APHIS Passenger and Landing Fees

The Food, Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus Budget Reconciliation Act of 1990, authorized the U.S. Department of Agriculture (USDA) through the Animal and Plant Health Inspection Service (APHIS) to collect various user fees. These fees include agricultural quarantine and inspection services provided in connection with the arrival of commercial aircraft and international passenger arrivals at ports in the Customs territory of the U.S. The Farm Bill defines the U.S. Customs territory as the 50 States, the District of Columbia, and Puerto Rico.

APHIS published a final rule in the Federal Register on April 12, 1991, requiring airlines to collect a user fee from international air passengers arriving in the U.S. Customs territory from other countries, except Canada. These fees became effective on May 13, 1991. On January 9, 1992, APHIS published a final rule requiring an inspection fee for commercial aircraft arriving in the U.S. from other countries except Canada, effective February 9, 1992. Aircraft and passengers on flights originating in Canada are

excluded from APHIS fees because of a negligible agricultural health threat to U.S. agriculture.

**d. Continental Airlines**

Continental Airlines inc. (Continental) was founded in 1934. Its headquarters is located in Houston, Texas. Continental is a major international carrier. Continental Express and Continental Micronesia are Continental's subsidiaries. Continental group of airlines serves over 127 domestic and 101 international destinations. The carrier has 50,500 employees, $7.3 million in annual sales and a fleet of B737-300, 500, 700, 800, 200, 200ER and 400ER, B777-200 and 200ER, ERJ-135 and 145, MD-81, 82, and 83, and Raytheon –1900D. The official airline code is CON.

Continental Airlines has code-sharing agreements with Delta, Aero Mexico, Air Europa Lineas Aereas, TAP Air Portugal and KLM. The company's website is www.continental.com.

## 2. REVIEW OBJECTIVES

The objectives were to: 1) evaluate the adequacy and reliability of internal controls, collections, recording, reporting, and remittance systems for user fees; 2) determine compliance with user fee regulations; and 3) partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

## 3. SCOPE AND METHODOLOGY

**a. Scope**

The review covered the period from January 1, 2002 through December 31, 2003, and was performed at the company's office in Houston, from May 10 through 14, 2004, by Mr. Frank Andreu.

**b. Methodology**

We tested for reporting and remittance compliance.

Continental Airlines bases its remittances on ticket sales. Therefore, the CBP review team focused on the collecting, recording, reporting and remitting of passenger flight statistics used as the basis for IUF, PPF and APHIS remittances.

**Collection compliance:**

To test collection compliance, passenger ticket-lifts for 8 random flights were negotiated with the carrier. This resulted in a net qualifying sample count of 1,270 ticket-lifts.

Random sample review:

We traced the collection of fees from a random sample of net qualifying ticket-lifts through the separate sales methods and ultimately to the general ledger liability account. Errors detected during this process were:

| | |
|---|---|
| Immigration User Fee | 4 |
| Customs Passenger Processing Fee | 3 |
| APHIS Passenger Fee | 5 |

Random sample months selected:

| Arrival Date | Flight # | Airport |
|---|---|---|
| 9/2/2002 | 67 | LGW-CLE |
| 11/11/2003 | 889 | PTY-IAH |
| 6/30/2002 | 8 | NRT-EWR |
| 5/11/2003 | 1103 | SJO-IAH |
| 1/19/2003 | 850 | STI-EWR |
| 3/6/2002 | 465 | CUN-IAH |
| 7/3/2003 | 25 | SNN-EWR |
| 10/12/2003 | 2 | GUM-HNL |

**Recording activity:**

To test recording compliance, data regarding the City Ticket Offices (CTO), ARC and Athens BSP was traced from the sales report to the general ledger account, which is the source of the remittances. The company does not have contracts with student consolidators.

**Recording activity:**

To test recording compliance, data regarding Airlines Reporting Corporation (ARC), Bank Settlement Plan (BSP), Airport Ticket Offices (ATO), City Ticket Offices (CTO) and other revenue sources were traced to sales report and general ledger.

Airlines Reporting Corporation:

We traced a sample of auditor coupons selected at random from the Airline Reporting Corporation (ARC) to the sales reports for August 2003.

Bank Settlement Plan:

We trace a random sample of auditor coupons from the Bank Settlement Plan (BSP) sales in Bahamas for the month of August 2003 to the associated sales report.

Airport and City Ticket Offices:

We traced a sample of auditor coupons selected at random from the ATO in Houston and from the CTO in Newark for month of August 2003 through the general ledger.

Charter Flight:

We reviewed a schedule of charter flights for the review period and compared the calculated user fee liability to the amount posted in the general ledger. We found that aircraft landing fees were not paid on Military Charter flights as required by regulations.

Employee, frequent flyer, infant tickets, etc:

We reviewed a monthly schedule of user fee payments made by the company on employee travel passes, infants, and frequent flyers' traveling free. These tickets were traced to the general Ledger. The company is in compliance.

Reporting activity:

To test reporting compliance, we traced the user fees from ARC, BSP, ATO and CTO sales reports to the applicable general ledger liability account.

Remitting activity:

For the period reviewed, Continental Airlines remitted:

| | |
|---|---|
| $74,086,268 | Immigration User Fees |
| $28,058,788 | Customs Passenger Processing Fees |
| $27,952,069 | APHIS Passenger Fee |
| $4,560,029 | APHIS Aircraft Clearance |

To test remittance compliance, data from the company was traced to remittances received for the review period.

Method of remitting:

For the review period, user fees are recorded in general ledger liability accounts. A summary report of the passenger count was prepared and accumulated for each month in the quarter. For each quarter, the number of passengers for which the remittance fees due was calculated using the applicable fees and remitted to the respective agencies.

Comparison of Reporting Consistency:

To obtain a reasonable assurance about company records in relation to remittances we conducted a comparative analysis of the passenger counts used as a basis for user fee remittances for the IUF, PPF, and APHIS Passenger Fee in comparison to relevant data with the Department of Transportation segment data.

**APHIS Aircraft Clearance Fee**

We compare company's schedule of landing counts by month and airport, to statistics provided by ECAR, and APHIS remittance data.

4. FINDINGS AND RECOMMENDATIONS:

**FINDING 1: Error Rate on qualifying tickets for Immigration User Fee (IUF), Customs Passenger Processing Fee (PPF), and APHIS Passenger Fee.**

Our review of the 1,270 passengers that qualified for inspection user fees, the company did not collect, or allocate collected user fees on 4 passengers for IUF, 3 passengers for PPF, and 5 passengers for APHIS Passenger Fees. The resulting error rate for IUF, PPF, and APHIS is 0.31 percent, 0.24 percent, and 0.39 percent, respectively. When the error rate is applied to IUF, PPF, and APHIS collected and properly allocated during the period, an additional liability as result of the error rate is as follows:

| | |
|---|---|
| Immigration User Fee (IUF) | $230,547 (See Exhibit 1) |
| Customs Passenger Processing Fee (PPF) | $ 67,598 (See Exhibit 2) |
| APHIS Passenger Fees | $109,535 (See Exhibit 3) |

**Recommendation:** Continental should remit the additional liability mentioned above immediately. In addition, the company should implement procedures to ensure the collection and remittance of user fees.

**FINDING 2: Failure to Remit Immigration User Fees (IUF), Customs Passenger Processing Fees (PPF) and APHIS Passenger Fees**

The company's Ireland sales offices included IUF, PPF and APHIS passenger fees in an XP tax code, instead of XY(IUF), YC(PPF), and XA (APHIS) tax code. As a result,

the IUF, PPF, and APHIS passenger fees for the Ireland sales office were not remitted. The respective outstanding user fee liabilities as result of under remittance for the review period are:

| | |
|---|---|
| Immigration User Fees (IUF) | $53,087 (See Exhibit 1) |
| Customs Passenger Processing Fees (PPF) | $39,285 (See Exhibit 2) |
| APHIS Passenger Fees | $24,357 (See Exhibit 3) |

**Recommendation:** Continental should remit the additional liability mentioned above immediately. In addition, the company should implement procedures to ensure the collection and remittance of user fees.

**FINDING 3: Failure to remit Military Charters Aircraft Clearance Fees**

Our review of the aircraft-landing fee determined that fees were not remitted for 755 aircraft landings. The liability due as result of under remittance for the review period is $49,264 (See Exhibit 4).

**Recommendation:** Continental should remit the additional liability mentioned above immediately. In addition, the company should implement procedures to ensure all aircraft landings are included in remitted fee calculations.

5. **LIABILITY**

a. **Immigration User Fees (IUF) and Customs Passenger Processing Fees (PPF):**

IUF - A total outstanding liability of $283,634 is assessed ($230,547 + $53,087). See Exhibit 1.

PPF - A total outstanding liability of $106,883 is assessed ($67,598 + $39,285). See Exhibit 2.

Note: The CBP, National Finance Center (NFC), will determine if interest and penalty amounts are due on Immigration User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by the NFC for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalty.

**b. APHIS Passenger and Aircraft Clearance Fees:**

Passenger Fee - A total outstanding liability of $133,893 is assessed. See Exhibit 3.

Aircraft Clearance Fee - A total outstanding liability of $234,672 is assessed. See Exhibit 4.

Note: The USDA, APHIS Collections Office will determine if interest and penalty amounts are due on APHIS Passenger and Landing Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) will be subject to interest and penalty.

Daune I. Robinson

## Continental Airlines

Exhibit 1

### IUF Liability Calculations

| | | |
|---|---|---|
| Sampled qualifying tickets: | 1270 | |
| IUF not collected: | 4 | |
| Error rate: | 0.31% | 0.31% |

| Year | Periods | Net Collections Posted to G/L | Adjustment to G/L | Total G/L | +Error Rate | Internal Adj to G/L | Total IUF Due(1) | IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 8,953,340 | $ 6,666 | $ 8,960,006 | $ 27,862 | | $ 8,987,869 | $ 8,953,340 | $ 34,528 |
| | Apr | $ 2,846,052 | $ 4,806 | $ 2,850,858 | $ 8,865 | | $ 2,859,723 | $ 2,846,052 | $ 13,671 |
| | May-Jun | $ 6,527,889 | $ 4,844 | $ 6,532,733 | $ 20,314 | $ 464,699 | $ 7,017,747 | $ 6,992,588 | $ 25,159 |
| | Jul-Aug | $ 6,645,321 | $ 8,813 | $ 6,654,134 | $ 20,692 | $ (270,141) | $ 6,404,684 | $ 6,375,179 | $ 29,505 |
| | Sep | $ 3,116,858 | $ 3,276 | $ 3,120,134 | $ 9,702 | $ (194,557) | $ 2,935,279 | $ 2,922,301 | $ 12,978 |
| | Oct-Dec | $ 8,257,782 | $ 8,708 | $ 8,266,490 | $ 25,706 | $ 64,492 | $ 8,356,688 | $ 8,322,274 | $ 34,414 |
| 2003 | Jan-Mar | $ 8,795,800 | $ 3,836 | $ 8,799,636 | $ 27,364 | $ (64,492) | $ 8,762,508 | $ 8,731,308 | $ 31,200 |
| | Apr-Jun | $ 9,823,427 | $ 4,102 | $ 9,827,529 | $ 30,560 | | $ 9,858,089 | $ 9,823,427 | $ 34,662 |
| | Jul-Aug | $ 6,449,933 | $ 2,296 | $ 6,452,229 | $ 20,064 | | $ 6,472,293 | $ 6,449,933 | $ 22,360 |
| | Sep | $ 3,052,563 | $ 3,787 | $ 3,056,350 | $ 9,504 | | $ 3,065,854 | $ 3,052,563 | $ 13,291 |
| | Oct-Dec | $ 9,617,303 | $ 1,953 | $ 9,619,256 | $ 29,912 | | $ 9,649,168 | $ 9,617,303 | $ 31,866 |
| | TOTAL | $ 74,086,268 | $ 53,087 | $ 74,139,355 | $ 230,547 | $ - | $ 74,369,902 | $ 74,086,268 | $ 283,634 |

(1) (Recorded+Unrecorded)/(1-error rate)

## Continental Airlines

Exhibit 2

### Customs - PPF Liability Calculations

| | | |
|---|---|---|
| Sampled qualifying tickets: | 1270 | |
| PPF not collected: | 3 | |
| Error rate: | 0.24% | 0.24% |

| Year | Periods | Net Collections Posted to G/L | Adjustment to G/L | Total G/L | +Error Rate | Internal Adj to G/L | Total PPF Due(1) | PPF Remitted | PPF Outstanding |
|---|---|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 3,701,481 | $ 5,555 | $ 3,707,036 | $ 8,918 | | $ 3,715,955 | $ 3,701,481 | $ 14,473 |
| | Apr-Jun | $ 3,770,460 | $ 7,465 | $ 3,777,925 | $ 9,089 | $ 85,921 | $ 3,872,934 | $ 3,856,381 | $ 16,554 |
| | Jul-Sep | $ 3,648,529 | $ 8,635 | $ 3,657,164 | $ 8,798 | $ 4,514 | $ 3,670,476 | $ 3,653,043 | $ 17,433 |
| | Oct-Dec | $ 3,172,023 | $ 6,220 | $ 3,178,243 | $ 7,646 | $ (65,909) | $ 3,119,980 | $ 3,106,114 | $ 13,866 |
| 2003 | Jan-Mar | $ 3,289,234 | $ 2,740 | $ 3,291,974 | $ 7,920 | $ (24,526) | $ 3,275,368 | $ 3,264,708 | $ 10,660 |
| | Apr-Jun | $ 3,693,883 | $ 2,930 | $ 3,696,813 | $ 8,894 | | $ 3,705,707 | $ 3,693,883 | $ 11,824 |
| | Jul-Sep | $ 3,352,381 | $ 4,345 | $ 3,356,726 | $ 8,076 | | $ 3,364,802 | $ 3,352,381 | $ 12,421 |
| | Oct-Dec | $ 3,430,797 | $ 1,395 | $ 3,432,192 | $ 8,257 | | $ 3,440,449 | $ 3,430,797 | $ 9,652 |
| | TOTAL | $ 28,058,787 | $ 39,285.00 | $ 28,098,072 | $ 67,597.61 | $ - | $ 28,165,670 | $ 28,058,788 | $ 106,882 |

(1) (Recorded+Unrecorded)/(1-error rate)

## Continental Airlines

Exhibit 3

# APHIS Liability Calculations

Sampled qualifying tickets: 1270
IUF not collected: 5
Error rate: 0.39% 0.39%

| Year | Periods | Net Collections Posted to Tax Sales Report | Adjustment to G/L | Total G/L | +Error Rate | Internal Adj to G/L | Total IUF Due(1) | APHIS Remitted | APHIS Outstanding |
|---|---|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 3,829,066 | $ 3,444 | $ 3,832,510 | $ 15,005 | | $ 3,847,516 | $ 3,829,066 | $ 18,449 |
| | Apr-Jun | $ 3,650,039 | $ 4,628 | $ 3,654,667 | $ 14,309 | $ 62,125 | $ 3,731,101 | $ 3,712,164 | $ 18,937 |
| | Jul-Sep | $ 3,584,153 | $ 5,354 | $ 3,589,507 | $ 14,054 | $ (50,851) | $ 3,552,710 | $ 3,533,302 | $ 19,408 |
| | Oct-Dec | $ 3,165,842 | $ 3,856 | $ 3,169,699 | $ 12,410 | $ (2,582) | $ 3,179,527 | $ 3,163,260 | $ 16,267 |
| 2003 | Jan-Mar | $ 3,328,568 | $ 1,699 | $ 3,330,267 | $ 13,039 | $ (8,692) | $ 3,334,614 | $ 3,319,876 | $ 14,738 |
| | Apr-Jun | $ 3,627,145 | $ 1,817 | $ 3,628,962 | $ 14,208 | | $ 3,643,170 | $ 3,627,145 | $ 16,025 |
| | Jul-Sep | $ 3,362,060 | $ 2,694 | $ 3,364,754 | $ 13,174 | | $ 3,377,928 | $ 3,362,060 | $ 15,868 |
| | Oct-Dec | $ 3,405,195 | $ 865 | $ 3,406,060 | $ 13,336 | | $ 3,419,396 | $ 3,405,195 | $ 14,201 |
| | TOTAL | $ 27,952,070 | $ 24,357 | $ 27,976,426 | $ 109,535 | $ (0) | $ 28,085,961 | $ 27,952,069 | $ 133,893 |

(1) (Recorded+Unrecorded)/(1-error rate)

**Continental Airlines** Exhibit 4

## Aircraft Landing Fee Liability Calculations

| Year | Periods | Calculated from Record | Military Charters | Total | Remitted | Outstanding |
|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 545,164 | $ 2,936 | $ 548,100 | $ 525,002 | $ 23,099 |
| | Apr-Jun | $ 602,192 | $ 3,915 | $ 606,107 | $ 624,867 | $ (18,759) |
| | Jul-Sep | $ 602,975 | $ 3,589 | $ 606,564 | $ 580,464 | $ 26,100 |
| | Oct-Dec | $ 556,190 | $ 6,395 | $ 562,586 | $ 536,029 | $ 26,557 |
| 2003 | Jan-Mar | $ 592,535 | $ 10,962 | $ 603,497 | $ 563,564 | $ 39,933 |
| | Apr-Jun | $ 601,279 | $ 11,484 | $ 612,763 | $ 560,432 | $ 52,331 |
| | Jul-Sep | $ 644,866 | $ 4,763 | $ 649,629 | $ 599,126 | $ 50,504 |
| | Oct-Dec | $ 600,235 | $ 5,220 | $ 605,455 | $ 570,546 | $ 34,909 |
| | TOTAL | $ 4,745,436 | $ 49,264 | $ 4,794,701 | $ 4,560,029 | $ 234,672 |