IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1736C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF BARBARA BLESSING

I, Barbara Blessing, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE") as Acting Director, Office of Financial Management.

3. I formerly worked for the Department of Justice, Immigration and Naturalization Service ("INS"), where I served as the Director of the Compliance Division in the Office of Financial Management from around April 2000 thru September 2003; however, I was detailed to U.S. Customs and Border Protection ("CBP") from September 2003 until February 2004 to assist with the transition of the airline review program. In my capacity as Director of the Compliance Division, I was delegated the authority from the INS Director, Office of Financial Management, to determine the amount that would be necessary for an airline to pay in order to satisfy a finding of audit liability. As part of this delegated authority, I was authorized to consider appeals from an airline as well as reduce or increase a finding of liability based on the information presented to me from an airline. In addition, the letters that our office sent out to the airlines prior to conducting the review (e.g., see Attached Exhibit A) were authorized under the delegation to our office and represented INS's official position concerning the purpose of the reviews.

4. In my capacity as Director of the Compliance Division, I was responsible for supervising the INS auditors, who would regularly conduct reviews of the airline industry for compliance

with user fee regulations. In particular, I supervised Eugene Schulman, an INS auditor ("the auditor").

5. While I was Director, Mr. Schulman conducted three reviews of American Airlines under my supervision: the first on September 18-22, 2000, for the period covering July 1, 1998, thru June 30, 2000; the second on January 14-18, 2002, for the period covering July 1, 2000, thru December 31, 2001; and, the third on March 10-14, 2003, for the period covering January 1, 2002, thru December 31, 2002.

6. The purpose of each of the three reviews I supervised was threefold: 1) to evaluate internal control adequacy and reliability regarding user fee collections, recording, reporting, and remitting of fee systems; 2) to determine the company's compliance with the INS regulations implementing user fee collections from international passengers arriving into the United States; and, 3) to provide information and advice to facilitate the airlines' continued compliance with the regulations. While evaluating the airline's compliance with the regulations, our office would make findings of additional liability where an airline failed to remit all the user fees required by law to be collected. <u>See</u> Attached Exhibit A, p.4

7. For the three reviews that I supervised, the review procedure and methodology were generally the same. Mr. Schulman would work with American Airlines ahead of time to select a group of flights that accurately reflected American's typical flight schedules. Then, once beginning the review, the auditor would request documentation from specific flights within the agreed-upon group to show that American paid the user fee for each qualifying ticket on the selected flight. Those tickets that did not show payment of the user fee were considered "potential errors."

8. The auditor would then ask American to show other documentation to prove if, in fact, the user fee was paid for each potential error. For those tickets where fee payment could be shown through documentation or where the ticket was shown to have been exempt from payment of the fee, the potential error was clarified and struck from the list. A typical way that American would use to show that the fee had been paid was to refer the auditor to the miscellaneous tax portion of the ticket, which would have been sufficient to cover all necessary taxes as well as the immigration user fee for that particular ticket.

9. For those potential errors where no documentation was produced to demonstrate payment or no exemption had been sought for that ticket, the potential error became an "error." Next, an "error rate" was calculated by taking the number of errors and dividing it by the number of qualifying tickets in the sample that had been reviewed. This error rate was then extrapolated to the entire population of qualifying tickets for the given period of time and any additional liability was determined.

10. The sampling methodology outlined above in paragraphs 7-9 was developed in collaboration with the airline industry in approximately 1997, before I took over the airline review program. It is my understanding that American participated in the development of this methodology. In addition, while I was the program director, American Airlines participated in the INS User Fee Advisory Board, which regularly met to address issues concerning user fees. Never once during any meeting of the Advisory Board or during any of the reviews I supervised did American Airlines offer any objection to the methodology of the user fee reviews (prior to the stratification issue raised during the review covering 2002).

11. Moreover, during the review covering the period of January 1, 2002, thru December 31, 2002, our office recognized that for one selected flight originating from Santo Domingo, Dominican Republic, American had an unusually high number of errors. Our office considered the number of errors on this flight to be anomalous and requested an explanation from American. In response, American asserted that the Dominican Republic, as well as seven other Central and South American countries, had laws that prohibited American from collecting the user fee; however, American did not produce any evidence that such laws existed. Nevertheless, we accepted this explanation based mostly on the assertion by American but also because we had anecdotal information suggesting that such collection problems might occur in some countries. We thus attempted to craft a solution to prevent extrapolating the errors from the Santo Domingo flight across the entire pool of flights.

12. American first requested that the Santo Domingo flight be struck entirely from the review list. We indicated that this was an unacceptable resolution. Instead, we offered to conduct a full review of flights for the review period instead of the sampling methodology. This would have prevented the Santo Domingo flight ticket errors from being extrapolated to the entire pool of qualifying tickets. However, American rejected

this offer. Instead, American asked that we substitute a different flight for the selected Santo Domingo flight. This too was an unacceptable solution as far as our office was concerned. Once our office had uncovered errors on a flight, we would not pretend to not have known of such errors. Then, our office and American worked together to achieve a solution.

13. As a compromise, our office agreed to stratify the qualifying tickets from the region that American had asserted prohibited them from collecting the user fee at the time of ticketing, i.e., Dominican Republic and seven other South and Central American countries. Through stratification, the error rate from the South and Central American pool of flights would only be extrapolated to the total number of qualifying tickets from those countries. The error rate from all other flights would be extrapolated to the remaining international qualifying tickets. Ultimately, the stratification benefited American because had the errors from the Central and South American region been extrapolated to the entire population of qualifying tickets, American's liability would have increased. In addition, American representatives participated in the development of this stratification procedure, accepting it as a reasonable approach.

14. When my office stated in the Report of Compliance for the review period of January 1, 2002, thru December 31, 2002, that "[t]he above 8 [South and Central American] countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale," this statement was not intended to represent the legal position of the federal government on this subject. Our office did not consult with government counsel to confirm the assertion regarding the laws of other countries made by American. Nor did our office intend to make a legal conclusion about the state of the law in other countries. Rather, when agreeing to stratify, we simply were relying on the representations made to us by American, our own observations about the higher than usual error rate for the Santo Domingo flight, and anecdotal information about these types of collection problems.

15. In addition, our office worked with American Airlines to alter how we conducted reviews to accommodate American's recordkeeping system. As we were informed by American, American only had access to the previous nine months of records regarding tickets. This was based upon recent alterations to their financial and storage systems. Rather than making American go

back and pull tickets that were more than nine months old at great cost to them (as they informed us), we requested tickets each quarter from a flight we would select. This prevented American from having to access records that would be difficult to locate and still permitted the auditor to select a representative sample of flights. In fact, the auditor would even notify American of a flight to be reviewed before the flight had taken place. Thus, American could have initiated a remediation plan before any problem had even occurred.

16. There were even occasions when our office accommodated American concerning employee pleasure travel. During the review covering July 1, 2000, thru December 31, 2001, and the review covering January 1, 2002, thru December 31, 2002, our office could have made a finding of liability against American because they were unable to substantiate proper payment. Instead, we worked with American and provided it with an opportunity to self-correct their accounting procedures.

17. The Ernst and Young report referenced in Mr. Hobbs' Declaration, in Paragraph 9, was a different kind of audit than the review conducted by my office. The Ernst and Young report was simply designed to ensure that the funds on the general ledger were properly accounted for. It did not evaluate whether all the funds that should have been collected were in fact collected. See Attached Exhibit B. The Ernst and Young report, if provided at all, was of very little use for assisting the goals of our reviews.

18. During my supervision of the American Airlines reviews, I attended several meetings concerning the reviews, in person and by conference call, with American Airlines employees, including Monty Hobbs and his predecessor, John Parente. Never once during any of those meetings did American indicate that it had submitted information about passengers who had refused to pay the user fee, as required by 8 C.F.R. § 286.4(c).

19. Furthermore, in my supervision of each of the three reviews, I would have been made aware by Mr. Schulman if American had presented information about passengers who refused to pay the user fee, in accordance with 8 C.F.R. § 286.4(c). As far as I am aware, American has never submitted any such information about passengers who refused to pay the user fee in accordance with 8 C.F.R. § 286.4(c).

20. If American had submitted such information about passengers either during the review itself or to the INS Debt

Management Center along with its quarterly user fee collection remittances, INS would have followed its normal business practice. The Debt Management Center would have contacted the individual passenger to determine the reason for refusal to pay the user fee and would have pursued collection of the fee. If a passenger indicated that he or she had not refused to pay the fee or if the passenger indicated that the airline had not requested that the passenger pay the fee, INS would have sought additional information and/or payment from the airline.

21. If a passenger had, in fact, refused to pay and the information about that passenger had been submitted to INS by the airline as required by 8 C.F.R. § 286.4(c), then our office during a review would have checked the name of the passenger against the list of passengers with potential errors and removed that ticket, if it appeared, from the list of potential errors. In essence, if there a was a ticket that INS could verify that the passenger refused to pay the fee and the airline had provided INS with notice of the refusal, as required by 8 C.F.R. § 286.4(c), then our office would treat such a ticket as one for which the airline would not be required to remit the user fee.

22. In preparing this declaration, I was unable to review the INS Debt Management Center records or INS Compliance Division audits along with their support papers relating to airline user fees, which are now in the custody of U.S. Customs and Border Protection.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 25th day of May, 2005.

Barbara Blessing
Barbara Blessing