**U.S. Department of Justice**
Immigration and Naturalization Service

80/6.4

*Office of Financial Management*

*425 I Street NW*
*Washington, DC 20536*

July 17, 2003

AMERICAN AIRLINES
Mr. Monty Hobbs
ATTN: Ms. Christi White
P.O. Box 619616
Dallas/Fort Worth Airport
Texas 75-261-9616

Dear Monty Hobbs:

Attached is the Department of Homeland Security (DHS), Immigration Office of Financial Management report on our review of AMERICAN AIRLINES' compliance with Immigration User Fees (IUF) and Customs Passenger Processing Fees (PPF) regulations between January 1, 2002 and December 31, 2002. This report includes operational observations and an assessment of the liability due to DHS for the IUF and Customs PPF. Details of the findings and financial liability were discussed with you at the exit conference and subsequent telephone calls/E-Mail messages.

**Immigration User Fee Liability:**

The total financial liability finding of $603,840 does not include interest or penalties. Your firm will not be charged interest for $603,840 of the liability amount, if received by DHS within thirty (30) days from the date of this letter. As notified in our initial letter, audit liability amounts attributable to errors (such as those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of this audit report. For any amount received after that date, you subsequently will be billed interest effective from the end of the quarter in which the overdue fees should have been remitted.

Remittances of the amount due DHS may be made by wire transfer or check in U.S. dollars. Checks must be payable to the U.S. Department of Homeland Security. To ensure proper handling and crediting of your remittance, we ask that you include the DHS account number, 93963, and your taxpayer identification number on your check, which should be sent as follows:

By U.S. Postal Service:

U.S. Department of Homeland Security
c/o Bank One
P.O. Box 93963
Chicago, IL 60673-3963

By Express Mail Center: U.S. Department of Homeland Security
c/o Bank One
DHS Account Number 93963
525 West Monroe Street
7th Floor Mail Room
Chicago, IL 60661

If you remit your fee by wire transfer, Bank One requires the information below in order to process the transfer. Your company is responsible for any wire fees, please include them with any payment via this method.

Bank One's bank routing number: 071000013
DHS electronic account number: 1115146

Billing and payment questions should be addressed to Michelle King of the Debt Management Center, at 802-288-7714.

**U.S. Customs PPF Liability:**

The financial liability finding of $62,743 for U.S. Customs PPF represents findings regarding unremitted fees and errors only and does not include interest or penalties. DHS retains the right to issue interest and any administrative charge assessments and/or penalties as it deems appropriate as a result of the findings in this report. Any interest or charges will be issued directly from DHS regarding the Customs PPF in a separate mailing after the issuance of this report.

Remittances of the amount due DHS may be made by check in U.S. dollars. Checks must be payable to the U.S. Department of Homeland Security and sent to:

U.S. Department of Homeland Security
Collections Team-User Fees
6026 Lakeside Blvd.
Indianapolis, IN 46278

Customs billing and payment questions should be addressed to the Office of Finance, Cost Management Group, at (202) 927-0310.

The DHS team greatly appreciates the cooperation and assistance your staff provided us during this review.

Sincerely,

Barbara A. Blessing, Director
Compliance Division
Office of Financial Management

Attachment

# Department of Homeland Security
## *Immigration Office of Finance*

# *Immigration User Fee Remittance*

# Report of Compliance

# On

AmericanAirlines

# *American Airlines*

Review Period
January 1, 2002 to December 31, 2002
Review Dates:
March 10-14, 2003

# User Fee Remittance

# Report of Compliance

# On

# *AMERICAN AIRLINES*

Review Period
January 1, 2002 to December 31, 2002

Review Dates:
March 10-14, 2003

# TABLE OF CONTENTS

Page

1. BACKGROUND ........................................ 1
   a. Immigration User Fees
   b. U.S. Customs PPF
   c. Data on American Airlines ........................................ 2

2. REVIEW OBJECTIVES ........................................ 3

3. SCOPE AND METHODS ........................................ 3

4. OBSERVATIONS ........................................ 7

5. FINDINGS AND RECOMMENDATIONS ........................................ 9

6. IUF LIABILITY ........................................ 9

EXHIBIT 1: IUF Liability Calculations ........................................ 12

EXHIBIT 1A: IUF Liability Calculations for Central/South American at 4.8% ........................................ 13

EXHIBIT 1B: IUF Liability Calculations for Rest of Population at 95.2% ........................................ 14

EXHIBIT 2: PPF Liability Calculations ........................................ 15

# 1. Background

## a. Immigration User Fees (IUF)

In 1986, the U.S. Congress passed the Omnibus Appropriation Bill (PL 99-500 and PL 99-591). This legislation permits the U.S. Department of Homeland Security (DHS) to collect Immigration User Fees (IUF). These fees offset the cost of inspecting incoming passengers at U.S. Ports of Entry to ensure that they are admissible to the United States. On December 20, 1993, the user fee was established at $6.00 per passenger. Effective May 1, 2002, the fee was increased to $7.00. Effective February 28, 2003, a $3.00 fee was established for the previously exempt areas for cruise line travel (no change for airlines as there are no exempt areas for IUF fees).

## b. Customs Passenger Processing Fees (PPF)

Effective July 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99-272, authorized DHS to collect user fees for certain services. On June 25, 1999 the Miscellaneous Trade and Technical Corrections Act of 1999 (Public Law 106-36) was signed into law. This law authorized two things: (1) continuation of the $5.00 fee for those passengers aboard commercial vessels or aircraft arriving in the United States territories, possessions, and adjacent islands, and (2) establishment of a new fee of $1.75 per passenger arriving aboard commercial vessels form Canada, Mexico, or the United States territories, possessions, and adjacent islands.

## c. AMERICAN AIRLINES

American Airlines (AMR) is a major United States airline whose corporate headquarters are in Fort Worth, Texas. American Airlines is one of the largest scheduled airlines in the world. According to the June 2003 Yahoo finance website profile, AMR, which includes substantial assets of Trans World Airlines (TWA0 as of December 31, 2002), provided scheduled jet service to more than 152 destinations throughout North America, the Caribbean, Latin America, Europe, and the Pacific. Its internet website is www.aa.com. As of December 31, 2002, AMR had 109,600 employees. According to www.hoovers.com, American Airlines and its American Eagle subsidiary had a fleet of over 800 jets and hubs in Chicago, Dallas/Fort Worth, Miami, and San Juan, Puerto Rico. The fleet includes airlines such as: Fokker F-100, Boeing Super 80, Boeing 737-800, Boeing 757, Boeing 767, Airbus A300, Boeing 777-200, and American Eagle CRJ 700, ATR 42/72, ERJ 135, 140 and 145, and SAAB 340B.

AMR Eagle Holding, a wholly owed subsidiary of AMR, owns two regional airlines: American Eagle Airlines and Executive Airlines. These airlines provide connecting service from American Airlines U.S. major/smaller markets to Canada,

Bahamas, and the Caribbean serving 130 cities. AMR has announced plans to sell Executive Airlines which flies out of Miami and San Juan.

American Airline participates in the global network with other international airlines called the "Oneworld Partnership." Its major strategic alliance partners include: British Airways, Cathay Pacific, Finnair, Iberia, Qantas, Aer Lingus, and Lan Chile. Its other partners include: Air Pacific, Asiana Airlines, China Eastern Airlines, LOT polish Airlines, Swissair, El Al Israel Airlines, Eva Air, Japan Airlines, Turkish Airlines, and TAM Airlines.

American Airlines provided charter passenger services to these entities during the 2002 calendar review period.: Club Med; ABC; the Philadelphia Phillies and Tampa Bay professional baseball teams; Apple Vacations; and Holiday Express.

During the review, this office performed statistical sampling of tickets for flights from these international locations: Paris, France; Mexico City, Mexico; Narita, Japan; Toronto, Canada; Aruba; Santo Domingo, Dominican Republic; Brussels; San Jose, Costa Rica; Bogota, South American; and Guatemala City, Guatemala. Some of the departure cities have legal regulations which prohibit the collection of the respective XY user fees at source of ticket sales. Consequently, American Airline ticket agents enforce "post ticketing' collections of user fees.

## 2. Review Objectives

a. Evaluate the adequacy and reliability of internal controls, collections, recording, reporting, and remittance systems for user fees.

b. Determine compliance with user fee regulations.

c. Provide information and advice to the company to facilitate continued compliance.

## 3. Scope and Methods

### a. Review Period

The review covered the period between January 1, 2002 through December 31, 2002 and was performed at the company's office in Dallas, Texas, between March 10-14, 2003, by Eugene Schulman and Shirley Harrison, auditors. During the period reviewed, American Airlines remitted $66,281,357, in Immigration User Fees and $ 24,423,902 was remitted for the Customs Passenger Processing Fees. There were substantial issues

to complete, thus final activity was completed in late June 2003 which provided a final closure to data for the audit.

**b. Methods**

User Fee regulations require airlines, travel agents, cruise lines and other ticket sellers to collect user fees during ticket sale. The sales should next be recorded on a sales report and posted to the general ledger with fees identified by appropriate categories (XY, YC, etc.). At the end of each specific payment period, the amount to be remitted should then be the cumulative balance in a general ledger liability account, which should be remitted to the appropriate agencies. When the user fees are collected in this manner the internal procedures and controls associated with **collecting, recording, reporting and remitting** user fees are reviewed.

American Airlines remits IUF and PPF based on ticket sales; however, fee liability is accrued in the accounting month as sales report stream of tickets is processed from various sales channels: Airline Reporting corporation (ARC), Billing and Settlement Plan (BSP), City Ticket Office (CTO), and direct sales including internet sales through the AMR website. The "PATH" database contains all sales sources (automated and manual). The ticket(s) image information is contained in the database and ticket summary information is retrieved from the databases (tables) by Ticket Number.

AMR also authorizes general sales agents throughout the world to use AMR's ticket stock to sell tickets for international travel. AMR accounts for these sales as 'direct reporting agencies" sales. Many of the general sales agents do not belong to ARC and/or BSP. Also, many of these agents provide manual tickets with a log of their ticket sales to American Airlines semi-monthly/monthly. American Airlines contracts with a private company in Juarez, Mexico to input source information into American Airlines sales revenue database related to the ticket fares, taxes including user fees.

The revenue database system aggregates sales transactions by sublevel codes such as: Q2 (Tax PFC PRAS Feeder INS user fees/PPF user fees; C5 (Passenger Revenue Accounting Charters; and F3 NRSA feeder-Employee Pleasure Travel. The integrity of the revenue database flows from the sales channels to the revenue database/subledgers then to the General Ledger accruals liability accounts for IUF and PPF. DHS verified the carrier's processes for collecting, recording, reporting, and remitting IUF and PPF.

For this review, we verified employee pleasure travel entries from a report generated from the NRSA database supporting the journal entry for both IUF and PPF for the accounting month of October 2002. Accordingly, we reduced the basis for extrapolating sample ticket exceptions for XY in the amount of $1,051,083 (see Exhibit 1A and 1B) and in the amount of $326,683 for YC (see Exhibit 2).

We traced the dollar remittances for the period from January 1, 2002 to December 31, 2002, from the American Airlines' General Ledger collections through deposits to the American Airlines' IUF and PPF fee liability account payments to DHS for IUF and PPF.

*Collection compliance:*

To test **collection** compliance, the initial (notification letter dated February 28, 2003) passenger ticket-lifts for six (6) random flights were negotiated with American Airlines. One of the original six flights (October 25, 2002 from Santo Domingo, Dominion Republic to New York (JFK) resulted in an sample ticket error rate of in excess of 7% (XY flight only as flights from the Caribbean to the U.S. are currently exempt for PPF and YC). This office agreed to stratify the sample results using this flight and 4.8%/95.2% geographic population split for ticket sales from SDQ and seven other countries versus the rest of the international ticket population. Based on discussions during the audit in March 2003 and immediately after the audit in April 2003, this office agreed that three additional flights to Central America and the Caribbean be added to the SDQ-JFK flight for a stratified total qualifying ticket count of 416 for XY at 4.8% and 400 qualifying ticket count for 95.2%. Thus, this office stratified the ticket sales and resulting XY remittances as $3,265,630 for 4.8% and $62,568,483 for 95.2% for extrapolation of sample ticket error rates. Exhibit 1, 1A, and 1B depict the sample ticket collection findings. *Note: Exhibit 1 for XY would apply if the qualified sample ticket population was not stratified.*

Thus, the initial six sample flights (two sample flights qualified for YC user fees) produced 516 qualifying tickets for XY and 246 qualifying tickets for YC which was less than the required representative statistical sample number of 333. Consequently, another flight was added for the YC which was on December 23, 2002 from Brussels to Chicago. When this flight's qualified sample tickets were added to the previous two original flights, American Airlines' qualified tickets for YC was then 385.

*Random sample review:*

We successfully traced the collection of user fees from a random sample of net qualifying ticket-lifts through the separate sales methods and ultimately to the general ledger liability account. For XY and its stratified random sample ticket review: this office found 17.142 errors were detected on 416 qualified tickets or a sample error rate of 4.12% at 4.8% stratified population and 3 errors were detected on 400 qualified tickets or a 0.75 error rate at 95.2% stratified population during this process for IUF; and 1 of error on 385 qualifying tickets or a sample error rate of .0026% for Customs PPF.

*Random sample review flights:*

| Arrival Date | | Flight # | XY | YC | Remarks |
|---|---|---|---|---|---|
| CDG-MIA | 2/27/02 | #63 | Yes | Yes | Original six |

| | | | | | |
|---|---|---|---|---|---|
| MEX-DFW | 7/5/02 | #1542 | Yes | No | Original six |
| NRT-LAS | 12/18/02 | #128 | Yes | Yes | Original six |
| YOW-ORD | 12/23/01 | #4308 | Yes | No | Original six |
| ARU-SJU | 12/23/02 | #5517 | Yes | No | Original six |
| SDQ-JFK | 10/25/02 | #180 | Yes | No | Original six |
| BUR-ORD | 12/23/02 | #89 | No | Yes | Added YC |
| GUA-DFW | 4/15/03 | #2196 | Yes | No | Added XY |
| SJO-DFW | 4/15/03 | #2166 | Yes | No | Added XY |
| BOG-MIA | 4/15/03 | #0914 | Yes | No | Added XY |

*Note: Added Flight SJO-DFW on 158 qualified tickets resulted in no sample ticket errors. The other two added XY flights from GUA and from BOG did result in 5 and 4 sample ticket errors.*

***Recording activity:***

To test recording compliance, data regarding Airlines Reporting Corporation (ARC), Bank Settlement Plan (BSP), Airport Ticket Offices (ATO), and City Ticket Offices (CTO), and other revenue sources were traced. The company represented it had no contracts with student consolidators during the review period. Accordingly, sales source tickets were traced for ARC, ATO, CTO, and BSP sales sources. All tickets reviewed were successfully traced to the respective XY and YC sales reports and to the respective XY and YC collection sources.

*Charter Flight:*

We satisfactorily reviewed a schedule of American Airlines' **charter flights** for the review period and compared the calculated user fee liability to the amount posted in the general ledger.

*Employee Pleasure Travel*

We performed a separate sample of American Airlines' employee pleasure travel (NRSA) for the period October 2002 to ensure compliance for the review period. For the review period NRSA provided a database that contained employee pleasure travel net collections of #156,480 or $1,051,083 for XY and #65,337 or $326,684 for YC. We selected a representative sample of transactions to validate the entries for XY and YC, respectively to test that the respective $7 XY and $5 YC fees were properly recorded in the NRSA database and journaled to the PATH system. We paid special attention to refunds paid/contra collections for transactions recorded in the NRSA database. Based on the review, we believe that generally American Airlines was able to provide sufficient documentation to trace collections to the NRSA from the employee payroll account for travel that was completed and recorded in the NRSA. We could not determine if all

employee pleasure travel for qualified international travel to the U.S. that was completed during the review period was recorded in the NRSA. We could not perform random tests by employee to determine if all applicable pleasure travel was properly recorded in the NRSA and then journaled to the respective XY and YC accrual liability general ledger accounts.

*Frequent flyer, infant tickets, etc:*

We satisfactorily reviewed a monthly schedule of user fee payments made by the company on **employee travel passes (separate sample), frequent flyer award tickets** and **infant tickets** which were traced to the general ledger.

American Airlines does follow the procedures set forth in 8 Code of Federal Regulations, Section 286.5(e) of the INS User Fee regulation. This section states that each "U.S. based remitter, which retains an independent accountant and which remits $10,000 or more in fees in any one calendar quarter, shall submit to the INS Associate Commissioner, Finance a report from the independent accountant, an accompanying Statement of INS Immigration User Fees Collected and remitted for each year ended. American Airlines provided an independent report for the year ended December 31, 2001."

The DHS representative confirmed that American Airlines did not contract with any student consolidator agencies for those agencies to issue tickets (using the consolidator ticket stock #000). Instead, American Airlines accepts student consolidator agency travel business using ARC and/or BSP tickets which cite the American Airlines ticket numbers.

***Reporting activity:***

To test **reporting** compliance, each sales channel was traced to associated sales reports and to the general ledger liability accounts.

*DOT and other agency reporting consistency:*

In order to confirm the accuracy of American Airlines' DOT Form T-100 flight statistics, the DHS review team representatives compared them to the ECAR and U.S.D.A. PAX from January 1, 2002, to December 31, 2002.

***Remitting activity:***

To test **remittance** compliance, data from the Company was traced to remittances received for IUF and Customs PPF for the report period.

*Method of remitting:*

User fees are recorded in a separate general ledger liability account. All payments were made in an accurate and timely manner.

*Comparison of Reporting Consistency:*

To obtain a reasonable assurance about company records in relation to remittances we successfully conducted a comparative analysis of the passenger counts used as a basis for user fee remittances for the IUF, Customs PPF, and USDA/APHIS in comparison to relevant data with the Department of Transportation segment data and the Custom's Entrance and Clearance Replicated (ECAR) The data was analyzed and compared favorably with the remittances by American Airlines for the review period.

## 4. OBSERVATIONS

### a. Employee Staff Pleasure Travel

For the 2002 calendar year audit of American Airlines, this office coordinated the review process for the validation of employee staff travel net collections for user fees (XY and YC). The notification letter dated February 28, 2003, indicated that this office would perform a review of the October 2002 NRSA database which supported the October 2002 journal entry for user fee collections. American Airlines provided this office with a net transaction database of #14,851 entries for XY and 8,334 entries for YC staff pleasure travel for qualified foreign travel to the U.S. We selected every 60 entry from the respective database for YC and XY and had American Airlines validate the entries against authorized travel to the U.S.

We were able to verify that database entries to the NRSA system were valid. However, we could not determine if all the qualified population of staff pleasure travel universe was included in the NRSA database. Consequently, we asked American Airlines to validate employee pleasure travel passes found on the third (additional YC) flight and on the three additional XY Central America flights. We found that American Airlines could not validate all employee pleasure travel found on the three additional XY flights, so ticket errors resulted. For the next review, we will review all qualified employee staff pleasure travel and ask American Airlines to validate.

### b. Post Ticketing Collections of User Fees for Dominion Republic and Seven Other Central and South American Countries

For the 2002 calendar year audit of American Airlines, this office coordinated the selection of six sample flights with representatives of American Airlines to ensure compliance for the XY and YC user fee remittances to DHS. Among the six sample

flights was a flight on October 25, 2002, from Santo Domingo, Dominion Republic to New York (JFK). American Airlines has a significant customer base who fly from Dominion Republic, Central America, and South American into the U.S. and its territories. This office believed that one of the six sample flights was therefore, representative of the population as a whole statistically for sample ticket review purposes. The above 8 countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale. American Airline therefore, had to implement strict debt collection procedures and "post ticketing collections" to collect user fees from customers that purchased tickets for international travel in those countries. *American Airline representatives indicated to this office that they were aware the error rate on tickets sold in those foreign countries was higher than the general ticket population.*

This office found 8.142 errors on 116 qualifying tickets on this flight alone (XY) about a 7% error rate. This office found 3 total errors on the other 5 qualifying XY sample flights on 400 qualifying tickets or a 0.75% rate. American Airlines believed that the Dominion Republic flight was an aberration and the results should not be applied against the population as a whole. American's premise that this flight was possibly an aberration had some merit. Sample flights from Puerto Plata, Dominion Republic, during the July 2000 to December 2001 audit, and sample flights from San Jose, Costa Rica; and from Santo Domingo, Dominion Republic to the U.S. in the audit of 1998 to June 2000, had resulted in either zero or 1 ticket error.

American Airlines provided documentation at the end of the audit in March through April 2003 that flights from the Dominion Republic and 7 other Central America and South America countries including: Columbia, Costa Rica, El Salvador, Honduras, Nicaragua, and Panama comprised 3.17% of the total international arrivals during 2002. Based on this information and other documentation that American Airlines provided, this office computed the above region at 4.80% of total remittances for 2002 based on what America Airlines provided for international arrivals by sales source (sales made in the U.S. and in those 8 international countries.)

If the results of this flight or region were not stratified, then American Airlines would face a sampling liability of $1,439,398 on the original six XY flights. This office agreed to sample 3 additional flights from the same region and add the results to the Santo Domingo to JFK flight results through a stratified population for remittances. The three flights added were from April 15, 2003, from BOG to MIA, from SJO-DFW, and from GUA-DFW.

This office reviewed the flights in the second week of May 2003 and the findings were completed in the middle of June 2003. This office found that only the San Jose, Costa Rica flight (158 qualifying tickets) had zero errors while the other two flights totaled 9 ticket errors on 142 qualifying tickets. Consequently, this region had a 4.12% error rate on 416 qualifying tickets.

The resultant liability by stratifying the population and applying 4.80% to this region resulted in a sampling liability of $134,577 and applying a 95.2% to the other general population resulted in a sampling liability of $469, 263 or a total stratified sampling liability of $603,840 less than the sampling liability for the population as a whole of $1,651,991 (based on 816 qualifying tickets with 20.142 errors or a 2.47% error rate.

This office coordinated the sampling process with the American Airlines' contact and his staff members to complete sample flight selections which both parties agreed were representative of American Airlines' ticket sales during the 2002 calendar year audit. Additionally, the DHS office jointly coordinated the flight selections with the USDA representative, as well.

The DHS office has consistently applied its flight sampling methodology with airlines (domestic and foreign) in its auditing database during the history of auditing carrier user fee remittances. This office believes the sampling process is sound and will continue to use this process to ensure compliance with user fee remittances. For the 2003 calendar year review for XY, we will discuss the process of flight selection with American Airline representative to ensure a representative ticket samples and minimize the need to stratify the sample liability results.

**c. Monthly Report on IUF Collections**

The requirements set forth in 286.2(b) of the User Fee regulations are not followed. The section states that where monthly collections in any month exceed $50,000 a summary statement showing the amount of the user fees collected is to be submitted to DHS.

**Recommendation:** Effective immediately, submit the required collection report in adherence with the law.

## 5. FINDINGS AND RECOMMENDATIONS:

***Immigration User Fees:***

**FINDING 1: Error Rate on qualifying tickets for IUF**

Of the 816 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 20.142 passengers, which translates to an error rate of 2.47%. *When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $ 1,651,991 resulted.* (See Exhibit 1). However, Exhibit 1 is provided to depict the IUF if the sample flights and the resulting sample exceptions were not stratified as agreed.

**Of the 416 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 17.142 passengers, which translates to an error rate of 4.12%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $134,577 resulted. (See Exhibit 1A).**

**Of the 400 passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 3 passengers, which translates to an error rate of 0.75%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $469,263 resulted. (See Exhibit 1B).**

**Recommendation:** Company is assessed liability due DHS for IUF and is encouraged to complete internal reviews to lessen the impact of errors in collecting IUF fees. Remit fees to DHS within 30 days of issuance of this report.

***Customs Passenger Processing Fees:***

**FINDING 1: Error Rate on qualifying tickets for Customs PPF**

Of the number passengers that qualified for inspection user fees, the company failed to collect, or failed to allocate collected user fees on 1 passenger, which translates to an error rate of .0026%. When the error rate is applied to PPF collected and properly allocated during the period, an additional liability of $62,743 resulted. (See Exhibit 2).

**Recommendation:** American Airlines is assessed liability due for Customs PPF and is encouraged to complete internal reviews to lessen the impact of errors in collecting PPF fees.

## 6. LIABILITY

### a. *Immigration User Fees:*

A total outstanding liability of $603,840 is assessed and should be remitted upon receipt of this report. See Exhibit 1A and Exhibit 1B.

Note: DHS is authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed to the DHS. This final audit report identifies principal amounts owed for the Immigration User Fee. The Immigration Debt Management Center (DMC) located in Williston, Vermont, will determine if interest and penalty amounts are due on Immigration User Fees collected by the carrier but not remitted. Interest and penalties will be computed back to the period when the fees should have been remitted and the carrier will be invoiced by DMC for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as

those found by sampling during the audit process) will not be subject to interest and penalty, unless they remain unpaid for 30 days following the date of the audit report.

*b. Customs Passenger Processing Fees:*

American Airlines should remit the net outstanding liability of $62,743 to DHS for Customs PPF as noted above, upon receipt of this report. (See Exhibit 2).

DHS retains the right to issue interest and any administrative charge assessments and/or penalties as it deems appropriate as a result of the findings in this report. Any interest or charges will be issued directly from DHS for the Customs PPF in a separate mailing after the issuance of this report.

**American Airlines** — Exhibit 1

## DHS - IUF Liability Calculations

BEFORE STRATIFICATION

| | |
|---|---|
| Sampled qualifying tickets: | 816 |
| IUF not collected: | 20.142 |
| Error rate: | 2.47% |

| Year | Periods | Net Collections Posted to G/L | MINUS PAYROLL STAF TRV | NET REMITT | NET TOTAL IUF DUE | TOTAL IUF Remitted | IUF Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 14,559,037 | $ 230,876 | 14,328,161 | 14,691,024 | 14,559,037 | $ 362,868 |
| | Apr-Jun | $ 17,340,700 | $ 274,987 | 17,065,713 | 17,497,939 | 17,345,700 | $ 432,199 |
| | May-Jun | $ - | | | | | |
| | Jul-Sep | $ 12,693,789 | $ 201,297 | 12,492,492 | 12,808,890 | 12,643,751 | $ 316,379 |
| | Sep | $ - | | | | | |
| | Oct-Dec | $ 21,687,831 | $ 343,923 | 21,343,908 | 21,884,412 | 21,687,171 | $ 540,545 |
| | TOTAL | $ 66,281,357 | $ 1,051,083 | $65,230,274 | $'66,882,265 | $ 66,281,357 | $ 1,651,991 |

Exhibit 1A

# American Airlines

## DHS - IUF Liability Calculations

CENTRAL AMERICA/SOUTH AMERICA COUNTRIES STRATIFICATION

| | |
|---|---|
| Sampled qualifying tickets: | 416 |
| IUF not collected: | 17.142 |
| Error rate: | 4.12% |

| Year | Period | IUF Remitted | Less Staff Travel Remit | Net Remitted | TOTAL IUF @4.80% DUE | Net Remit Stratification | IUF 4.80% Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | 14,559,037 | 230,876 | 14,328,161 | 717,312 | 687,751 | 29,561 |
| | Apr-Jun | 17,340,700 | 274,987 | 17,065,713 | 854,364 | 819,156 | 35,208 |
| | Jul-Aug | 12,693,789 | 201,297 | 12,492,492 | 625,414 | 599,641 | 25,773 |
| | Sept | 5,261,408 | 83,448 | 5,177,960 | 259,225 | 248,542 | 10,683 |
| | Oct-Dec | 16,426,423 | 260,475 | 16,165,948 | 809,315 | 775,963 | 33,352 |
| | TOTAL | 66,281,357 | 1,051,083 | 65,230,274 | 3,265,630 | 3,131,053 | 134,577 |

# American Airlines

Exhibit 1B

## DHS - IUF Liability Calculations

POPULATION EXCEPT 1A at 95.20%

| | |
|---|---|
| Sampled qualifying tickets: | 400 |
| IUF not collected: | 3 |
| Error rate: | 0.75% |

| Year | Period | IUF Remitted | Less Staff Travel Remitted | Net Remitted | Total IUF 95.2% Due | Net Remit Stratification | IUF 95.2% Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | 14,559,037 | 230,876 | 14,328,161 | 13,743,468 | 13,640,392 | 103,076 |
| | Apr-Jun | 17,340,700 | 274,987 | 17,065,713 | 16,369,334 | 16,246,564 | 122,770 |
| | Jul-Aug | 12,693,789 | 201,297 | 12,492,492 | 11,982,730 | 11,892,860 | 89,870 |
| | Sept | 5,261,408 | 83,448 | 5,177,960 | 4,966,677 | 4,929,426 | 37,251 |
| | Oct-Dec | 16,426,423 | 260,475 | 16,165,948 | 15,506,274 | 15,389,978 | 116,296 |
| | TOTAL | 66,281,357 | 1,051,083 | 65,230,274 | 62,568,483 | 62,099,220 | 469,263 |
| | TOTAL | EXHIBIT 1B | | | | | 134,577 |
| | GRAND TOTAL EXHIBIT 1A and 1B | | | | | | 603,840 |

American Airlines — Exhibit 2

# Customs - PPF Liability Calculations

Sampled qualifying tickets: 385
PPF not collected: 1
Error rate: 0.0026%

| Year | Periods | Net Collections Posted to G/L | MINUS PAYROLL STAF TRV | NET REMITT | NET Total PPF Due(1) | TOTAL PPF Remitted | PPF Outstanding |
|---|---|---|---|---|---|---|---|
| 2002 | Jan-Mar | $ 6,086,009 | $ 81,404 | $6,004,605 | $ 6,020,239 | $ 6,086,009 | $ 15,634 |
| | Apr-Jun | $ 6,582,726 | $ 88,048 | $6,494,678 | $ 6,511,588 | $ 6,582,726 | $ 16,910 |
| | Jul-Sep | $ 5,922,439 | $ 79,216 | $5,843,223 | $ 5,858,437 | $ 5,922,439 | $ 15,214 |
| | Oct-Dec | $ 5,832,728 | $ 78,015 | $5,754,713 | $ 5,769,697 | $ 5,832,728 | $ 14,985 |
| | TOTAL | $ 24,423,902 | $ 326,683 | 24,097,218 | 24,159,961 | $ 24,423,902 | $ 62,743 |