IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Senior Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Court's Rules ("RCFC"), the United States respectfully responds as follows to the findings of fact proposed by the plaintiff, Continental Airlines, Inc.

PRELIMINARY STATEMENT

"[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." McCallum Highlands, Ltd. v. Washington Cap. Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995) (internal quotation marks omitted), quoted in Impresa Construzioni Geom. Domenico Garufi v. United States, 61 Fed. Cl. 175, 181 (2004), app. dismissed. As noted below, many of Continental's proposed findings rest upon insufficient support, principally, the largely conclusory affidavit of a Continental manager, David Bowman. Pursuant to RCFC 56(h)(1), the Court should not adopt those defective proposed findings. Our briefs demonstrate that, even to the extent that plaintiff's proposed findings are supported and accurate, they do not support granting Continental's cross-motion for summary judgment as to liability.

To the extent the Court deems Continental's conclusory and self-serving allegations relevant to Continental's motion, it should grant our accompanying RCFC 56(f) motion.

RESPONSES TO PROPOSED FINDINGS

1. Continental is the fifth largest commercial air carrier in the world and, with its regional partners operating as Continental Express and Continental Connection, offers more than 3,200 daily flights serving 151 U.S. and 137 international locations, including to and from Canada, Latin America, Europe, and Asia. Declaration of David V. Bowman ("Bowman Decl.") (Exhibit 1 hereto) ¶ 3.

Response:

We agree that Continental flies international routes, which is all that is relevant for purposes of the parties' motions. "Fifth largest" and "more than 3,200" are vague, in any event.

2. The Government has audited Continental's compliance in connection with the "Immigration User Fee" (i.e., the fee imposed by 8 U.S.C. § 1356 and 8 C.F.R. § 286.1-286.9) and with the "APHIS User Fee" (i.e., the fee imposed by 21 U.S.C. § 136a and 7 C.F.R. § 354.3(f)) for audit periods beginning at least in 1999, on approximately an annual or biannual basis (the "User Fee Audits"). Bowman Decl. ¶ 5.

Response:

This is generally uncontroverted, but vague and potentially confusing. It is generally accurate to state that the Government conducted the audits annually or biannually to determine Continental's compliance with the statutes and regulations pertaining to the collection of international air passenger inspection fees for the Immigration and Naturalization Service ("INS"), its successor, U.S. Customs and Border Protection ("CBP"), and the Animal and Plant Health Inspection Service ("APHIS") of the United States Department of Agriculture ("USDA"). The audits had two purposes: first, to ensure that Continental remitted to the Government an

immigration and an agriculture and quarantine inspection ("AQI") user fee for every international air passenger for which there was evidence that Continental collected such user fee; and second, to determine the amount Continental owed for any sampled tickets that did not evidence full collection or full remittance of a user fee. Def. App. 2 (Robinson Decl. ¶ 9), 17 (Blessing Decl. ¶ 8), 55-56 (Martin Decl. ¶¶ 6-7).

3. The Government has also audited Continental in connection with the "Customs User Fee" (i.e., the fee imposed by 19 U.S.C. § 58c(a)(5)(A)), which is not at issue in this case. In connection with each of the User Fee Audits, the Government prepared an audit report, which it sent to Continental. Sometimes, an audit report covered more than one of the three user fees (Immigration, APHIS, and Customs). Bowman Decl. ¶¶ 6-7.

Response:

This is admittedly irrelevant to this case and requires no response. RCFC 56(h)(1).

4. In connection with the User Fee Audits, the Government tested for collection, recording, reporting, and remittance compliance. Bowman Decl. ¶ 10.

Response:

Uncontroverted but vague. See our response to number 2 above. Additionally, and importantly, the auditors had no means of "test[ing] for collection" of user fees. Rather, the Government's audits determined the extent to which Continental could document its collection of user fees from covered passengers. Def. App. 3 (Robinson Decl. ¶ 13), 17-18 (Blessing Decl. ¶ 10), 57 (Martin Decl. ¶ 10), 79 (Nicholson Decl. ¶ 13).

5. For each of the User Fee Audits, the Government tested Continental's user fee collection compliance by reviewing Continental-issued tickets (i.e., tickets sold on Continental

ticket stock, which means it carries Continental's 005 code) from a sampling of Continental flights during the relevant period. The Government then checked each ticket for evidence that the user fees had been collected. Any ticket lacking such evidence (and for which Continental could not produce any other evidence that the fees had been collected or that the passenger was exempt from the fees) was deemed an "error" by the Government auditors. Bowman Decl. ¶ 11.

Response:

This is narrowly correct, but potentially misleading, because Continental skips important steps in the audit process. It is more accurate to state that a "qualifying ticket" lacking evidence of proper collection or remittance of a user fee was labeled a "potential error." For those potential errors, the auditors would ask Continental whether it could supply evidence that the user fee had been collected from the passenger. Where the required fee payment could be shown, or where the passenger was shown to have been exempt from the user fee, the potential error was eliminated. "Confirmed errors" were noted when Continental did not produce evidence that the user fee had been collected in the correct amount and remitted, or that the passenger was exempt from the fee. Def. App. 3 (Robinson Decl. ¶ 13), 17-18 (Blessing Decl. ¶ 10), 57 (Martin Decl. ¶ 10), 79 (Nicholson Decl. ¶ 11). In the audit that covered the period from July 1999 through December 2001, the auditors determined, in addition, that some fees were collected but not properly remitted to the Government. Def. App. 58-59 (Martin Decl. ¶¶ 12-13).

For the audit covering charter flights for the period from January 2004 through September 2005, the process was as described in the declaration of John Patrick Nicholson. Def. App. 80 (Nicholson Decl. ¶ 18).

6. Many of these "errors" in which the tickets did not contain evidence of collection and for which Continental could not otherwise produce any evidence that the user fees had been collected, in fact represent instances where Continental did not collect a user fee. The vast majority of user fees are collected at the time of ticketing through an automated process that prices the tickets and marks them with evidence of collection. As a practical matter, although Continental makes attempts to do so, very few user fees are collected after the time of ticketing. In any case, in the course of each User Fee Audit, Continental staff searched Continental's relevant records for evidence that the user fees had been collected after the time of ticketing in connection with the "errors" in that audit. Any evidence found was presented to the Government auditors during the audit. Based on that information, such a ticket would not be included as an "error" (unless there was some independent problem with it). Bowman Decl. ¶ 12.

Response:

This entire proposed finding, and the cited language of the Bowman declaration, should be disregarded as argumentative, conclusory, and vague (e.g., "many of these errors," "makes attempts to do so," "very few user fees," "some independent problem"). To the extent the Court deems any of these allegations supported and relevant, the Government should be permitted to conduct pertinent discovery, pursuant to RCFC 56(f), before Continental's motion is decided.

7. For each User Fee Audit, the Government auditors calculated an "error rate" by dividing the number of "errors" by the total number of qualifying tickets in the sample. Bowman Decl. ¶ 13.

Response:

Uncontroverted, subject to our response to number 5.

8. For each User Fee Audit, the Government auditors then used the “error rate” to assess a liability against Continental by applying the “error rate” to the total dollar amount of applicable Immigration User Fees or APHIS User Fees that Continental had remitted during the period covered by the audit. Bowman Decl. ¶ 14.

Response:

Continental misstates the statistical conclusions of the audits. The Government auditors did not "assess" or impose liabilities. They made statistical determinations (estimates) of Continental's preexisting liabilities under the applicable statutes and regulations. Accordingly, there is no one-to-one relationship between (i) any individual ticket that was used to calculate an error rate and (ii) any dollar amount owed by Continental. The tickets in the samples were used to make projections concerning the entire population of qualifying tickets for the audit period.

9. Continental has paid each of the assessments from each of the User Fee Audits. Bowman Decl. ¶ 15.

Response:

Uncontroverted, with the clarifications in our response to number 8.

10. Since at least 1999 until the present, Continental has had effective policies, procedures, and systems designed to collect Immigration User Fees and APHIS User Fees from all eligible passengers. Bowman Decl. ¶ 16.

Response:

This proposed finding, and the cited language of the Bowman declaration, should be disregarded as argumentative, conclusory, and vague (e.g., "effective," "designed to," and

"eligible" ). To the extent the Court deems any of these allegations supported and relevant, we should be permitted to conduct discovery before Continental's motion is decided.

11. Since at least 1999, Continental has experienced difficulties in collecting user fees from some international passengers, especially those whose flights originate from certain Central and South American countries. Bowman Decl. ¶ 17.

Response:

This proposed finding, and the cited language of the Bowman declaration, should be disregarded as argumentative, conclusory, and vague (e.g., "difficulties," "some international passengers," "certain . . . countries"). To the extent the Court deems any of these allegations supported and relevant, we should be permitted to conduct discovery before Continental's motion is decided.

12. Continental offers flights to and from these countries. Bowman Decl. ¶ 18.

Response:

This proposed finding shares the flaws of number 11.

13. Some passengers and travel agencies from these countries claim that either their country's laws prohibit, or its sovereignty would be injured, if the United States or its agents collected any fees or taxes from their country's citizens. Bowman Decl. ¶ 19.

Response:

This proposed finding should be disregarded, as it relies upon hearsay and provides no indication that Continental could prove its allegations with admissible evidence at trial. RCFC 56(h)(1); Bannum, Inc. v. United States, 59 Fed. Cl. 241, 244-45 (2003). There is no showing that Mr. Bowman possesses personal knowledge of these matters. To the extent the Court deems

any of these allegations supported and relevant, we should be allowed to conduct discovery, pursuant to RCFC 56(f), before Continental's motion is decided. Indeed, during the user fee audits, Continental provided no documentation of alleged collection problems in Central or South America.

14. It is well known within the airline industry that there are difficulties collecting user fees from some passengers, especially those in certain Central and South American countries. Bowman Decl. ¶ 20.

Response:

See our response to number 13.

15. In connection with a user fee audit of American Airlines in 2003, the Government's audit report states that, with respect to the Dominican Republic and seven other South and Central American countries: "those countries prohibit ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale." Declaration of Barbara Blessing (Exhibit 2 hereto) ¶ 14; Exhibit 3 hereto at 13.

Response:

This paraphrase is generally uncontroverted, although the audit report is the best evidence of its contents. The auditors took American Airlines's word for this. Def. App. 19 (Blessing Decl. ¶ 19).

16. These difficulties mean that some passengers will not have paid their fees at the time they purchase their tickets. Bowman Decl. ¶ 21.

Response:

This is unsupported. See our responses to numbers 11 and 13. To the extent the Court deems this proposed finding supported and relevant, the Government should be permitted to conduct pertinent discovery, pursuant to our accompanying RCFC 56(f) motion.

17. Some foreign passengers who did not pay user fees when they purchased their tickets also fail to pay the user fees at the airport. Bowman Decl. ¶ 22.

Response:

This is unsupported. See our responses to numbers 11 and 13. To the extent the Court deems this proposed finding supported and relevant, the Government should be permitted to conduct pertinent discovery, pursuant to our accompanying RCFC 56(f) motion.

18. On or about March 27-30, 2001, the Government audited Continental in connection with Immigration User Fee remittances for the period April 1, 1999 through December 31, 2000. Bowman Decl. at 13.

Response:

Generally uncontroverted. See our responses to number 4-8.

19. The Government auditors found that Continental remitted $55,542,318 in Immigration User Fees during the audit period. Bowman Decl. at 13.

Response:

Uncontroverted.

20. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 8

"errors" out of 1,056 qualifying sampled tickets, which translated to an "error rate" of 0.76 percent. Bowman Decl. at 15.

Response:

Generally uncontroverted. See our responses to numbers 4-8 concerning the audit methodology. Continental correctly describes the calculated error rate, which represents non-collection of the user fee from approximately one out of every 132 covered passengers.

21. The auditors applied the "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $420,784. Bowman Decl. at 15, 17.

Response:

Generally uncontroverted. See our responses to numbers 4-8 concerning the audit methodology and the verb "assessed."

22. In response to this assessment, on or about October 18, 2001, Continental paid $420,784 to the Government. Bowman Decl. 24.

Response:

Continental actually paid $425,848.00 to resolve the audit, as it had an additional liability.

23. On or about August 5-8, 2002, the Government audited Continental in connection with Immigration User Fee remittances for the period of January 1, 2001 through December 31, 2001. Bowman Decl. at 21.

Response:

Generally uncontroverted. See our responses to number 4-8.

24. The Government auditors found that Continental remitted $32,756,501 in Immigration User Fees during the audit period. Bowman Decl. at 21-22.

Response:

Uncontroverted.

25. Using the sampling methodology described above, the Government audit personnel audited Continental's passenger tickets for the audit period and concluded there were 11 "errors" out of 879 qualifying sampled tickets, which translated to an "error rate" of 1.25 percent. Bowman Decl. at 22, 25.

Response:

Generally uncontroverted. See our responses to numbers 4-8. The error rate represents non-collection of the user fee from approximately one out of every 80 covered passengers.

26. The auditors applied the "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $414,639. Bowman Decl. at 25.

Response:

Generally uncontroverted. See our responses to numbers 4-8 concerning the audit methodology and the verb "assessed."

27. In response to this assessment, on or about December 2, 2002, Continental paid $414,639 to the Government. Bowman Decl. 26.

Response:

Uncontroverted, with the clarifications in our response to number 8.

28. On or about May 10-14, 2004, the Government audited Continental in connection with Immigration User Fee remittances for the period January 1, 2002 through December 31, 2003. Bowman Decl. at 33.

Response:

Generally uncontroverted. See our responses to number 4-8.

29. The Government auditors found that Continental remitted $74,086,268 in Immigration User Fees during the audit period. Bowman Decl. at 35.

Response:

Uncontroverted.

30. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 4 "errors" out of 1,270 qualifying sampled tickets, which translated to an "error rate" of 0.31 percent. Bowman Decl. at 34, 36.

Response:

Generally uncontroverted. See our responses to numbers 4-8. The error rate represents non-collection of the user fee from approximately one out of every 318 covered passengers.

31. The auditors applied the "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $230,547. Bowman Decl. at 36-37, 39.

Response:

Generally uncontroverted. See our responses to numbers 4-8 concerning the audit methodology and the verb "assessed."

32. In response to this assessment, on or about July 21, 2004, Continental paid $230,547 to the Government. Bowman Decl. 28.

Response:

In fact, Continental paid a total of $390,516 to resolve the audit, as it had additional liabilities. See also our response to number 8.

33. On or about February 27 through March 3, 2006, the Government audited Continental in connection with Immigration User Fee remittances for the period January 1, 2004 through September 30, 2005. Bowman Decl. at 49-50.

Response:

Generally uncontroverted. See our responses to numbers 4-8.

34. The Government auditors found that Continental remitted $80,069,918.50 in Immigration User Fees during the audit period. Bowman Decl. at 50.

Response:

Uncontroverted.

35. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 4 "errors" out of 1,279 qualifying sampled tickets. Bowman Decl. at 52.

Response:

Generally uncontroverted. See our responses to numbers 4-8 above. The error rate represents non-collection of the fee from approximately one out of every 318 covered passengers.

36. At the time of the audit, the Government auditors were aware that this Court had already held in American Airlines, Inc. v. United States, 68 Fed. Cl. 723 (2005), that airlines are not liable for Immigration User Fees they do not collect from passengers.

Response:

No supporting evidence is cited. See RCFC 56(h)(1). In any event, American Airlines is interlocutory, and, even when a final judgment is issued, will not bind this Court.

37. The Government's audit report states that 3 of these 4 "errors" represent instances where Continental collected but did not correctly remit the user fee. Bowman Decl. at 54.

Response:

Uncontroverted.

38. The Government's audit report states that the remaining "error" represents an instance "where Continental did not prove collection and remittance of the" user fee. Bowman Decl. at 54.

Response:

Uncontroverted.

39. During the audit, Continental told the Government auditors that this "error" represented an instance where Continental had not collected a user fee from the passenger. Bowman Decl. at 51.

Response:

Uncontroverted.

40. The Government auditors did not conduct any testing to verify Continental's claim that this user fee had not been collected from the passenger. Bowman Decl. at 51, 55.

Response:

Uncontroverted.

41. Despite this and despite knowing of this Court's holding in the American Airlines case, the Government auditors assessed a liability against Continental for this "error." Bowman Decl. at 51, 54-56.

Response:

Continental again misstates the statistical conclusions of these audits. No "liability" was "assessed . . .for" any individual ticket. Rather, the audit results were statistical projections concerning the entire population of qualifying tickets in the audit period. See our response to number 8, and our response to number 36 concerning American Airlines.

42. Specifically, the Government auditors computed an "error rate" of 0.08 percent based on this single "error." The auditors applied this "error rate" to the amount of Immigration User Fees remitted by Continental during the audit period and assessed an additional Immigration User Fee liability of $62,503.29. Bowman Decl. at 54-56.

Response:

Generally uncontroverted. See our responses to numbers 4-8 above concerning the audit methodology and the verb "assessed." The error rate represents non-collection of the fee from approximately one out of every 110 covered passengers.

43. In response to this assessment, on or about September 12, 2006, Continental paid this $62,503.29 to the Government (in addition to the other amounts assessed in the audit). After learning of this assessment, but before paying it, Continental explained to the Government auditors that it would pay the assessment, but that it believed this amount was being illegally

exacted from it and that it reserved its rights to sue to recover such amount. Bowman Decl. at 31; id. at 69.

Response:

Uncontroverted, with the clarifications provided in our response to number 8.

44. On or about January 28-February 1, 2002, the Government audited Continental in connection with APHIS User Fee remittances for the period July 1, 1999 through December 31, 2001. Bowman Decl. at 76-77.

Response:

Generally uncontroverted. See our responses to number 4-8.

45. The Government auditors found that Continental remitted $30,704,044.94 in APHIS User Fees during the audit period. Bowman Decl. at 75.

Response:

Uncontroverted.

46. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 24 "errors" out of 862 qualifying sampled tickets, which translated to an "error rate" of 2.81 percent. Bowman Decl. at 77.

Response:

Generally uncontroverted. See our responses to number 4-8. The error rate represents non-collection of the user fee from almost three out of every 100 covered passengers.

47. The auditors applied the "error rate" to the amount of APHIS User Fees remitted by Continental during the audit period and assessed an additional APHIS User Fee liability of

$863,979.89. Bowman Decl. at 77.

Response:

Generally uncontroverted. See our responses to numbers 4-8 above concerning the audit methodology and the verb "assessed."

48. In response to this assessment, on or about July 30, 2002, Continental paid $863,979.89 to the Government. Bowman Decl. ¶ 34.

Response:

Uncontroverted, with the clarifications in our response to number 8.

49. In addition, the Government assessed interest charges of $48,687.60 on the amount described in Paragraph 48. Continental paid that $48,687.60 to the Government on or about November 15, 2002. Bowman Decl. ¶ 35.

Response:

Continental appears to be confused. It actually paid a total interest liability of $75,025.71 in November 2002, of which $68,021.22 related to user fees for international passengers. Def. App. 30 ( Ford Decl. ¶ 5).

50. On or about May 10-14, 2004, the Government audited Continental in connection with APHIS User Fee remittances for the period January 1, 2002 through December 31, 2003. Bowman Decl. at 33.

Response:

Generally uncontroverted. See our responses to numbers 4-8.

51. The Government auditors found that Continental remitted $27,952,069 in APHIS User Fees during the audit period. Bowman Decl. at 35.

Response:

Uncontroverted.

52. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 5 "errors" out of 1,270 qualifying sampled tickets, which translated to an "error rate" of 0.39 percent. Bowman Decl. at 34.

Response:

Generally uncontroverted. See our responses to numbers 4-8. The error rate represents non-collection of the user fee from approximately one out of every 280 covered passengers.

53. The auditors applied the "error rate" to the amount of APHIS User Fees remitted by Continental during the audit period and assessed an additional APHIS User Fee liability of $109,535. Bowman Decl. at 36, 41.

Response:

Generally uncontroverted. See our responses to numbers 4-8 above concerning the audit methodology and the verb "assessed."

54. In response to this assessment, on or about July 21, 2004, Continental paid $109,535 to the Government. Bowman Decl. ¶ 28.

Response:

Uncontroverted, with the clarifications provided in our response to number 8, and in "Finding 1" of the audit report.

55. In addition, the Government assessed interest and penalty charges of $15,476.68 on the amount described in Paragraph 54. Continental paid that $15,476.68 to the Government on or about January 5, 2005. Bowman Decl. ¶ 29.

Response:

The stated amounts of Continental's interest liability and payment are again incorrect. See Def. App. 30-31 (Ford Decl. ¶ 6) ("audit 2"). The date is uncontroverted.

56. On or about February 27 through March 3, 2006, the Government audited Continental in connection with APHIS User Fee remittances for the period January 1, 2004 through September 30, 2005. Bowman Decl. at 49-50.

Response:

Generally uncontroverted. See our responses to numbers 4-8.

57. The Government auditors found that Continental remitted $38,486,753.34 in APHIS User Fees during the audit period. Bowman Decl. at 50.

Response:

Uncontroverted.

58. Using the sampling methodology described above, the Government's audit personnel audited Continental's passenger tickets for the audit period and concluded there were 4 "errors" out of 1,260 qualifying sampled tickets. Bowman Decl. at 52, 62-63.

Response:

Generally uncontroverted. See our responses to numbers 4-8. The error rate represents non-collection of the fee from approximately one out of every 315 covered passengers.

59. At the time of the audit, the Government auditors were aware that this Court had already held in American Airlines . . . that airlines are not liable for APHIS User Fees they do not collect from passengers. Bowman Decl. at 69.

Response:

See our response to number 36.

60. The Government's audit report states that 3 of these 4 "errors" represent instances where Continental collected but did not correctly remit the user fee. Bowman Decl. at 62.

Response:

Generally uncontroverted, although the audit report is the best evidence of its contents.

61. The Government's audit report states that the remaining "error" represents an instance where "Continental did not prove collection and remittance of the" user fee. Bowman Decl. at 62.

Response:

This is a paraphrase; the audit report is the best evidence of its contents. The auditors did not take steps to confirm Continental's admission of non-collection.

62. During the audit, Continental told the Government auditors that this "error" represented an instance where Continental had not collected a user fee from the passenger. Bowman Decl. at 51.

Response:

Generally uncontroverted. See our responses to numbers 4-8.

63. The Government auditors did not conduct any testing to verify Continental's claim that this user fee had not been collected from the passenger. Bowman Decl. at 51, 63.

Response:

Uncontroverted.

64. Despite this and despite knowing of this Court's holding in the American Airlines case, the Government auditors assessed a liability against Continental for this "error." Bowman Decl. at 51, 62-64.

Response:

Continental misstates the statistical conclusions of the audit. See our response to number 8, and our response to number 36 concerning American Airlines.

65. Specifically, the Government auditors computed an "error rate" of 0.08 percent based on this single "error." The auditors applied this "error rate" to the amount of APHIS User Fees remitted by Continental during the audit period and assessed an additional APHIS User Fee liability of $30,428.57.5 Bowman Decl. at 51, 62-64.

Response:

Generally uncontroverted. See our responses to numbers 4-8. The error rate represents non-collection of the fee from approximately one out of every 110 covered passengers.

66. In response to this assessment, on or about September 12, 2006, Continental paid this $30,428.57 to the Government (in addition to the other amounts assessed in the audit). After learning of this assessment, but before paying it, Continental explained to the Government auditors that it would pay the assessment, but that it believed this amount was being illegally exacted from it and that it reserved its rights to sue to recover such amount. Bowman Decl. ¶ 31; id. at 69.

Response:

Uncontroverted, with the clarifications in our response to number 8. For the other payments on the same date, see Def. App. 31 (Ford Decl.¶ 7 ).

67. In addition, the Government auditors found that "Continental failed to collect the correct amount for" the APHIS User Fee in connection with 3,111 passengers on flights by one of the charter companies that Continental contracts with. Bowman Decl. at 52, 66.

Response:

This paraphrase is generally accurate, although the audit report is the best evidence of its contents. The auditors took no steps to confirm Continental's admission of non-collection.

68. Specifically, although the amount of the user fee had increased from $3.10 to $4.95 during the audit period, the auditors found that only $3.10 was collected from covered passengers. Bowman Decl. at 66.

Response:

This is misleading. The Government accepted Continental's word for this. "[T]he auditor did not verify that Continental failed to collect the proper APHIS user fee amount from the passengers." Def. App. 80 (Nicholson Decl. ¶ 18). Indeed, the auditor did not review the actual tickets in question. See Def. App. 79 (Nicholson Decl. ¶ 13).

69. For each of the 3,111 passengers, the Government assessed an additional liability against Continental for the $1.85 difference between the $4.95 APHIS User Fee and the $3.10 actually collected from the passengers. Bowman Decl. at 66-67.

Response:

Generally uncontroverted, with the clarifications in our response to number 8 and 68, although the audit report is the best evidence of its contents.

70. The total amount of this assessment was $5,755.35 ($1.85 times 3,111). Bowman Decl. at 66-67.

Response:

Generally uncontroverted, with the clarifications in our response to number 8 and 68, although the audit report is the best evidence of its contents.

71. The $1.85 assessed against Continental for each of these 3,111 passengers represents user fee amounts that were not collected from the passengers. Bowman Decl. at 66-67.

Response:

This proposed finding is unsupported, as there is no showing that Mr. Bowman possesses personal knowledge. See RCFC 56(h)(1). See also our response to number 68. Should the Court deem this proposed finding supported and relevant, we should be allowed to conduct discovery, pursuant to RCFC 56(f), before Continental's motion is decided.

72. In response to this assessment, on or about September 12, 2006, Continental paid this $5,755.35 to the Government (in addition to the other amounts assessed in the audit). After learning of this assessment, but before paying it, Continental explained to the Government auditors that it would pay the assessment, but that it believed this amount was being illegally exacted from it and that it reserved its rights to sue to recover such amount. Bowman Decl. ¶ 31; id. at 69.

Response:

The second sentence is a paraphrase; the correspondence is the best evidence of its contents. That said, this proposed finding is generally uncontroverted, with the clarifications provided in our responses to numbers 8 and 68.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
by Bryant G. Snee
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:

ANDREW S. KOSEGI
Attorney
U.S. Customs and Border Protection
Indianapolis, IN

CYNTHIA A. KOCH
Senior Counsel
United States Department of Agriculture
Washington, DC

March 21, 2007

CERTIFICATE OF FILING

I certify under penalty of perjury that the attached document was filed electronically with the Court on March 21, 2007. Service is complete upon filing and the document may be accessed through the Court's electronic system.

s/Kyle Chadwick