IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF DAUNE ROBINSON

I, Daune Robinson, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I have a Bachelor's degree in Accounting from San Diego State University, and over the last 19 years have worked as an auditor, a computer audit specialist, an assistant field director, a field director, and a field oversight director. Through each of these positions, I have gained extensive experience performing financial audits, which involve the review of trial balance activity, general ledger accounts and entries, and financial statements.

3. I am currently employed by the Department of Homeland Security, U.S. Customs and Border Protection ("CBP") as a Supervisory Auditor in the Office of Finance, Financial Management Division. In this capacity, I have been establishing the protocols and performing reviews to verify eligibility, including the review of financial information and qualifying expenditures for amounts distributed, of affected domestic producers under the Continued Dumping and Subsidy Offset Act program.

4. Prior to transferring to the Financial Management Division, I served as the Director of Field Oversight in the Regulatory Audit Division. I worked for the Regulatory Audit Division for 18 years and in my capacity as the Director of Field Oversight for around 4 years. In that capacity, I was responsible for the actions of approximately 150 auditors and for overseeing approximately 200 audits of different types annually. The types of audits I oversaw included financial audits, performance audits, fraud audits, user fee audits, and other forms of audits.

5. As the Director of Field Oversight, I oversaw the user fee audit of Continental Airlines ("Continental") performed by Mr. Frank Andreu ("auditor"), a contract member of my staff, on May 10-14, 2004, for the period covering January 1, 2002, through December 31, 2003. This user fee audit was conducted for CBP and the

U.S. Department of Agriculture-APHIS ("APHIS") regarding several fees. Although the audit covered many types of fees, my declaration will be limited in scope to that portion of the audit covering the immigration and APHIS international air passenger user fees (collectively referred to as "user fee").

6. For this Continental user fee audit, as was typically the case, our office worked with Continental Airlines months prior to the on-site review to select flights that were representative of Continental's typical flight pattern as to passenger volume, port of entry, and overall number of flights. Consistent with prior practice, at least one flight was selected for each quarter. On March 22, 2004, our office sent an engagement letter to Continental indicating what documents our office expected to be available for the review, including the tickets from the selected flights previously discussed with Continental.

7. For this user fee audit, as was generally the case, our office utilized a sampling methodology whereby we would select a fixed number of Continental's flights and review all the qualifying tickets of the selected flights for evidence of user fee collection. [A "qualifying ticket" is one for which user fee collection would have been required.]

8. To my knowledge, this is the same methodology previously used by the auditors in the other audits at issue in this case. In addition, until Continental filed its original complaint to recover the user fee liability resulting from this audit, I was never aware that Continental had any concerns or raised any objections about the user fee audit methodology outlined herein.

9. There were at least two purposes for the sampling methodology utilized in the Continental user fee audit: (1) to ensure that Continental remitted to the Government a user fee for every ticket for which there was evidence that Continental had collected such user fee; and (2) to assess a liability if there were any qualifying tickets for which Continental failed to demonstrate that a user fee was collected.

10. During the audit, if the auditor identified a qualifying ticket that failed to evidence collection of the user fee, the ticket would be considered a "potential error." The auditor would then provide Continental with the opportunity to present evidence that Continental had collected the user fee for the "potential error" ticket. This typically was accomplished either by demonstrating that the user fee had been collected in some other way (e.g., in the miscellaneous tax portion of the ticket) or that no user fee was owed for that ticket (e.g., it was an exchanged ticket where the user fee was already paid for that passenger's travel on the original ticket issued). If Continental provided evidence of user fee collection for a "potential error" ticket, the auditor would then ensure that the collected user fee was properly remitted to the Government. If there was evidence that the collected user fee was properly remitted to the Government, the "potential error" ticket was removed from the potential error list and was treated as having had the user fee properly collected and remitted.

11. If Continental failed to present evidence that the user fee was collected for a "potential error" ticket, the ticket would then be considered to represent an "error." In addition, if Continental failed to demonstrate that a user fee that had been collected for a ticket was remitted to the Government, this too would be considered an "error."

12. All errors of a certain type (e.g., those errors for fees collected but not remitted and those errors for which no evidence of collection was presented) were then extrapolated across Continental's qualifying tickets from the selected flights to arrive at a finding of liability. Specifically, the "error rate" was calculated by taking the total number of a given type of errors during the review period and dividing it by the number of qualifying tickets in the selected flights that had been reviewed. Our office would then take the error rate for each quarter and multiply it by Continental's total user fee remittances from that quarter to arrive at the liability finding due for that quarter. We arrived at a total liability finding by adding together the amounts due for each quarter of the review.

13. When Continental failed to produce evidence that a user fee was collected for a qualifying ticket, the auditor would accept Continental's statement that no such user fee was collected and would not verify Continental's assertion. Thus, if Continental had collected the user fee but failed to disclose such a user fee collection for whatever reason (e.g., poor accounting), the auditor would not have known about it.

14. A goal of the audit was to ensure that a liability was assessed and a payment was received for those qualifying tickets for which Continental should have collected a user fee. Once Continental agreed to make payment, CBP viewed this payment as an admission of liability; and, therefore, at the time of the audit, there was no need for the auditor to verify whether Continental's statement concerning non-collection was accurate. Because of this mutual understanding between Continental and CBP, it did not occur to CBP that Continental would later contest its user fee liability.

15. Had a timely challenge to the audit methodology been made by Continental, CBP could have, and almost certainly would have, taken earlier actions to clarify that it is lawful to require Continental (as well as all international air carriers) to remit international air passenger fees that it did not collect. In addition, short of performing a complete financial audit as detailed below, CBP could have heightened its internal control review of Continental to pinpoint potential problem areas. This type of audit would have been very similar to the types of audits performed by my office to verify importer compliance.

16. In order to demonstrate that Continental actually failed to collect and/or to remit a user fee for each qualifying ticket from each of the audits at issue in this case, an auditor would have needed to perform an extensive financial audit, which would involve obtaining copies of all trial balance activities, general ledger accounts and entries, and financial statements for the time periods at issue. Noting the activity from the trial balances, the auditor would then have to review each unexplained entry in the

general ledger accounts and determine whether that entry might contain a user fee. Given that Continental will have multiple general ledger accounts and each account likely would contain multiple entries that are unexplained, a financial audit of this nature would be extremely costly (for both Continental and the Government) and take at least one year to complete.

17. To my knowledge, at no time during this user fee audit or at any time thereafter did Continental ever present to my staff any information about passengers who refused to pay the immigration user fee, as required by 8 C.F.R. § 286.4(c), such as the passenger's full name, complete address, nationality, passport number, and alien file number. As far as I am aware, Continental has never presented to the Immigration and Naturalization Service nor to CBP such information about passengers allegedly refusing to pay the fee.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 16th day of March 2007.

[signature]
Daune Robinson 3/16/07

330 Second Ave. South, Suite 320
Minneapolis, MN 55401

U.S. Customs and
Border Protection

January 11, 2006

Mr. David Bowman
Director, Operating Taxes
Continental Airlines, Inc.
P.O. Box 4607 HQSTX
Houston, Texas 77210-4607

Dear Mr. Bowman,

This letter confirms arrangements made on January 10, 2006, by Mr. Eric Robertson, U.S. Customs and Border Protection (CBP), Regulatory Audit Division, to conduct a compliance review of the Immigration User Fee (IUF), the Customs Passenger Processing Fee (PPF), and Animal, Plant and Health Inspection Service (APHIS) passenger and landing fees collections by Continental Airlines, Inc. for the inspection of passengers and aircraft arriving into the United States. The review will cover the period from January 1, 2004, to September 30, 2005, for the IUF, PPF, and APHIS fees and will be performed at your offices in Houston, Texas, from February 27, 2006, to March 3, 2006, by Mr. Eric Robertson.

The objectives of this review are to: 1) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and 2) determine air carrier liability, when applicable.

The review will verify:

- the quarterly reports submitted by the company to the financial records;
- the quarterly reports and records to the manifest reporting process;
- the reports provided to the U.S. Department of Transportation (DOT) and remittances to each agency; and
- the number passengers for interline, code share, charter, etc. passengers.

Failure to provide requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the following requested data before the audit date and have the items available at or before the entrance conference, preferably in electronic format. Also, please be aware that this is a preliminary request for data, data requested is not necessarily limited to the following, and additional requests for information may be submitted.

1. All tickets lifted from passengers, electronic ticket facsimiles, the flight manifests, the general declaration, and the airport agent post-ticketing collection reports, and/or any other reports that will validate passenger sales and load, for the first flights arriving at the following airports, on the following dates.

| FLIGHT ARRIVAL DATE | FLIGHT # | AIRPORT |
|---|---|---|
| Wednesday, March, 22, 2004 | 1725 | MEX-IAH |
| Monday, June 21, 2004 | 019 | LGW-EWR |
| Wednesday, August 11, 2004 | 0006 | NRT-IAH |
| Friday, December 31, 2004 | 056 | CDG-EWR |
| Monday, January 24, 2005 | 2214 | YYZ-CVG |
| Sunday, May 15, 2005 | 47 | AMS-IAH |
| Saturday, July 23, 2005 | 85 | TLV-EWR |

2. The auditor coupons and the sales report for the following Airlines Reporting Corporation periods. Also the detail general ledger account reflecting the same sales activity.

| YEAR | BANK | MONTH | WEEK | CYCLE |
|---|---|---|---|---|
| 2005 | 04 | 08 | 4 | 1 |

3. Auditor coupons and sales report for August 31, 2005, for the airport ticket office (ATO) at Ciudad de Mexico (MEX) and for the New Jersey City Ticket Offices (CTO) for August 31, 2005. Also the detail general ledger account reflecting the same month's sales activity.

4. Auditor coupons and sales report for the Billing and Settlement Plan (BSP) sales for Mexico for the second half of August 2005. Also, the detail general ledger account reflecting the same month's sales activity.

5. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

6. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving into U.S. and territories only.

7. Copies of the T-100 data filings to DOT for the review period.

8. Copies of code-sharing agreements/alliances for the review period. A listing of all subsidiaries and what methods are utilized for remittance of user fees.

9. Full fee remittance history for each of the fees for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees should be available.

10. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business pleasure travel, internet sales, E-tickets, and any other sales method.

11. Company annual reports covering the review period.

12. Copies of internal audits performed on the subject of ticket sales and various governmental user fees and taxes collected.

13. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

14. One report of all student consolidator tickets issued for transportation on your airline, with destination of the United States by month and travel agent for the audit period. This report should include the tickets with airline ticket stock 000. Please include appropriate documents to trace these tickets to the remittances and a copy of any policy or protocol that demonstrates the method ensuring compliance with remittance requirements.

15. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects, and remits fees for the review period.

16. A report containing the company's fleet by tail numbers and plane types with corresponding seating configurations. Please identify the tail numbers and plane types for the planes with capacity of 64 or more seats and those under 64 seats.

As mentioned, the review will cover the period from January 1, 2004, through September 30, 2005. However, the Department of Homeland Security (DHS) retains the right to review and assess liability on areas of partial, sporadic, or non-remittance of the inspection user fees for a period of the past six years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff to resolve the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the applicable review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and liability at the exit conference. A final report will be issued after completion of the audit.

CBP and U.S. Department of Agriculture (USDA), APHIS are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed. DHS and APHIS retain the right to issue interest and any administrative charge assessments and/or penalties as considered appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from the CBP National Finance Center (NFC) for the IUF and PPF, and from the APHIS Collection Office for the APHIS related fees, in a separate mailing after the issuance of the final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

If you have any additional questions or need additional information please contact Eric Robertson at (612) 373-1260 x552, or via e-mail at eric.robertson@dhs.gov, to discuss the status of the compilation of the above information.

Sincerely,

John Nicholson
Assistant Field Director
Regulatory Audit Division

## 5. FINDING AND RECOMMENDATION

### a. FINDING 1: Error Rate on Sampled Flight Coupons

Of the 879 sampled ticket lifts that qualified for INS inspection user fees, Continental Airlines failed to collect IUF, or failed to allocate collected user fees to the proper authority, on 11 tickets. The associated error rate is 1.25%. When the error rate is applied to IUF collected and properly allocated during the period, an additional liability of $414,639 results.

**Recommendation:** United should remit the additional liability amount to the INS. (See Exhibit 1).

## 6. IUF LIABILITY

Continental Airlines should remit the net outstanding IUF liability of $414,639 as noted in 5a, above (see Exhibit 1), within 30 days.

Appendix #2 (missing page?)

Continental is still researching this matter. Per communication with Continental, the airline is being given additional 30 days to resolve the situation. Should Continental failed to meet the 30 days timeline, the difference of $1,181,128 in additional user fees should be submitted to the INS immediately.

*e. Lumping of User Fees / Taxes as "XT" on Ticket Lifts*

More than 25% of the ticket lifts without an indication of XY were lumped in with other user fees and taxes with an "XT" indication. It is recommended that Continental show the breakdown of XT on the face of each ticket.

## 5. IUF LIABILITY

Continental Airlines should remit the outstanding IUF liability of $425,848 as noted in Observation 4a, and 4b (see Exhibit 1), within 30 days. It was agreed that this finding would be sent to the airline as an interim finding prior to a final audit closure.

Also, as noted in observation 4c and d, should Continental fail to provide the requested detail listing of actual travel passes used as the basis of the adjusting entries made in November 2000 to its estimate for June 2000 travel passes, the additional liability of $1,181,128 should be remitted to the INS within 35 days receipt of this audit notification.

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and
Border Protection

MAR 22 2004

Mr. David Bowman
Manager, Domestic & International Taxes
Continental Airlines
P.O. Box 4607 HQSTX
Houston, Texas 77210-4607

Dear Mr. Bowman:

This letter confirms that the Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), Regulatory Audit Division (RAD), will conduct a compliance review of the Immigration User Fee (IUF), the Customs Passenger Processing Fee (PPF), and Animal, Plant and Health Services (APHIS) passenger and landing fees collections by Continental Airlines' for the inspection of passengers and aircraft arriving into the United States. The review will cover the period from January 1, 2002 through December 31, 2003, and will be performed at your office in Houston, Texas on May 10-14, 2004 by Carol Lynn Heatherly.

The objective of this review is threefold:

1) evaluate internal control adequacy and reliability of user fee collections, recording, reporting and remitting systems;
2) determine the company's compliance with regulations implementing user fee collections from international passengers arriving into the United States; and,
3) to partner with the company, providing information and advice to facilitate continued compliance with prevailing regulations.

The review will concentrate on validation of all funds due for the fees for the review period. To that end, the company must disclose the full number of sales, landings and passengers transported where the fees apply. The review will validate:

- the quarterly reports submitted by the company to the financial records of the company
- those reports and records to the manifest reporting process by the company
- the reports provided to DOT and remittances to each agency
- the amount or number of interline, code share, charter, etc. passengers and
- the number of inspections conducted by the government

We expect that the company will be able to validate its sales, transported passengers, net interline and code share sales, charters or any other entity involved in the fee collection process. In addition, the company will be expected to disclose all sales entities that support its financial records, including subsidiaries. Below we request a variety of information intended to allow us to validate company activity with regard to inspection and landing fees. We expect to work in cooperation with you and your staff, and if you are aware of more appropriate information to conduct this review, we request that you supply it.

The information requested below should be provided to the review team upon their arrival at your offices on the first day of the review in order to facilitate the review process and minimize interruptions to your day-to-day operation. Failure to provide the requested data may contribute to additional error findings, resulting in greater liability for the company. Thus, it is imperative that you compile the necessary data before the audit date.

1. Flight manifests, passenger statistic sheets, Advanced Passenger Information System, and/or any other reports that will validate passenger load by flight. Be prepared to validate the actual data that is the basis of your remittance process, with number of sales and passenger count on the flights. We ask that you query your operational database for the number of passengers and crew by date, flight number and location. If interline data is available, it will also be helpful in determining fee remittance responsibility for passenger loads.

| FLIGHT ARRIVAL DATE | FLIGHT # | AIRPORT |
|---|---|---|
| March 6, 2002 | 465 | Houston (IAH) |
| June 30, 2002 | 8 | Newark (EWR) |
| September 2, 2002 | 67 | Cleveland (CLE) |
| October 12, 2002 | 2 | Honolulu (HLU) |
| January 19, 2003 | 2983 | Miami (MIA) |
| May 11, 2003 | 1103 | Houston (IAH) |
| July 3, 2003 | 25 | Newark (EWR) |
| November 11, 2003 | 889 | Houston (IAH) |

2. The auditor coupons and the sales reports for the following Airlines Reporting Corporation periods. Also the detail general ledger account reflecting the same sales activity.

| YEAR | BANK | MONTH | WEEK | CYCLE |
|---|---|---|---|---|
| 2003 | 05 | 08 | 2 | 4 |

3. Auditor coupons and sales report for August 10, 2003 for the airport ticket office (ATO) at Houston and for the Newark City Ticket Offices (CTO) for August 31, 2003. Also the detail general ledger account reflecting the same month's sales activity.

4. Auditor coupons and sales report for the Billing and Settlement Plan (BSP) sales for Japan for the second half of August 2003. Also, the detail general ledger account reflecting the same month's sales activity.

5. A report of international charter flights/block ticket sales on scheduled/charter flights into the United States and territories for the review period. Include dates, passenger counts, and full itineraries. Please provide documentation of charter flight contracts that will indicate which entity is responsible for remitting user fees.

6. Flight statistics reports by airport (airport landing counts, including charter flights), date and total passenger count for the review period for flights arriving to U.S. and territories only. Provide the book of codes that explain the codes found on the schedules.

7. Copies of the T-100 data filings to U.S. Department of Transportation (DOT) for the review period. Be prepared to demonstrate how the numbers reported to DOT are determined and the parties responsible for reporting. Also, a listing of all flights under 50 passengers that were excluded from the DOT-100 reporting requirement.

8. Copies of Code-sharing agreements/alliances for the review period. A listing of all subsidiaries and what methods are utilized for remittance of user fees.

9. Full fee remittance history for each of the fees for the review period and the supporting documents used for determining the amount remitted, including summary sales or passenger reports, by month, that were used to support the remittances submitted. If applicable, copies of internal procedures for compiling and remitting the fees should be available.

10. Procedures and processes used to record, collect, and report user fees for frequent flyers, employee business pleasure travel, internet sales, E-tickets and any other sales method.

11. Company annual reports covering the review period.

12. Copies of internal audits and financial statement reports performed on the subject of ticket sales and various governmental user fees and taxes collected.

13. Copies of the general ledger showing where and how user fee liability is posted. Include any necessary documentation needed to trace the total user fee dollars from all sales sources to the general ledger accounts.

14. One report of all student consolidator tickets issued for transportation by or through your company, with destination of the United States by month and travel agent for the audit period. This report should include the tickets with airline ticket stock 000. Please include appropriate documents to trace these tickets to the remittances and a copy of any policy or protocol that demonstrates the method ensuring compliance with remittance requirements.

15. A report of all infants transported where tickets were not issued. This should include the process and policies regarding non-revenue lap children with a demonstration of how the carrier reports, collects and remits fees for the review period. Specific data demonstrating any non-revenue infants on the sample flights should be provided with the sample.

16. A monthly schedule of aircraft landings into the United States (all flights into the 50 United States, D.C., or Puerto Rico) for the review period, listed by port.

17. Detailed worksheet of prepaid trip passes for employee pleasure travel, which includes trip and buddy passes used by employees.

As mentioned, the review will cover the period from January 1, 2002 through December 31, 2003. However, DHS retains the right to review and assess liability on areas of partial, sporadic or non-remittance of the inspection user fees for a period of the past 6 years. In reviewing your data, if you find such a situation, alert the review team so that they can work with your staff in resolution of the issues. For the air passenger user fee, the lifted tickets from the sample selected will be audited. Any noncompliance rate resulting from auditing the sample of tickets will be extrapolated over the 24-month review period. The remittance history will be used as the basis for any additional liability assessment.

You will be given a copy of audit exceptions and be able to provide additional information which may clear any/all of those exceptions. For consideration, the additional information should be received by our staff 2-weeks post review, unless you obtain a written agreement to extend the timeframe. A final report will be issued after this timeframe.

DHS and USDA are authorized by Federal statute (Debt Collection Improvement Act of 1996) and regulation (31 CFR 901.9) to assess and collect interest and penalty amounts, in addition to principal on debts owed. The financial liability finding for the fees will represent findings regarding unremitted fees and error determinations and will not include interest or penalties. DHS and USDA retain the right to issue interest and any administrative charge assessments and/or penalties as deemed appropriate as a result of the findings in this audit. Any interest or charges will be issued directly from the DHS, CBP, National Finance Center (NFC) for the IUF and PPF, or from the USDA, APHIS Collection Office for the APHIS related fees, in a separate mailing after the issuance of the final audit report. Interest and penalties will be computed back to the period when the fees should have been remitted.

Please contact Carol Lynn Heatherly by May 3, 2004, to discuss the status of the compilation of the above information. If you have any additional questions or need additional information, please do not hesitate to contact Ms. Heatherly at (949) 770-7617.

Sincerely,

Daune I. Robinson
Director
Field Oversight Division I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF BARBARA BLESSING

I, Barbara Blessing, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I am currently employed by the Department of Homeland Security ("DHS"), Bureau of Immigration and Customs Enforcement ("ICE") as the Strategic Planning and Special Projects Officer. I have been standing up this office for the past few months. Prior to holding this position, I worked in the ICE-Office of Financial Management as the Director of Financial Operations for about one year and nine months and the Acting Director, ICE-Office of Financial Management for approximately one year.

3. Before ICE became part of DHS, I worked for the Department of Justice, Immigration and Naturalization Service ("INS"), where I served as the Director of the Compliance Division in the Office of Financial Management from around April 2000 through September 2003. I was then detailed to U.S. Customs and Border Protection ("CBP") from September 2003 until February 2004 to assist with the transition of the airline review program, which was transferred from INS to CBP.

4. In my capacity as Director of the Compliance Division, I was responsible for administering procedures to review airline carriers for compliance with immigration user fee regulations. In this capacity, I also served as the INS representative at routine meetings with the airline industry, including International Air Transport Association (IATA) and other regional conferences, to discuss compliance activities. In addition, I personally oversaw the compliance reviews, which also included assessing any outstanding immigration user fee liabilities. [Throughout this declaration, the terms "immigration user fee" and "user fee" are used interchangeably.]

5. While I was Director of the Compliance Division, I supervised two of the user fee audits of Continental Airlines ("Continental") at issue in this case, which were

performed by Mr. Muhamed Ayodeji ("auditor"), a contract member of my staff, as well as Shirley Harrison, an INS employee, who supported Mr. Ayodeji during these audits. The first Continental audit was performed from March 27 through March 30, 2001, and covered the period of April 1, 1999, through December 31, 2000. The second Continental audit was performed from August 5 through August 8, 2002, and covered the period of January 1, 2001, through December 31, 2001.

6. For these user fee audits, as was generally the case, our office utilized a sampling methodology whereby we would select a fixed number of Continental's flights and review all the qualifying tickets of the selected flights for evidence of user fee collection. [A "qualifying ticket" is one for which user fee collection would have been required.] There were also instances where certain categories of tickets, e.g. travel passes, where our office would consider segregating the treatment of certain tickets from the general methodology described herein. Based on negotiations with Continental, our office did in fact segregate the treatment of travel passes in the first Continental audit noted above.

7. Until Continental filed its original complaint to recover the user fee liability resulting from these audits, I was not aware that Continental had any concerns or raised any objections about the user fee audit methodology outlined herein. This was in spite of the fact that Mr. David Bowman, on behalf of Continental, was rather outspoken about other areas of concern during the user fee audits.

8. There were at least two purposes for the sampling methodology utilized in the Continental user fee audits: (1) to ensure that Continental remitted to the Government a user fee for every ticket for which there was evidence that Continental had collected such user fee; and (2) to assess a liability if there were any qualifying tickets for which Continental failed to demonstrate that a user fee was collected.

9. During the audits, if the auditor identified a qualifying ticket that failed to evidence collection of the user fee, the ticket would be considered a "potential error." The auditor would then provide Continental with the opportunity to present evidence that Continental had collected the user fee for the "potential error" ticket. This typically was accomplished either by demonstrating that the user fee had been collected in some other way (e.g., in the miscellaneous tax portion of the ticket) or that no user fee was owed for that ticket (e.g., it was an exchanged ticket where the user fee was already paid for that passenger's travel on the original ticket issued). If Continental provided evidence of user fee collection for a "potential error" ticket, the auditor would then ensure that the collected user fee was properly remitted to the Government. If there was evidence that the collected user fee was properly remitted to the Government, the "potential error" ticket was removed from the potential error list and was treated as having had the user fee properly collected and remitted.

10. If Continental failed to present evidence that the user fee was collected for a "potential error" ticket, the ticket would then be considered to represent an "error." In

addition, if Continental failed to demonstrate that a user fee that had been collected for a ticket was remitted to the Government, this too would be considered an "error."

11. All errors of a certain type (e.g., those errors for fees collected but not remitted and those errors for which no evidence of collection was presented) were then extrapolated across Continental's qualifying tickets from the selected flights to arrive at a finding of liability. Specifically, the "error rate" was calculated by taking the total number of a given type of errors during the review period and dividing it by the number of qualifying tickets in the selected flights that had been reviewed. Our office would then take the error rate for each quarter and extrapolate it against Continental's total user fee remittances from that quarter to arrive at the liability finding due for that quarter. We arrived at a total liability finding by adding together the amounts due for each quarter of the review.

12. When Continental failed to produce evidence that a user fee was collected for a qualifying ticket, the auditor would accept Continental's statement that no such user fee was collected and would not verify Continental's assertion. Thus, if Continental had collected the user fee but failed to disclose such a user fee collection for whatever reason (e.g., poor accounting), the auditor would not have known about it.

13. The sampling methodology outlined above was developed in collaboration with the airline industry in approximately 1997, before I took over the airline review program. In addition, while I was the program director, Continental participated in the INS User Fee Advisory Board, which regularly met to address issues concerning user fees. Never once during any meeting of the Advisory Board or during any of the reviews I supervised did Continental offer any objection to the methodology of the user fee reviews.

14. A goal of the audits was to ensure that a liability was assessed and a payment was received for those qualifying tickets for which Continental should have collected a user fee. Once Continental agreed to make payment, our office viewed this payment as an admission of liability; and, therefore, at the time of the audit, there was no need for the auditor to verify whether Continental's statement concerning non-collection was accurate. Because of this longstanding and mutual understanding between Continental and INS regarding Continental's liability for fees (whether collected from passengers or not), it did not occur to us that Continental would later contest its user fee liability for alleged non-collection of the user fees from passengers.

15. Had a timely challenge to the audit methodology been made by Continental, our office could have, and would have, taken earlier actions to clarify that it is lawful to require Continental (as well as all international air carriers) to remit international air passenger fees that it did not collect.

16. To my knowledge, at no time during these user fee audits or at any time thereafter did Continental ever present to INS any information about specific passengers – including those passengers from Central and South American countries –

who allegedly refused to pay the immigration user fee, as required by 8 C.F.R. § 286.4(c). Such required information would include the passenger's full name, complete address, nationality, passport number, and alien file number. As the program director, I would have been made aware of such passenger refusals if they had been presented to the auditor.

17. As I explained in my declaration in the American Airlines case, which has been referenced in this case, when my office stated in the Report of Compliance for Americans' review period of January 1, 2002, thru December 31, 2002, that "[t]he above 8 [South and Central American] countries were grouped together, since those countries prohibited ticket agents from collecting user fees/taxes for foreign countries at the time of ticket sale," this statement was not intended to represent the legal position of the federal government on this subject. Our office did not consult with government counsel to confirm the assertion regarding the laws of other countries made by American. Nor did our office intend to make a legal conclusion about the state of the law in other countries. Rather, we simply were relying on the representations made to us by American, our own observations about the higher than usual error rate for the selected Santo Domingo flight, and anecdotal information about these types of collection problems.

18. If Continental had submitted information about passengers refusing to pay them the user fees, INS would have followed its normal business practice. Specifically, the INS-Debt Management Center would have contacted the individual passenger to determine the reason for refusal to pay the user fee and would have pursued collection of the fee. If a passenger indicated that he or she had not refused to pay the fee or if the passenger indicated that the airline had not requested that the passenger pay the fee, INS would have sought additional information and/or payment from the airline.

19. If a passenger had, in fact, refused to pay and the information about that passenger had been submitted to INS by the airline as required by 8 C.F.R. § 286.4(c), then our office during a review would have checked the name of the passenger against the list of passengers with potential errors and removed that ticket, if it appeared, from the list of potential errors. In essence, if there a was a ticket that INS could verify that the passenger refused to pay the fee and the airline had provided INS with notice of the refusal, as required by 8 C.F.R. § 286.4(c), then our office would treat such a ticket as one for which the airline would not be required to remit the user fee.

20. In preparing this declaration, I was unable fully to review the INS Debt Management Center records or INS Compliance Division audits along with their support papers relating to airline user fees, which are now in the custody of CBP.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 20th day of March 2007.

Barbara Blessing

Mar 20 2007 7:55AM HP LASERJET 3392 p.6

**U.S. Department of Justice**
Immigration and Naturalization Service

Tax ID# 74-2099724

Carrier Compliance
*Dallas, Texas*

September 21, 2001

UF0126
IMMIGRATION USER FEE
INVOICE # DMC-IA-00416
FED. CODE 2
BATCH DATE & SUFFIX
9/21/01 301M
REC. AMT$ 425,848

MEMORANDUM FOR LOIS JARVIS
DEBT MANAGEMENT CENTER

FROM: Barbara Blessing
Director
Compliance Division

SUBJECT: Carrier Liability – FY 2001 Audit

Continental Airlines has been found to have liability in their Immigration User Fee remittances. A recent audit has been completed and found liability of $425,848. This is considered a partial liability as the audit still has an outstanding issue.

The Compliance Division is notifying the carrier of this liability on the attached. The carrier is asked to remit payment within thirty (30) days of the dated letter. In addition, we have notified them that the DMC may assess interest and penalties.

Please establish the necessary Accounts Receivable in accordance with regulatory requirements and notify the Compliance Division upon successful payment of this liability. We will utilize data from your unit to finalize our files on this carrier review.

Thank you.

Attachment(s)

Deposit # DMC-02-0524
SF-215 # 434588
Deposit Date 10/18/01
Batch Date/Suffix 663 U 10/24/01
Pay't Amt. 425,848.00

Page: 1 Document Name: untitled Continental Airlines

Audit

```
____ SDTD 3 THF SINGLE TRANSACTION DETAIL      01/10/19  7.3
MENU        CO      1 OP #JEH            MS 50852 ACTION COMPLETE
ACTION              COID                  ACCT COND
PROD CODE DDA      ACCT         1115146.   SHORT NAME IMMIGRAT & NATURALIZATI
(RVTR, RTTR, RVSC)                          (PF-04 FOR EXTENDED TEXT)
TRAN CODE  9589  DESCRIPTION INCOMING DOMESTIC MONEY TRANSFER
SUBPROD  P4    BRANCH  01111   BAI CD   195                      CURRENCY
POST DATE 101/10/18 TRACE ID FC011018007466      TIME 11.03.36 CURR DG  32
EFF DATE  101/10/18 OPERATOR MQSERIES            ENVMT        1 REV T/C  95
STMT DATE           TRAN NO  1018000002  POST SEQ        2    SOURCE    MT
SYS DATE  101/10/18 SERIAL # 1018007466  TXN BRANCH              SOURCE TYPE
TRAN AMOUNT           425,848.00  MATCHED REVERSAL  N  NUMBER CREDITS
CASH AMOUNT                       MATCHED STMT REV  N  NUMBER DEBITS
CURR AMOUNT                       PD INTO OVERDRAFT    NO LOCAL DEPOSITS
COLL BAL            2,282,892.87  TRANSACTION TYPE  C  NO FOREIGN DEP
CURR BAL            2,284,184.87  TRANS SIGN        1  XFER TO APPL ID
FLOAT AMT0                        INTERNAL GEN         XFER TO TRAN CODE
FLOAT AMT1                        STMT REVERSAL     N  XFR TO ACT
FLOAT AMT2                        GLI SOURCE        W  XFER FROM APPL ID
FLOAT AMT3                        DEP/WD IND        D  XFER FROM TRAN CODE
FLOAT AMT4                        PAPER ITEM        N  XFR FR ACT
FLOAT AMT5                        COUNT FOR STMT    Y  LOC INT COLL
FLOAT AMT6                        FORCE PAID           LOC INS COLL
FLOAT AMT7                        CAPT CTR             ORIG CURR
```

DHC-IA-0046

Date: 10/19/2001 Time: 07:30:50 AM