IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONTINENTAL AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-432C |
| v. | ) | (Judge Margolis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN PATRICK NICHOLSON

I, John Patrick Nicholson, hereby declare as follows:

1. I am over the age of 18 years and competent to testify to the following facts, of which I have personal knowledge.

2. I graduated with High Honors from De Paul University with a Bachelor of Science degree, majoring in Accounting. I have worked for the federal government for the last 26 years. I am a certified public accountant (CPA), licensed in the State of Illinois since 1981.

3. My first three years of federal government service were with the Internal Revenue Service, where I worked as a revenue agent (which is like an auditor). Over the last 23 years, I have worked for U.S. Customs and Border Protection, which previously, in part, was the U.S. Customs Service. Specifically, over the last 23 years, I have worked for the Regulatory Audit Division as an Auditor, Senior Auditor, Supervisory Auditor, and as an Assistant Field Director. Through each of these positions, I have gained extensive experience performing financial audits, which involve the review of trial balance activity, general ledger accounts and entries, and financial statements.

4. I am currently employed by the Department of Homeland Security, U.S. Customs and Border Protection ("CBP") as an Assistant Field Director, Minneapolis Branch, Chicago Field Office, in the Office of Regulatory Audit ("ORA"), formerly known as the Regulatory Audit Division. I have held this position for around 5 years. In this capacity, I am responsible for managing audit assignments to meet CBP's mission in accordance with the audit plan established by ORA in a timely manner. I am responsible for ensuring that audits are reliable and meet professional standards of quality, including the Generally Accepted Government Auditing Standards (GAGAS).

5. As the Assistant Field Director, I supervised the user fee audit of Continental Airlines ("Continental") that had on-site work performed by Kristin Simonson

77

and Eric Robertson (collectively referred to as "auditor"), members of my staff, between February 27, 2006, through March 3, 2006, for the period covering January 1, 2004, through September 30, 2005. Even though the on-site portion of the audit was completed in March 2006, our office continued working in close contact with Continental until the final audit report was issued on August 29, 2006. This user fee audit was conducted for CBP and the U.S. Department of Agriculture-Animal and Plant Health Inspection Service ("APHIS") regarding several types of fees. Although the audit covered many types of fees, my declaration will be limited in scope, unless otherwise noted, to that portion of the audit covering the immigration and APHIS international air passenger user fees (collectively referred to as "user fee").

6. For this Continental user fee audit, as was typically the case for the user fee audits, our office worked with Continental Airlines several months prior to the on-site review to select flights that were representative of Continental's typical flight pattern as to passenger volume, port of entry, and overall number of flights. Consistent with prior practice, at least one flight was selected for each quarter. On January 11, 2006, our office sent an engagement letter to Continental indicating what documents our office expected to be available for the review, including the tickets from the selected flights previously discussed with Continental.

7. For this Continental user fee audit, as was generally the case in user fee audits, our office utilized a sampling methodology whereby we would select a fixed number of Continental's flights and, after removing any tickets issued by other airlines, review all the tickets issued by or on behalf of Continental of the selected flights for evidence of user fee collection. These are referred to as "qualifying tickets," or those tickets for which user fee collection would have been required. To my knowledge, this is the same methodology previously used by the auditors in the other audits at issue in this case. This general methodology does not specifically apply to the review of Continental's charter flights, which will be addressed below separately.

8. In general, the objective of the audit was to determine the company's compliance with statutes and regulations pertaining to the collection and remittance of the user fees and to quantify any monetary impact. To this end, there were at least two purposes for the sampling methodology utilized in the Continental user fee audit: (1) to ensure that Continental remitted to the Government a user fee for every ticket for which there was evidence that Continental had collected such user fee; and (2) to assess a liability if there were any qualifying tickets for which Continental failed to demonstrate that a user fee was collected.

9. During the audit, if the auditor identified a qualifying ticket that failed to evidence collection of the user fee, the ticket would be considered a "potential error." The auditor would then provide Continental with the opportunity to present evidence that Continental had collected the user fee for the "potential error" ticket. This typically was accomplished either by demonstrating that the user fee had been collected in some other way (e.g., in the miscellaneous tax portion of the ticket) or that no user fee was owed for that ticket. If Continental provided evidence of user fee collection for a

"potential error" ticket and there was evidence that the collected user fee was properly remitted to the Government, the "potential error" ticket was removed from the potential error list and was treated as having had the user fee properly collected and remitted.

10. If Continental failed to present evidence that the user fee was collected for a "potential error" ticket, the ticket would then be considered to represent an "error." In addition, the auditor would follow-up with Continental to request Continental's explanation for the alleged non-collection. Moreover, if Continental failed to demonstrate that a user fee that had been collected for a ticket was remitted to the Government, this too would be considered an "error" (i.e., fee collected but not remitted).

11. All errors of a certain type (e.g., those errors for fees collected but not remitted and those errors for which no evidence of collection was presented) were then extrapolated across Continental's qualifying tickets from the selected flights to arrive at a finding of liability. Specifically, the "error rate" was calculated by taking the total number of a given type of errors during the review period and dividing it by the number of qualifying tickets in the selected flights that had been reviewed. Our office would then take the error rate for each quarter and extrapolate it (after a series of calculations) against Continental's total user fee remittances from that quarter to arrive at the liability finding due for that quarter. We arrived at a total liability finding by adding together the amounts due for each quarter of the review.

12. When Continental failed to produce evidence that a user fee was collected for a qualifying ticket, the auditor would accept Continental's statement that no such user fee was collected and would not verify Continental's assertion. Thus, if Continental had collected the user fee but failed to account for such a user fee collection for whatever reason (e.g., improper accounting entry), the auditor would not have known about it.

13. At the time of the audit performance, there was still no apparent need for the auditor to verify whether Continental's statement concerning non-collection was accurate. At no time during the performance of the audit did Continental raise any objection to the audit methodology. Nor did Continental provide any indication during the performance of the audit that it believed it was not liable for allegedly uncollected fees. Rather, it was not until Continental filed its original complaint on May 31, 2006, to recover allegedly uncollected user fee payments that our office first became aware that Continental objected to the audit methodology. At this late point, our office had almost completed the audit work and had nearly completed the draft audit report.

14. While our office was aware that, before this user fee audit of Continental began, American Airlines had filed a similar complaint to the one later filed by Continental, we also knew that the American case was not final, was in all likelihood going to be appealed by the Government once it became final, and that it only directly applied to American Airlines anyway.

79

15. Had a timely challenge to the audit methodology been made by Continental, CBP could have, and almost certainly would have, taken earlier actions to clarify that it is lawful to require Continental (as well as all international air carriers) to remit international air passenger fees that it did not collect. In addition, short of performing a complete financial audit as detailed below, CBP could have heightened its internal control review of Continental to pinpoint potential problem areas. This type of audit would have been very similar to the types of audits performed by my office to establish importer fraud or negligence, where a detailed review is needed to identify all areas with potential errors or omissions.

16. In order to demonstrate that Continental actually failed to collect and/or to remit a user fee for each qualifying ticket from each of the audits at issue in this case, an auditor would have needed to perform an extensive financial audit, which would include obtaining copies of all trial balance activities, general ledger accounts and entries, financial statements, and other pertinent records for the time periods at issue. Noting the activity from the trial balances, the auditor would then have to review each unexplained entry in the general ledger accounts and determine whether that entry might involve a user fee. Given that Continental will have multiple general ledger accounts and each account likely would contain multiple entries that potentially involve user fees, a financial audit of this nature would be extremely costly (for both Continental and the Government) and take at least one year to complete.

17. To my knowledge, at no time during this user fee audit or at any time thereafter did Continental ever present to my staff any information about passengers who refused to pay the immigration user fee, as required by 8 C.F.R. § 286.4(c), such as the passenger's full name, complete address, nationality, passport number, and alien file number. As far as I am aware, Continental has never presented to the Immigration and Naturalization Service nor to CBP such information about passengers allegedly refusing to pay the fee. In addition, at no time during the user fee audit or at any time thereafter did Continental ever present to my staff any information about passengers who refused to pay the APHIS user fee.

18. For our office's review of the charter flights, the auditor selected multiple charter flights and reviewed the sales report data (not the tickets) for the selected flights. According to the information we reviewed, for one particular type of charter flight, the sales report data did not show that the proper amount of the APHIS fee had been collected, i.e., $3.10/ticket had apparently been charged the passengers instead of the proper amount of the fee, which was $4.95/ticket. Because of this "error," our office then reviewed all similar types of charter flights to determine whether the error was recurring. After completely reviewing the similar charter flights, the auditor determined that the difference from the incorrect fee and the correct fee (of $1.85) was due for 3,111 tickets, resulting in a total outstanding APHIS user fee liability for charter flights of $5,755.35. As with the general methodology described above, the auditor did not verify that Continental failed to collect the proper APHIS user fee amount from the passengers.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 16th day of March 2007.

John Patrick Nicholson

John Patrick Nicholson

81